

AO 241
(Rev. 01/15)

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

Page 2

APR 0 6 2022

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
DEPUTY CLERK

| **United States District Court** | District: | EASTERN DISTRICT |
|---|---|---|

| Name (under which you were convicted): ROBERT HENRY | Docket or Case No.: 2:22 CV-0609 DB (HC) |
|---|---|

| Place of Confinement : California health Care Facility | Prisoner No.: D32467 |
|---|---|

| Petitioner (include the name under which you were convicted) ROBERT HENRY v. | Respondent (authorized person having custody of petitioner) ROBERT BURTON |
|---|---|

| The Attorney General of the State of: CA.   ROB BONTA |
|---|

## PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging:

Solano County Superior Court
600 Union Ave

FairField, Ca. 94533

   (b) Criminal docket or case number (if you know): VC19726

2. (a) Date of the judgment of conviction (if you know): May 19, 1986

   (b) Date of sentencing: June 16, 1986

3. Length of sentence: Life Without the Possibility of Parole

4. In this case, were you convicted on more than one count or of more than one crime? ☒ Yes   ☐ No

5. Identify all crimes of which you were convicted and sentenced in this case: penal code 187, 190.2(a)
   (1); health & safety code 11350

6. (a) What was your plea? (Check one)

   ☒ (1) Not guilty   ☐ (3) Nolo contendere (no contest)

   ☐ (2) Guilty   ☐ (4) Insanity plea

AO 241
(Rev. 01/15)

Page 3

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did
you plead guilty to and what did you plead not guilty to?    petitioner plead guilty to
the health & and safety code ~~violation 11350 and~~
not guity on
the murder charge.

(c) If you went to trial, what kind of trial did you have? (Check one)

☒ Jury    ☐ Judge only

7.    Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☒ Yes    ☐ No

8.    Did you appeal from the judgment of conviction?

☒ Yes    ☐ No

9.    If you did appeal, answer the following:

(a) Name of court:    california court of appeal 1st appellate dist. div.4

(b) Docket or case number (if you know): A035447

(c) Result:    affirmed

(d) Date of result (if you know):    September, 1988

(e) Citation to the case (if you know):    People v. Robert henry, A035447

(f) Grounds raised:    insufficiency of evidence; exclusion of evidence;
several jury ~~instruction violations; and evidentiary errors.~~

(g) Did you seek further review by a higher state court?    ☒ Yes    ☐ No

If yes, answer the following:

(1) Name of court:    California Supreme Court

(2) Docket or case number (if you know):    S007648

(3) Result:    Review denied

(4) Date of result (if you know):    December 22, 1988

AO 241
(Rev. 01/15)                                                                                          Page 4

(5) Citation to the case (if you know):          People v. Robert Henry

(6) Grounds raised:          Jury Instruction Violation

_____

_____

_____

(h) Did you file a petition for certiorari in the United States Supreme Court?     ☐ Yes     ☒ No

If yes, answer the following:
                                                            N/A
(1) Docket or case number (if you know):     _____

(2) Result:     _____

_____

(3) Date of result (if you know):     _____

(4) Citation to the case (if you know):     _____

10.  Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?     ☒ Yes     ☐ No

11.  If your answer to Question 10 was "Yes," give the following information:

(a)  (1) Name of court:     Solano County Superior Court

(2) Docket or case number (if you know):     FCR333123

(3) Date of filing (if you know):     October 2017

(4) Nature of the proceeding:     habeas corpus petition

(5) Grounds raised:     newly discovered evidence of actual innocence

_____

_____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☒ Yes     ☐ No

(7) Result:     denied

(8) Date of result (if you know):     December 30, 2019

AO 241
(Rev. 01/15)

Page 5

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court:   Court of Appeal first appellate district, Div.4

(2) Docket or case number (if you know):   A150637

(3) Date of filing (if you know):   July 31, 2020

(4) Nature of the proceeding:   habeas corpus petition

(5) Grounds raised:   Newly Discovered Evidence required a

New Trial; and False Evidence was used to convict
Petitioner.

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☒ No

(7) Result:   Denied

(8) Date of result (if you know):   September 29, 2021

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court:   California Supreme Court

(2) Docket or case number (if you know):   S271618

(3) Date of filing (if you know):   November 4, 2021

(4) Nature of the proceeding:   habeas corpus petition

(5) Grounds raised:   1) Newly discovered Evidence of innocence
2) Brady violation 3) False Evidence 4)prosecutor misconduct
5)Transfered intent Instruction violation 6)ineffective
assistence of counsel

AO 241
(Rev. 01/15)                                                                                      Page 6

    (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

       ☐ Yes   ☑ No

    (7) Result:    *DENIED  (ON THE MERITS)*

    (8) Date of result (if you know):    *MARCH 23, 2022*

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application,

or motion?

    (1) First petition:   ☑ Yes   ☐ No

    (2) Second petition:   ☑ Yes   ☐ No

    (3) Third petition:   ☑ Yes   ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

                N/A

12.    For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

    **CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

**GROUND ONE:**              SEE APPENDIX OA

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

                SEE APPENDIX OA

(b) If you did not exhaust your state remedies on Ground One, explain why:

                N/A

AO 241
(Rev. 01/15)                                                                                           Page 7

(c)     **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?        ☐ Yes      ☒ No

(2) If you did not raise this issue in your direct appeal, explain why:  New Evidence that was
revealed after the conviction was final.


(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes     ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:        habeas petition

Name and location of the court where the motion or petition was filed:  Solano County Superior
Court, 600 union ave. FairField,Ca. 94533

Docket or case number (if you know):     FCR333123

Date of the court's decision:      December 30, 2019

Result (attach a copy of the court's opinion or order, if available):     denied


(3) Did you receive a hearing on your motion or petition?                          ☒ Yes      ☐ No

(4) Did you appeal from the denial of your motion or petition?                     ☒ Yes      ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  ☒ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:     First appellate district, Div.4


Docket or case number (if you know):       A160596

Date of the court's decision:       September 29, 2021

Result (attach a copy of the court's opinion or order, if available):     Denied

(SEE APPENDIX A)


(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

N/A

AO 241
(Rev. 01/15)

Page 8

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have

used to exhaust your state remedies on Ground One:     A habeas corpus was filed in the
California Supreme Court.

**GROUND TWO:**                    SEE APPENDIX OA

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

SEE APPENDIX OA

(b) If you did not exhaust your state remedies on Ground Two, explain why:

N/A

(c)   **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?        ☐  Yes      ☒  No

(2) If you did not raise this issue in your direct appeal, explain why:    New Evidence that was
revealed after the conviction was final.

(d)   **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes    ☐  No

(2) If your answer to Question (d)(l) is "Yes," state:

Type of motion or petition:        habeas corpus petition

Name and location of the court where the motion or petition was filed:      California Supreme Court.

Docket or case number (if you know):        S271618

Date of the court's decision:        MARCH 23, 2022

AO 241
(Rev. 01/15)                                                                                   Page 9

Result (attach a copy of the court's opinion or order, if available):    *denied*

_____ *(SEE APPENDIX C )* _____

(3) Did you receive a hearing on your motion or petition?                 ☐ Yes    ☒ No

(4) Did you appeal from the denial of your motion or petition?            ☐ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☐ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

(e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Two :    habeas corpus in the
        California Supreme Court. _____

_____

_____

**GROUND THREE:**                              SEE APPENDIX OA

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

                        SEE APPENDIX OA

_____

_____

_____

_____

_____

_____

_____

AO 241
(Rev. 01/15)

Page 10

(b) If you did not exhaust your state remedies on Ground Three, explain why: _ALL GROUNDS IN THIS_

_PETITION HAS BE EXHAUSTED_     _(SEE APPENDIX C )_

N/A

(c)   **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?   ☐ Yes   ☒ No

(2) If you did not raise this issue in your direct appeal, explain why:   New evidence was revealed
after conviction was final.

(d)   **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes   ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:   habeas corpus

Name and location of the court where the motion or petition was filed:   California Supreme Court.

Docket or case number (if you know):   S271618

Date of the court's decision:   _MARCH 23, 2022_

Result (attach a copy of the court's opinion or order, if available):   _DENIED_

(3) Did you receive a hearing on your motion or petition?   ☐ Yes   ☒ No

(4) Did you appeal from the denial of your motion or petition?   ☐ Yes   ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☐ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes." state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

AO 241
(Rev. 01/15)

Page 11

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Three:   habeas corpus in the
California Supreme Court.

_____

**GROUND FOUR:**                    SEE APPENDIX 0A

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

SEE APPENDIX 0A

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why:   _____

N/A

_____

_____

(c)   **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?          ☐  Yes       ☒  No

(2) If you did not raise this issue in your direct appeal, explain why:    new evidence was revealed
after conviction was final.

_____

(d)   **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒  Yes      ☐  No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:            habeas corpus petition.

AO 241
(Rev. 01/15)

Page 12

Name and location of the court where the motion or petition was filed: California Supreme Court

Docket or case number (if you know): S271618

Date of the court's decision: _MARCH 23, 2022_

Result (attach a copy of the court's opinion or order, if available): _(DENIED ON THE_

_MERITS)_

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☑ No

(4) Did you appeal from the denial of your motion or petition? ☐ Yes ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☐ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

N/A

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Four: _HABEAS CORPUS_

AO 241
(Rev. 01/15)

Page 13

13. Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court

having jurisdiction?   ☒ Yes   ☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not

presenting them:   N/A

(b) Is there any ground in this petition that has not been presented in some state or federal court? If so, which

ground or grounds have not been presented, and state your reasons for not presenting them:

none of these grounds in Appendix OA have been raised in the federal court because all of these grounds are

products of newly discovered evidence that was revealed in 2019

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction

that you challenge in this petition?   ☒ Yes   ☐ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues

raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy

of any court opinion or order, if available.   yes, federal district court,eastern district

of california, Case No. Civ S-94-0916 JKS EFB P, habeas corpus .
based on newly discovered evidence of actual innocence.
denied Sepetember 2010.

(SEE APPENDIX B)

15. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for

the judgment you are challenging?   ☒ Yes   ☐ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues

raised.   habeas corpus in the california court of appeal

AO 241
(Rev. 01/15)

Page 14

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: Jerry O'Hanlon, solano county public defenders office, vallejo, ca. 94590. (retired)

(b) At arraignment and plea: same as above

(c) At trial: same as above

(d) At sentencing: same as above

(e) On appeal: William D. Farber, appellate court appointee. address unknown

(f) In any post-conviction proceeding: Leslie Prince, one harborcenter, suite 230 Suisun city, ca. 94585

(g) On appeal from any ruling against you in a post-conviction proceeding: Matthew Alger, P.O. Box 3735, Oakhurst, Ca. 93644

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? ☐ Yes ☒ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

N/A

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future? ☐ Yes ☐ No

18. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

Petitioner's petition herein filed was filed based on newly discovered evidence that came into existence in 2019 and had exhausted his state remedies within a year of obtaining the new evidence.

Further, petitioner's petition is based on Newly Discovered Evidence that demonstrate his actual innocence pursuant to both, Herrera v. Collins, 506 U.S 390 and Schlup v. Delo, 513 U.S. 298.

which may exclude any procedural bar.

AO 241
(Rev. 01/15)

Page 15

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in

part that:

(1)     A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in
        custody  pursuant to the judgment of a State court. The limitation period shall run from the latest of -

        (A)     the date on which the judgment became final by the conclusion of direct review or the expiration
                of the time for seeking such review;

        (B)     the date on which the impediment to filing an application created by State action in violation of
                the Constitution or laws of the United States is removed, if the applicant was prevented from
                filing by such state action;

        (C)     the date on which the constitutional right asserted was initially recognized by the Supreme Court,
                if the right has been newly recognized by the Supreme Court and made retroactively applicable to
                cases on collateral review; or

        (D)     the date on which the factual predicate of the claim or claims presented could have been
                discovered through the exercise of due diligence.

AO 241
(Rev. 01/15)

Page 16

(2)     The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief:     _A NEW TRIAL OR_

_IMMEDIATE RELEASE,_

or any other relief to which petitioner may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on     _APRIL 4, 2022_ (month, date, year).

Executed (signed) on     _R. Gilardy_     (date).   _APRIL 4, 2022_

_____
Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

_N/A_

APPENDIX OA

GROUNDS 1 through 6

HABEAS CORPUS


EXCERPTS OF THE RECORDS

NOTE:"RT" REFERS to Reporters Transcripts in[people v. Robert Henry] case no. VC19726.

"RT...Brewer" REFERS to Reporters Transcripts in [ People v. FRANCIS LEE BREWER] case no. VC20218.

"Sup. ct. hr. tr." REFERS to Superior Court Evidentiary Hearing Transcript in In re Robert henry, case no. FCR333123.

" Evid. hr. Fed. tr." or "Fed. Evid. hr. tr." REFERS to Evidentiary Hearing Federal Transcripts or Federal Evidentiary hearing transcripts in Henry v. Marshall, case no. CIV. S-94-0916 JKS EFB P


TABLE OF CONTENTS OF APPENDIX'S AND EXHIBITS

APPENDIX A

APPENDIX B

APPENDIX B1

APPENDIX C
EXHIBIT 1

EXHIBIT 2

## STATEMENT OF THE CASE

On November 28,1986 a shooting took place in Vallejo,Ca., within 48 hours Robert Henry (hereafter, Petitioner) was arrested and charged with Murder.
The prosecutions theory was that Petitioner hire Francis Lee Brewer to kill a man name Cedric Turner (whom petitioner believed participated in a robbery of petitioner), and Mr. Brewer instead shot and killed Andre Johnson (Johnson), believing Johnson to be Cedric Turner.

The prosecution argued that petitioner was guilty of the Johnson Murder as an aider and abettor on the theory of Transfered Intent. On may 19,1986 petitioner was convicted of first degree murder with a special circumstance that the murder was carried out for financial gain pursuant to penal code 190.2 (a)(1).
Petitioner was sentenced to Life Without the Possibility of Parole on June 16, 1986. The court of appeal affirmed the conviction in a 1988 unpublished opinion. (People v. Henry (Sept.21,1988, A035447)
For the purposes of this habeas petition,petitioner will assume for the sake of argument the truth of the Statement of Facts outlined in the state courts opinion affirming petitioners conviction in 1988 in People v. Henry case no.A035447 (see Appendix A)
Petitioner assumes the truth of these facts only up to the point when Brewer and Bernard Oden arrive at the scene of the crime and petitioner pointed out Cedric Turner to Brewer stating"that's the guy". [The rest of the facts in the statement of facts are in dispute,]based on NEWLY DISCOVERED EVIDENCE AND THE REVEALING OF FALSE EVIDENCE THAT WAS USED AT PETITIONERS TRIAL.

In October 2017 petitioner filed a Writ of Habeas Corpus in the Superior Court raising two claims both based on newly discovered evidence pursuant to penal code 1473 (b) (3). An order to show cause was issued and an evidentiary hearing was ordered. On December 30,2019 the superior court denied the petition on the merits.   On July 31,2020 petitioner filed another Habeas Corpus in the court of appeal, first appellate district raising the same claims raised in the October 2017 petition in the superior court plus one additional claim "a false evidence claim".   The appellate court issued an order to show cause on May 25,2021 after requesting informal briefing by the parties. On august 10,2021 the court held Oral Arguments and on September 29,2021 denied the petition for  writ of habeas corpus.
      The appellate court found that petitioners claims of Newly Discovered Evidence based on the theory that Bernard Oden was the shooter was untimely and did not qualify to fall under penal code 1473 (b),(3) (the new revised statute for new evidence claims).
However, the Appellate Court found that Petitioners newly discovered evidence claims based on an Enhanced Audio Recording of Jeffrey Taggart (a prosecutions key witness at petitioners trial),and the false evidence claim was newly disc-overed evidence under P.C. 1473 (b) (3) ; 1473 (b) (1) and was timely, and had denied those claims on the merits.

Petitioner has filed as many as five (5) habeas corpus petitions in state court maintaining Factual Innocence of this crime based on two particular issues (1) he did not hire Brewer to kill Cedric Turner, and (2) the victim Andre Johnson was not shot because of a mistake in identity (i.e.a transfered intent theory). The evidence New and Old now makes clear that petitioners conviction was and is a MISCARRIAGE  OF JUSTICE.

1.

**GROUND 1.**

### NEWLY DISCOVERED EVIDENCE ESTABLISHES THAT MR. HENRY IS FACTUALLY INNOCENT OF FIRST DEGREE MURDER IN THE MURDER OF ANDRE JOHNSON

In May 1986, Robert Henry, (petitioner) was convicted of first degree murder with special circumstances, in that the murder was committed for financial gain. On June 16, 1986 petitioner was sentenced to Life Without The Possibility of Parole. The prosecutions theory being that petitioner hired Francis Lee Brewer (Brewer) to kill a man named Cedric Turner (Turner) because Mr. Turner had robbed petitioner earlier in the day, However, Brewer shot and killed another man ANDRE JOHNSON under the mistaken belief that Mr. Johnson was Cedric Turner. Petitioners defense was that he did not hire Brewer to kill Cedric Turner and if Brewer shot and killed Mr. Johnson he did so for reasons unrelated to petitioner quarrel with Mr. Turner.

The Newly Discovered Evidence is an ENHANCED AUDIO RECORDING of one of the state key witnesses in petitioners trial, Jeffrey Taggart (hereafter, Jeffrey). On November 30, 1985 Mr. Taggart, who is petitioner's half brother, was interviewed by police detectives regarding the death of Mr. Johnson. Jester Taggart was interviewed after Jeffrey on the same date, and petitioner was interviewed after Jester, all on the same date. The interviews were recorded and transcribed. The transcript of "Jeffrey's statements" to police was used at petitioners trial to support the prosecutions theory (not playing the actual recording to the jury in petitioners trial) that petitioner, Jester Taggart, and Jeffrey had discussed beating up, or shooting Mr. Turner in the leg for his role in robbing petitioner. (there was no discussion about killing Turner)

According to the transcript of Jeffrey's police interview, Jeffrey also told police that petitioner was in possession of weapons out at the scene prior to the shooting of Mr. Johnson, but had taken the guns away prior to the shooting. Jeffrey also told police that after the shooting (a day after the shooting)

2.

Petitioner and Brewer met and that petitioner had told Brewer he had hit/killed the wrong guy/man and Brewer had responded that Johnson was talking a mile a minute (the other part of this statement was inaudible), petitioner then told Brewer"he would straighten it out". (RT.358) (Exhibit 1. pp.34)

Based on Jeffrey Taggart's police interview statements he was given Immunity to testify against petitioner (RT.318). The prosecution relied on Jeffrey's statements to police to support its'"transfered intent theory" when he told petition ers jury during closing arguments [when Mr. Brewer drove up at the scene of the crime he watch the confrontation between petitioner and Johnson whom Brewer had assumed was the man who petitioner hired him to shoot (Cedric Turner) because Brewer did not know exactly who Cedric Turner was, and that this argument went on for some time. (it is undisputed that Mr. Johnson eas cursing and threaten-everyone out at the scene (RT. 238,258-259,377-378). In other words, the state prosecutor sold the belief to petitioner's jury that when Brewer drove up and saw Johnson yelling and cursing at petitioner Brewer was referring to that as Turner "was talking a mile a minute"(under the belief that Johnson is Turner) not realizing the victim was a man name Andre Johnson (RT.478-480).

It is worth noting that Jeffrey's actual unenhanced audio recording was not played for petitioners jury and the transcribed version of Jeffrey's recorded interview was placed into evidence.

THE NEWLY DISCOVERED EVIDENCE:

In October 2017 when petitioner filed his habeas petition in the Superior Court and' after the Order to Show Cause issued in that case, and counsel was appointed petitioner's attoney requested that funds be allotted so that counsel can hire an expert forensic video and audio analyst, the court granted that request and the audio recording of Jeffrey's police interview was enhanced to fill in the inaudible sections on the transcript of Jeffrey's police interview because even the original audio recording of Jeffrey's was hard to hear.(RT.724-726 Brewer)

3.

In the Enhanced version of Jeffrey's audio recording it could be heard thatwas what Jeffrey actually told police when the detectives asked him "what did LEE say when he was told he hit the wrong guy"?  Jeffrey told police that Brewer said "Oh, Well, he was talkin, he was talkin,'a mile a minute **and pulled out a gun , thats what he said"**  The additioner statement that Johnson"pulled out a gun was critical to petitioners case and defense because it demonstrate that Brewer had an independent reason for shooting Mr. Johnson that was not related to petitioner's quarell with Cedric Turner, and completely undermines that state prosecutions case when all the evidence is considered together New and Old with respect to Brewer having an independent reason to shoot Mr. Johnson.

OLD EVIDENCE THAT WAS PRESENTED AT PETITIONER"S TRIAL:

Cedric Turner, the prosecutions witness and alleged intended target told police during his interview which took place the same night of the shooting, that Mr. Johnson had approached the blue car driven by Brewer and argued with the guys in the car whom Mr. Turner thought was petitioners relatives and when Mr.Johnson turned to walk away he was shot. (RT.93-94) Although Turner denied making that statement when he testified, Vallejo police officer Kevan Cosgrove who interviewed Mr. Turner testified  Mr. Turner said that Mr. Johnson walk over to Mr. Brewers car and talked to the juveniles in the blue car who Turner thought was petitioners relatives from Richmond, California and as he (Johnson turned to walk away he was shot(RT..131-132). Know other witness corroborated Turners statement to police so his statement apparently did not resignate with the jury in petitioners case.

TheStatement by Mr. Turner could have been corroborated by petitioner himself had his attorney allowed him to testify.Petitioner told police that Mr. Johnson had walk towards Brewer car and argued with Brewer and Bernard Oden.

4.

Bernard Oden, the prosecutions witness testified that when he and Brewer drove
up to the scene of the crime petitioner approached Brewer and told him that the
guy and pointed out Cedric Turner, who was seated in the passenger side of Mr.
Johnson's car (RT.56, 146-147,167-174, 199, 203).

Criminalist Robert R. Ogle,jr.,testified for the defense that the trajectories
of the bullets indicated that they were not fired at the passenger in the victim
automobile but were fired directly at the victim either as he was falling or
while he was on the ground (RT.428-432). In Ogle's opinion the target of the
shooting was clearly the victim in this case not the passenger (RT. 436).
Petitioner's trial attorney made an offer of proof to bolster the defense's
theory that this shooting did not take place because of any solicitation by
petitioner, the defense offered to show that on November 5, 1985 23 days before
the Johnson shooting Mr. Brewer had shot another man in an attempt to rob the
the man, who was filling his car with gasoline at a food and liquor store.
Upon Brewer's demand for the mans wallet, the man took a swing at Mr. Brewer
and called him a mother fucker. He missed Brewer and turned to run towards the
store when Brewer shot the man, who fortunatly survived it, as it was only a
flesh wound. The prosecution took the possition that the evidence was inadmiss-
ible, and the defense argued that the similarity of circumstances was not appli-
cable, but that if it were it was sufficenFlYsatisfied by the circumstances of
the case.  However, the        case did involve insulting works directed either
at Brewer directly or as a member of the group. In both situations the victim
was challenged in his attitude. In both cases he t urned his back.  The defense
possition was that this evidence shows the slight motive it takes for Brewer to
form an intent to shoot or kill an tends in logic to prove that this killing did
not take place because of mistake within the meaning of the provisions of
section 1101(b) of the evidence code.  The court conceded the evidence offered

5.

regarding the prior incident was relevant. However, the court felt that the

similarity of the circumstances rule applied. In addition the court felt that

the harm    which might be induced by this evidence outweighed its probative

value under the provisions of section 352 of the evidence code. thus, the

petitioner was blocked from presenting the evidence it had that would provide

an explanation for the shooting of Mr. Johnson other than the solicitation by

petitioner. Further, although pititioner did not testify at his attorney's

behest, petitioner did tell the police detectives when he was being interview-

ed that Mr. Johnson had personally argued with Brewer and Bernard Oden out at

the scene of the crime.( RT.179-185-253-255) ( Sup. ct. Evid. hr.Tr.298-299)

It is also clear that the prosecutor had vouched for Jeffrey's credibilty in

his closing arguments in both petitioners trial and Mr. Brewer's trial.

The prosecutor told petitioner's jury that " the most important part of Jeffreys

testimony is when he said to the officers--I submit to you the testimony, when

he made his statement totthe police officer, was certainly more credible than

'I dont remember"sanswers he gave you in here earlier this week." the prosecutor

went further to identify the subject he was referring to and tells the jury,

HE SAYS AFTER THE SHOOTING, Mr. BREWER AND Mr.ODEN CAME OVER TO COLLECT. WELL,

WHAT DID THE DEFENDANT TELL MR. BREWER? "YOU KILLED THE WRONG MAN" what does

the defendant do then"? "OH,I'll STRAIGHTEN IT OUT". (RT.515)

Although the prosecutor left out the Response that Brewer gave when told he

killed the wrong man (i.e well, he was talking a mile a minute) the prosecutor

nevertheless,told the jury those statements in particular was important part

of thier case and that Jeffrey was more creditable when he spoke with police

because he had testified differently at petitioners trial when he told the

jury that petitioner was not present when Brewer and Oden came by the day after

the Johnson shooting to have any discussion with Brewer.

At Mr. Brewer's trial the same prosecutor told Brewer Jury in closing argument's

6.

" Jeffrey Taggart, when he was talking to the police, that's when he gave the most truthful statements of what occurred because he was trying to save himself. (RT. 775 Brewer   .)[n1]   All of this old evidence was produced at petitioner's trial, but Because none of it could be substantiated by independent evidence, there was know direct evidence that Brewer had an independent reason to shoot Mr. Johnson.

The Superior court held an evidentiary hearing in this matter after issuing an order to show cause, but denied relief, The appellate court also issued an order to show cause on the same claim after the superior court denied relief, and later denied relief as well, both court had found credibility issues, specifically, with Jeffrey Taggart's testimony at two evidentiary hearings and at petitioner's trial. However, as discussed above, the prosecution had vouched (unconstitutionally) for Jeffrey's statements to police in both trials (see RT.515 henry) and (RT.775 brewer), further, Jeffrey was given immunity based on the statements he gave to police (Sup. Ct. evid. hr. 102). Due to the revealation of the Enhanced Audio Recording in 2019 which not only substantiates the old evidence produced at petitioners trial, when all that evidence is taken together with the new evidence, The newly discovered Enhanced Audio Recording of the prosecutions witness stating, that Brewer admitted shooting Johnson for talking a mile a minute and pulling out a gun  (see Sup. Ct. evid. hr. tr.35) undermines the prosecutions entire case with respect to the transfered intent theory. In that Jeffrey's statements to police was central to the theory the prosecution relied on in this case. There was no other evidence that the prosecution could point to that would prove that Mr. Brewer had shot Johnson due to a mistake in identification. The only other evidence that would support the prosecution's theory of transfered intent is the prosecutions opening statement to the Jury, inwhich, the

7.

----------------------------------------------------------------

Fn.1 Petitioner request that this court take judicial notice

new evidence,( by way of the enhanced audio recording of Jeffrey's police state-
ment) which is clear evidence that the prosecutions theory as articulated in his
closing  argument is undermined by the new evidence in that when the police ask-
ed Jeffrey what did Brewer say when he was told he killed the wrong man and
Jeffrey told police that that Brewer had responded He was talking a mile a
minute(referring to Johnson).... (for inaudible) the prosecution used this part
of Jeffrey's statement to prove it transfered intent element of the case,but
in 2019 when the Jeffrey's audio recording was enhanced because of the inaudible
sections the forensic analyst made it possible to enhance the speech and Jeffrey
(the prosecutions witness) can be heard telling the police when Jeffrey was ask-
ed by police what did Brewer say when he was told he killed the wrong man?
Jeffrey actualy told police Brewer said he **was talking a mile a minute and pull-**
**ed out a gun.** The prosecutor relied on the transcribed version of Jeffrey's
police interview statement (the prosecution never allowed or played the actual
recording of Jeffrey's police interview to petitioner's jury) and did not even
mention the part were Brewer said**"he pulled out a gun"** presumably because that
part of the statement was inaudible on the transcript and unheard on the orig-
inal recording, in either case prosecutor relied on **false evidence** when he
told the jury how Brewer came to think that Mr. Johnson was in fact, Cedric
Turner. The prosecutor told the jury when Brewer and Oden drove up to the scene
of the crime Brewer saw the victim, Mr. Johnson, arguing with petitioner and
there was a heated argument going on for some time. who does Mr. Brewer see
pushing the person who just hired him? who does he see him having a problem
with? ......... So,in his mind (Brewer) without knowing exactly who Cedric
Turner was, (because Johnson is the one talking a mile a minute) he figures Mr.
Johnson is the man petitioner wanted to be hit (paraphrasing) (see 478-479).
The prosecution went on to state "Now, I think the other pieces of evidence
------------------------------------------------------------------------
.of the transcript in People v. Brewer, case no. VC20218  specifically pg.723-
726; 775)

that point out that my theory is correct, ladies and gentlemen, is the fact that
later on, either that night, some of the testimony is that same night, Bernard
Oden and Mr. Brewer go to collect, or the next day. but up until that time,
Brewer thought he had, in fact, done the right deed, shot the right man. But
this defendant said, "No, you shot the wrong guy." Notice at this point they're
no longer talking about a couple hubbas but talking about he wanted $200, Mr.
Brewer wanted $200.     What does the defendant tell him? "look, you shot the
wrong guy.  Well, you know, he was talking a mile a minute (referring to Brewer
response). (see RT.479)

        In the prosecution's openning statement the prosecution laid out its'
theory and the evidence it sought to produce. with respect to the theory that
Johnson was shot by mistake,it is clear that the prosecutor relied on Jeffrey's
statements to police that took place a day after the shooting of Mr. Johnson,
as the prosecution pointed out above [stating when "oden and Mr. Brewer go to
collect," the next day "but up until that time, Brewer thought he had,  in fact,
done the right deed, shot the right man."]  In order to get to the wrong man
theory the prosecution had to believe Jeffrey statements were credible when
the police asked him"what did Lee say when he was told he hit/killed the wrong
guy/man?  and Jeffrey responded that Brewer said"he was talking a mile a minute"
(the partial version that support the prosecution's theory of the case, that is
undiputedly false)
When Jeffrey Testified at petitioner's trial, he testified that he made a mis-
take when he told police that petitioner was at that house the day after the
shooting and that it was someone else who had that discussion with Brewer about
stating the wrong man had been shot. (RT.357-358)
The prosecution then called detective Bawart to testify as to the validity of
Jeffrey's statements when he interviewed Jeffrey. (RT. 390-391)

                                    9.

The prosecutor asked the detectives,(regarding Jeffrey's statements)did he tell you that next--the day after the shooting that Bernard Oden and Mr. Brewer came to their house? The Detective: Yes,he did. Prosecutor: did he tell you that Mr. Robert Henry was there? Detective: He did. Prosecutor: what did he tell you Mr. Henry told Mr. Brewer:.........Detective: Indicated that he would get the monies together and pay him...... Prosecutor: Okay. Did he indicate anything else about who he shot?...... Yes he indicated that the wrong man had been killed. Prosecutor: That what Mr. Jeffrey Taggart told you Mr. Henry said to Mr. Brewer? Detective: I believe he did.I don't recall specifically what the wording was. [Yes. he indicated that Robert Henry had indicated he shot the wrong man and that he was talking a mile a minute........Prosecutor: No. Officer look at line three.....Detective: Yes. Oh, he said that Lee Brewer was talking a mile a minute......Prosecutor: Lee Said that?    Detective: Yes.  Prosecutor: Mr. Brewer?  Detective: Yes. The detective and the prosecutor use the transcription of Jeffrey's police interview statement to refresh the detectives memory as to what Jffrey told him, in either case the prosecutor and the detective left out the part where Jeffrey told them in the complete statement that Brewer said that " and he (Johnson) pulled out a gun". The fact that the prosecutor argued false evidence to petitioner's jury and     allowed the detective to testify falsly regarding that evidence  to support the prosecutions theory of transfered intent, as highlighted by the Enanced Version of Jeffrey's Audio Recording of his police interview, the false evidence was, specifically,"that Jeffrey told detectives that when Petitioner  told Brewer that he hit/killed the wrong guy/man", Brewer had told petitioner " Oh, Well,  he was talking a mile a minute",[a part of a statement that supported the prosecution theory] and although this state- ment was on the transcribed version of Jeffrey's recorded interview, which was relied on by the prosecution (without playing Jeffrey's actual tape recording for the jury), It was revealed in 2019 after getting Jeffrey's Audio recording

enhanced that Jeffrey had actually told police, that when petitioner told Brewer
"He hit/killed the wrong guy/man, Brewer, actually replied "He was talking a
mile a minute and pulled out a gun".  This Newly Discovered Evidence completely
undermines the prosecutions theory with respect to Transfered Intent.  Further,
Additional New Evidence was revealed after petitioner's trial in that in 2009
Mr. Brewer testified in a Federal Court Evidentiary Hearing for the first, in
which petitioner was given an evidence hearing there. Mr. Brewer did not testify
at petitioner's trial because he himself was awaiting trial on the same case the
court,allowed separate trial in this matter . However, Brewer testified at the
hearing that,[he was out at the scene of the crime and that although he was not
the one who shot Mr. Johnson,]"If, he was the shooter he would of known Mr.
Johnson was not Cedric Turner, because he met Mr. Johnson before and if he saw
Mr. Turner he would of known Mr. Turner was not Andre Johnson because he know
Mr. Turner when he see him, given that he saw Turner around at times". This is
direct evidence that completely contradicts the prosecutions theory that he
(the prosecutor) argued in his closing  arguments stating "This defendant point-
ed out Mr. Cedric Turner, and apparently Mr. Brewer did not know who Cedric
Turner was, and this is where the mistake is made, Ladies and Gentalmen, as to
the inadvertent killing of Mr. Johnson. (RT. 478) The fact that the prosecutor
presented"no evidence that Brewer did not know Cedric Turner", and only inferred
such, based on Jeffrey statements to police about what Brewer said when he was
told he hit the wrong guy (i.e. he killed the wrong man ) and Brewer's response
thereto, in its' partial form,"that he was talking a mile a minute", was a false
inferrence based on the enhance recording  of Jeffrey Taggart and Brewer's
testimony at the federal evidentiary HEARing that  Brewer had knew and met Mr.
Johnson before the shooting and knew who Turner was when he saw him (Evid. hr.
Fed. Tr. 40-42).

11.

APPELLATE COURT OPINION OF (Sept. 29,2021)

The First Appellate District, Division Four denied petitioner relief, although the appellate court found that the Enhanced Audio Recording of Jeffrey Taggart police interview constitute New Evidence pursuant to 1473 Subdivision (b)(3) (see Appendix A pg. 1, 19) and False Evidence pursuant to 1473 (b)(1).

The appellate court denied both claim stating, petitioner cannot meet the prejudice element of either claim ( see Appendix A pg.20). The court stated Jeffrey, the prosecutions key witness, was the only witness who have said any-thing about Brewer believing Johnson had a gun, and that was an unsworn state-ment. However, Jeffrey testified at the Superior Court evidentiary hearing and verified under oath that he in fact told the detectives that when Brewer was told that he killed the wrong man (by petitioner) Brewer had resonded he (Mr. Johnson) was talking a mile a minute and pulled out a gun  (Sup.Ct.Evid.hr. tr. 35-36). It is assumed that the appellate court said Jeffrey's statement was unsworn at the time he made the statement to police, and because of such,some how Jeffrey's  lack of creditability in subsequent proceedings calls into the question of his original statement to police that when Brewer was told he killed the wrong man and Brewer's response that he (Johnson) was talking a mile a minute,was not credible (despite the prosecutor vouching for the credibility of Jeffrey's statements to police in the first instance (Rt. 515) ). The court of appeal went further and stated, when Brewer testified about the murder of Mr. Johnson he (Brewer) never said that Johnson[engaged in the provocative act of pulling out a gun]. In other words, the court implies that Brewer himself needed to corroborate Jeffrey's statement/testimony that Johnson pulled out a gun. (see Appendix A pg.20-21)   However, during the course of the 2019 evidentiary hearing in the superior court Brewer was called to testify on behalf of petit-ioner but his attorney in a Penal code 1170.95 matter made an appearance in court and stated Mr. Brewer would be pleading his Fifth Amendment right not to testify (Sup. Ct. Evid. hr. tr. 7-8,70).

Petitioner sought to solicit the testimony from Brewer that he not only had the knowledge that Johnson had a gun but that he displayed the gun and he saw it.

Petitioner sought federal habeas relief in the federal district court and had initially suffered a denial of his claim that[newly discovered evidence established his innocence of the crime], However, petitioner obtained an order on appeal to the Ninth Circuit remanding the proceeding for an evidentiary hearing. (Henry v Marshall (9th Cir. 2007) 224 Fed. Appx. 635, 636-637.) On remand, the federal district court referred the case for an evidentiary hearing before a magistrate judge. (see Henry v. Marshall (E.D. Cal. May 27, 2010, No. CIV S-94-0916 JKS EFB P) 2010 U.S. Dist. LEXIS 52192,)  (see Appendix B).

In March 2009, Mr. Brewer was interviewed by deputy attorney general Michael D. O'Reilley prior to the federal evidentiary hearing, in which Brewer told the deputy attorney general that prior to the **Johnson shoot**ing he was informed that Mr. Johnson had a gun and wave it in the air and they saw it and thats when he was shot. (see Appendix B,2010 U.S. LEXIS 52192, p.*59) Petitioner's claim in the ferderal district court was based on Newly Discovered Evidence demonstrate that Bernard oden was the shooter (not Brewer) in the shooting of Andre Johnson. Petitioner sought to raised an alternative ground for relief in the federal district court based on new evidence that came out during the evidentiary hearing that Brewer may have had an independent motive when and if he shot Mr. Johnson, however, the federal court stated " The Ninth Circuit's remand order does not allow this court to revisit petitioner's claim that he is innocent even if Brewer Killed Johnson". (see Appendix B, 2010 U.S. LEXIS 52192, pp.*78) Brewer had testified at the federal evidentiary hearing for the first time regarding the shooting of Mr. Johnson and when asked a question regarding his interview by Deputy Attorney General Michael D. O'Reilley prior to the hearing with respect to how he came to know Mr. Johnson had a gun . brewer stated " Well, actually I heard two different ways it happen, and two different ways he showed up with the same firearm. So youknow, I mean, it was just rumors out there, you know". (fed. evid. hr. tr. 70)

13.

Petitioner sought to produce Brewer's testimony at the Superior Court evident- iary hearing to clearify the two different ways Johnson ended up with a firearm, one way is clear as he discribe in his interview statement with the deputy attorney general    that "he heard Johnson had a gun" which he percieved as a rumor,up until Johnson pulled up his shirt and they seen it" and when Johnson pulled it and"held it striaght in the air, thats when he got shot", this state- ment is very consisitent with Jeffrey statement to police that johnson was wave- ing around a gun , (see Appendix B, 2010 U.S. Dist. LEXIS 52192 pp.*59) (Sup. ct. Evid. hr. tr. 298). The appellate court also stated that petitioner's trial counsel never offered Jeffrey's transcript of the police interview into evidence at petitioner's trial and presumesd that this is so because the whole transcript contained information that inculpated petitioner and that it is sheer speculation  that competent counsel would have offered even the Enhanced trans- cript into evidence. (see Appendix A pg.22)    But see also [RT.504]. Petitioner's trial counsel would have produced the transcript of Jeffrey's police interview into evidence in its' enhanced form despite the inculpated statements, wereas, Competent counsel would have recognized that the incriminating statements Jeffrey told police are isolated to petitioner conduct after he reported to  his relatives that he had been robbed by Cedric Turner, which is a separate question from whether Brewer had shot Mr. Johnson by mistake in Identity which was the petitioner's trial counsel's main argument (see RT. 497-498). Had Jeffrey's transcripts of his interview with police not have omitted the fact that Jeffrey told police that Brewer admitted he shot Johnson for pulling out a gun, that evidence would have supported petitioners defense  and was material by definition Even if petitioner's trial counsel would have produced the original interview statement by Jeffrey,(without the enhanced version) petitioner's trial counsel would have been  in the same boat that the prosecutor and detective in petitioner trial is in, when they imputed false evidence into the trial proceedings.

14.

The exculpatory evidence that was omitted from the transcript of Jeffrey's police interview statement probative value exceeded and prejudice coming from the transcript, and contrary to the appeal court opinion competent attorney's had found it better practice not to introduce transcripts of audio recordings due to the many inaudible sections and omissions in said transcript out of precaution. If petitioner's trial counsel would have offered the complete inter-view of Jeffrey's police interview that was transcribed"without the enhancement" petitioner's trial counsel would have produced false evidence against their client, so it is clear that petitioner's trial attorney legally could not have a tacticle reason to not offer Jeffrey police interview transcript into evidence, as implied by the appellate court.  The Appellate court points out that the petitioner points to know traditional indicia suggesting that this case was close (e.g., split verdic, lenghthy deliberations, reported impasse, or issues regarding the transfered intent), However, the indicia used in this case was the prosecutor closing arguments arguing to the triers of facts (jury) on part-ial evidence, which by reason of false inferences, created, becomes false evidence. Jeffrey's statement to police was the prosecutors evidence of the theory of transfered intent, which was allegedly corroborated by petitioner's statement to police that he allegedly hired Brewer to kill Cedric Turner and he Brewer killed the wrong man, however, if Jeffrey statement was not true, that, when Brewer was told he killed the wrong man and Brewer had responded that he (Johnson) was talking a mile a minute, there is no corroborative evidence to support petitioner's alleged statement to detective Bawart. Therefore,petitioner is factually innocent of the crime he was convicted of.

## MEMORANDUM OF POINTS AND AUTHORIES

In Re Bell, 42 cal.4th 630 and In Re Lawley, 42 cal. 4th 1231;

Carriger vs. Stewart, 132 f.3d 463 (9th) , Schlup vs. Delo, 513 U.S. 298

Further,The appellate court in denying petitioner's petition applied the wrong
standard. The court relied on penal code 1473 (b),(3) (A), the lower standard
for newly discovered evidence claims, but that standard had been define to
suggest that all is required is that at lease one juror would agree that the
resuls would have been different.(In re sagin,39 cal.app. 5th 579 (Appendix A.
pg. 19-22). The appellate court also failed to consider the complete record
when it utilized the federal district courts findings and recommendations in
HENRY V. MARSHALL, 2010 U.S. Dist. LEXIS 52192, petitioner's prior case.
The appellate court found that "in the absent of corroborating testimony from
Brewer himself about what was going on in his mind, Jeffrey's hearsay statement
that Brewer said Johnson pulled a gun is attenuated proof of intent". (Appendix
A. pg.21-23) The appellate court failed to acknowledge that Brewer's attorney on
a separate matter appeared at the superior court evidentiary hearing and assert-
ed on Brewer's behalf his fifth admendment right not to testify . (see Sup.Ct.
Evid. hr. tr. 7-8,70) Brewer's testimony would have been critical because he
told the deputy attorney general that he had knowledge that Johnson had a gun
and that when he pulled it out they had saw it, and that's when he was shot.
This information can also be found in HENRY V. MARSHALL,2010 U.S. Dist. LEXIS
52192 at p.*59, which the appellate court did not consider.[n2] (see Appendix B1.
docket no.166) Because Brewer decided to excercise his fifth amendment right not
to testify at the superior court evidentiary hearing, because he himself was
facing a possible evidentiay hearing regarding his 1170.95 petition, the exculp-
atory nature of his statements to the deputy attorney general, which the appe
llate court acknowledged would have changed the outcome of petitioner's trial.
(i.e.Brewer's corroborating testimony) this evidence would of proved petitioners
Innocence. (see(Herrera v. Collins, 506 U.S. 390)

---

fn2 on March 10,2009 the deputy attoney general interviewed Brewer. the federal
court refferenced the content of brewer's statement in its decision in henry v.
mashall, 2010 U.S. dist. Lexis 52192 at *59 but misstates the word that brewer
spoke to"police" and it should state brewer's statements to "deputy att.general"

GROUND 2.                    PROSECUTOR COMMITTED BRADY VIOLATION
                   PURSUANT TO BRADY V. MARYLAND [1963] 373 U.S  83
                         IN FAILING TO DISCLOSE EXCULPATORY EVIDENCE.


As discussed in ground 1 the prosecutor's key witness [Jeffrey Taggart] was inter-
viewed by detective Bawart and another detective (police) the interview was record-
ed and a transcript was made of that interview (it is not in dispute that the
prosecutor did not play Jeffrey's recorrding to petitioner's jury).

In the course of questioning Jeffrey the police asked Jeffrey " **What** did Lee say
(referring to Brewer) when he was told he hit the wrong guy? Jeffrey answered and
said " He said  Oh, Well, he was talkin,he was talkin' a mile a minute",Before....
guns. thats what he said".   At petitioner's trial Jeffrey testified that it was
Not petitioner who told Brewer he killed/ hit the wrong guy/man, he had mistaken
petitioner for someone else,because petitioner was not present when that conversa-
tion took place. ( Rt.355-358) see)also (Exhibit 1. pp. 34) Because Jeffrey had
testified that petitioner was not present for that conversation,the prosecutor
called detective Bawart to testify as to what Jeffrey told him.  Detective Bawart
was asked to review the transcript of his interview with Jeffrey Taggart to refresh
his recollection regarding what Jeffrey told him that Lee Brewer said when petit-
ioner told Brewer he had shot the wrong man. Bawart testified as follows:

        A. He indicated that Robert Henry had indicated he shot the wrong man
                    and that he was talking a mile a minute.
                         Q. Who said that?
        A. Robert Henry-or Jester-Jeffrey Taggart said that of Robert Henry.
                    Q. No. Officer,take a look at line three.
        A. Yes [Refers.]Oh, he asid that Lee Brewer was talking a mile a minute.
        (RT.390-391)

This portion of the of the transcript of the interview with Jeffrey that Bawart
used to refresh his recollection, however, read as follow: "Oh. Well, he was
talkin, he was talkin' a mile a minute, before....guns. (see Exhibit 1. pp.34).

                                   17.

Upon Enhancing the audio recording of that interview in 2019,it was revealed that Jeffrey had relayed that Brewer said:: " Oh, Well, he was talkin', he was talkin' a mile a minute, and pulled out a gun. That's what he said" (Sup. Ct.Evid. hr. tr 35-36)(see Appendix A. pg. 21)

Detective's then asked Jeffrey what did Brewer say when he was told he hit the wrong guy, and that Jeffrey said,Brewer said he was talking a mile a minute . Bawart, Specifically, stated despite his hearing problem, he could hear the conversation, because he was sitting across from Jeffrey. (RT.392) Therefore, the detective would have heard the words that were omitted from the transcript of Jeffrey's description of what Brewer said when he was supposedly was told he shot the wrong man, and did or did not inform the prosecutor of such critical information/evidence. The detectives certainly did not inform the defense nor did the prosecutor. That information provided strong support for the defense because it was directly related to petitioner's defense "that Brewer had an independent reason for shooting Mr. Johnson" and by implication petitioner's jury had not been informed  that Jeffrey actually told the police that Brewer had said Johnson was talking a mile a minute because detective Bawart had testified inaccurately on that point,as to what the transcript recites, and although Jeffrey testified that Brewer said "he was talking a mile a minute,"the only part of the statement that the prosecutor presented to him to refresh and recollect his memory of.(RT.390-391; 358)  The prosecutor's witnessess detective Bawart and Jeffrey Taggart gave inaccurate and false testimony that allowed the prosecution to suggest to the jury as they did, that Brewer had believed that Johnson was the person that petitioner wanted him to shoot, because Johnson was the one arguing with petitioner.(RT.479-480.) Because of the omission in the transcript, petitioner's jury was not informed that Jeffrey had stated that Brewer actually had said that "Johnson was talking a mile a minute and pulled out a gun ". If Johnson pulled out a gun on Brewer, that

18.

would provide a reason for Brewer to shoot Johnson,that had nothing to do with
and an agreement to harm Cedric Turner. This was likely to cause the jury to reject
the prosecution's theory that Brewer shot Johnson in order to fulfill an agree-
ment to kill Turner. when, as  here , transcripts of admissible tape recordings
are so inaccurate that they could mislead the jury into convicting an innocent
man, the transcript were prejudicial. See Bawart's testimony (RT. 723-726 Brewer)
The prosecutor also withheld evidence that detective Bawart had a hearing impar-
ement of a chronic nature. This information was not revealed at petitioner's
trial, in fact, it was not revealed until petitioner was appointed counsel in
2020 on his prior habeas petition in the appellate court, when petitioner's
habeas counsel reviewed Brewer's trial transcript's were detective Bawart had
testified that he had a hearing problem at the time he interviewed Brewer reg-
arding the murder of Mr. Johnson (which was prior to petitioner's trial)
(RT.406 Brewer), The prosecutor at petitioner's trial was also familiar with the
detectives hearing impairment at the time of petitioner's trial when he argued
to petitioner's jury during closing arguments stating: "you know, I thought that
was a cheap shot to pick on the detectives hearing......."because he does have
a hearing problem" (RT.512 Ln.14-22).  The prosecutor was referrencing petition-
er's trial counsel statements during the defense closing argument's when defense
counsel referrenced the detectives testimony that petitioner had admitted to
hiring Brewer to kill Turner, and killed the wrong man, and because the detec-
tived testified that petitioner made the statement after the recording was turn-
ed off and that the statement was "Verbatim", But that the detectives actual
police reports states that petitioner made a statement "Similar" to he hired
Brewer to kill Turner, but he killed the wrong man. Petitioner's trial counsel
then told the jury that apparently, the detectives memory improves with age.
(RT.501) Counsel did not referrence the detectives"hearing", but only his"memory"

19.

Although, petitioner's trial counsel focused only on the detectives memory, not his hearing, petitioner nor his counsel was aware the detective Bawart had a chronic hearing impairment,which would have been relevant to question the relia-bility of detective Bawrat's statement (that was unrecorded) that petitioner had admitted to him that he hired Brewer to kill Turner, and that Brewer killed the wrong guy. which petitioner adamently denies. In fact petitioner has always main-tained that he only asked the detective a question to clarify what the detective was explaining to him before the recording was turned off. In paraphrasing, the detective told petitioner (while being recorded) at the end of the interview that he had a warrant for petitioner's arrest, petitioner asked the detective who he killed?  the officer stated ,if I go out and tell someone  i'll give you two rocks of cocaine if you shoot someone,and the guy shoot the person for me, i'm guilty of murder even if I was not the person who pulled the trigger. The other detective chimed in and said "It's also true if I miss and shoot your brother, he's guilty, and i'm going to jail. (see Exhibit 2. pp.31-32); See also (APPENDIX B, 2010 U.S. LEXIS 52192, p.*69).

PREJUDICIAL EFFECT:

If petitioner and his trial attorney  was aware that detective Bawart had a med-ical hearing impairment that evidence could of been used to impeach the detect-ives testimony that petitioner made such admission after the recording was turn-ed off or moved to throw out all of detective Bawart's testimony on the grounds that it would be unfair and unreliable to the defendant/petitioner because  mis-statements of facts can be testified to by a presumed creditible police detect-ive and presumed true by a jury. Which ,in fact, had occurred with this detect-ive, based on the newly discovered evidence as outlined in grounds 1, and 2 of this petition.

## SUPPORTING AUTHORITIES

In re Brown (1998) 17 cal. 4th 873,879, quoting Kyles v. Whitley (1995) 514 U.S. 419,437 ; and Brady v. Maryland (1963) 373 U.S. 83.

Ground 3.       NEW EVIDENCE REVEALED THAT FALSE EVIDENCE
           WAS USED AT PETITIONER*S TRIAL AND ADMITTED INTO EVIDENCE
        AND THE JURY INSTRUCTION ON ADOPTIVE ADMISSIONS WAS PREJUDICIAL
        ERROR,THAT VIOLATED PETITIONER*S FOURTEENTH AMENDMENT RIGHTS.

A petition for writ of habeas corpus may be prosecuted on the grounds that false

evidence that is substantially material "or" probative on the issue of guilt or

punishment was introduced at a hearing or trial relating to his or her incarcer-

ation. (P.C. 1473, subd. (b)(1). It is immaterial whether the prosecution knew

or should have known of the false nature of the evidence (P.C. 1473 subd. (c))

In re hall,30 cal.3d 424.

The new evidence described in ground one of this petition highlights the false

evidence that was used at petitioner's trial. It is undisputed that Jeffrey was

interviewed by police and the interview was recorded and a transcript made of

that interview.  According to the transcript, when the detective asked Jeffrey

"what did Lee (Brewer) say when he was told he hit the wrong guy?" [n3]. Jeffrey

had told police Brewer had told petitioner "Oh, Well, he was talkin',he was

talkin, a mile a minute. before....gun[s]. That's what he said".

The prosecution did not play the tape recording of Jeffrey's interview for the

jury. The prosecutor awarded Jeffrey an immunity based on the statements he made

to the police (Rt. 318). However, when it came time for Jeffrey to testify at

petitioner's trial, Jeffrey had testied that petitioner was not present when

Brewer and Oden came by his cousin's home the day after the shooting allegedly

looking for payment, so it was not petitioner who told Brewer he shot the wrong

man, it was alex (Rt.356). The prosecution immediately called the detective to

the stand to testify regarding what Jeffrey told him when Jeffery was interviewed.

The detective told the jury that Jeffrey said when petitioner told Brewer he

killed the wrong man, Jeffrey said that Lee Brewer was talking a mile a minute.

(RT. 390-391)

fn.3 -------------------         ------------         --------
    The statement that Brewer killed the wrong man was an inferrence from the
    alleged statement that Brewer was told he hit the wrong guy.

Although the detective was given the transcript of what Jeffrey said to refresh recollect from his memory what was actually said the detective never said what the transcript actually recited, which was Brewer said "Oh, Well, he (johnson) was talkin', he was talkin, a mile a minute. Before...guns. That's what he said." The detective said Brewer was talking a mile a minute(RT.390-391). Even if we can assume Detective Bawart meant to say  that Brewer said he (referring to johnson) was talking a mile a minute.  In 2019 Jeffrey's original audio recording was Enhanced by an expert video and audio analyst. That enhancement revealed that when Brewer was told he hit the wrong guy,(allegedly by petitioner) Brewer had actually said Johnson was **talking a mile** a minute and"pulled out a gun". Without the enhanced recording [ the prosecutor was allowed to impeach Jeffrey with detective Bawart's testimony](i.e.false evidence). Petitioner's trial counsel objected to this evidence being introduce on the ground that there is case law that it is a reasonable inference to draw that, if there is a mistake made and the wrong man is killed,it's a reasonable inference to be found that the conspiracy had terminated at that moment and, therefore, going on for payment does not show a continuing conspiracy. (RT.394) The court overruled the objection stating it was letting those statements in  because he (Jeffrey) denied it on the stand, said it before, but then it comes in impeaching what he said, and it would come in, then, as an admission. (RT. 395) Based on that finding the court admitted false evidence into the trial. Again, and witout the enhanced recording, the prosecutor relied on the false evidence as demonstrated in his closing arguments. It is clear that the prosecutor adopted the transcript version of Jeffrey's police interview that when Brewer was told allegedly by petitioner that he killed the wrong man, and Brewer's response being "he was talking a mile a minute",because the prosecutor told the jury that 1) Brewer did not know who Turner was, 2) that Brewer had drove up to the scene and saw petitioner and Johnson arguing (i.e. talking a mile a minute), 3) who does Brewer see pushing the person who just hired him?, 4)in Brewer's mind he thinks Johnson is Cedric Turner. (RT.479)

The prosecutor argued his points of evidence in chronologicle order as discribed above in[1 thru 4]. The prosecutor then , specifically talks about his next _ _ _ pieces of evidence that point out that his theory is correct, and told the jury, later on that night or the next day Brewer and Bernard Oden goes to collect, but up until that time, Mr. Brewer thought he had, in fact, done the right deed, sho the right man.......What does the defendant tell him? "look, you shot the wrong guy.  Well, you know, he was talking a mile a minute.(referencing what Brewer said) (RT. 480)

The enhanced audio recording, which filled in the inaudible sections of the transcript of Jeffrey's police interview statement, makes clear that when petitioner allegedly told Brewer he killed the wrong man, Brewer responded that he shot Johnson for talking a mile a minute [and pulling out a gun] highlghts the false narrative the prosecutor sold to petitioner's jury and the false infer ences drawn fromthe false evidence. The false evidence shows, 1) Brewer did not shoot Johnson because of an agreement with petitioner to harm Turner, 2) Jeffrey did not tell police that Brewer said he shot Johnson for merely talking a mile a minute, 3) Johnson was not shot under the mistaken belief that he was Turner, 4) petitioner did not allegedly agree to reduce the price to $100 instead of $200 because the wrong man was killed, it would not be a reasonable inference, who hires a person to build a house for them and the builder decides to take on another job for personal reasons and offers to the builder when he returns half the money for doing a job he have not done? and 5) and it is equally false that petitioner told the detective,in an unrecorded statement that he hire Brewer to kill Cedric Turner and that Brewer had killed the wrong man. Petitioner has al ways maintained that detective Bawart had misheard what petitioner had said, in that petitioner had asked a question If he hired Brewer and he killed the wrong man how could I be charged?, petitioner was only making sure that what the polic was acticulating to him when they told him he was being booked for murder.

(see Appendix B, 2010 U.S. Lexis 52192 pp.*69) Further, Jeffrey was the first of the three(Jester and pettioner) to be interviewed by the police and when Jeffrey told police that petitioner allegedly had informed Brewer that he killed the wrong man and Brewer's response thereto. that johnson was talking a mile a minut was corroborated by petitioner's alleged admission to detective Bawart that I he hire Brewer to kill Turner but Brewer killed the wrong man.  In other words, petitioner's admission to detective Bawart was used to corroborate a false statement in the first instant. It is also worth noting that detective Bawart testified that when he was interviewing Jeffrey regarding what Brewer's response was when petitioner told him he killed the wrong man,despite being unable to articulate what Jeffrey said, when cross-examined and asked about his hearing problem, the detective stated: "I was sitting across from him, and I could hear the conversation,and I'm relying on the transcript to refresh my memory of what was said some six or so months ago (RT. 392). It is clear that the detective did not hear what Jeffrey said because the detective only said Brewer only said "he was talking a mile a minute" and apparently did not hear Jeffrey say "and he pulled out a gun", and if the detective did hear that part of the statement then the goverment withheld exculpatory evidence. If it be the former, that the detective did not hear Jeffrey's complete statement then it stands to reason that Detective bawart's testimony that petitioner admitted that he hired brewer to kill,Turner but that Brewer killed the wrong man in not reliable, as the prosecutor himself acknowledged that the detective had a hearing problem. (RT. 512)  Based on the undisputed false evidence that was introduced at petitioner's trial consisting of the detective testifying falely, the trial court's admission into evidence false evidence, and the prosecution arguing that false evidence to the jury was overwhelmingly prejudicial and a miscarraige of justice (see In re Richards (2016) 63 cal. 4th 291,312 );Hayes v. Brown,399 f.3d 972,984

24.

THE PREJUDICE:

When the trial court admitted Jeffrey's statements  to police into evidence, reg-

arding what Brewer had said when he was told he hit the wrong guy by petitioner,

and Brewer's response thereto, that, he, (johnson) was talking a mile a minute,

although in its' false context, the trial court compound that error when it had

instructed the jury on Adoptive Admissions, Pursuant to CALJIC No.2.71.5 which

states: " if you should find from the evidence that there was an occasion when

the defendant, under conditions which reasonably afforded him an oppertunity to

reply, failed to make denial or made false, evasive or contradictory statements

in the face of an accusation expressly directed to him or in his presents charg-

ing him with the crime for which he is now on trial or tending to connect him

with its' commission, and if you should find that he had heard the accusation

and understood its' nature, the circumstances of his silence or the conduct on

that occasion may be considered against him as indicating an admission that the

accussation thus made was true........

The instuction allows the jury to infer guilt from when petitioner allegedly

told Brewer that he killed the wrong man and Brewer's response that , "he was

talking a mile a minute" is an admission that both parties (petitioner and

Brewer) were in agreement that Johnson was shot by mistake. when infact, the new

evidence demonstrate that Brewer's response did not compel a response from pet-

itioner because it was not accusatory when Brewer told petitioner he shot John-

son not because Johnson was talking a mile a minute, **but because Johnson pulled**

**out a gun.**  Therefore, no reasonable inference could be drawn from Brewer's

response or petitioner's lack of a response other than Brewer had shot Johnson

for an independant reason, unrelated to petitioner's quarell with Cedric Turner.

Petitioner's 14th amendment rights were violated pursuant to Napue v. Illinios,

360 U.S. 264, 269.

GROUND 4
## PROSECUTORIAL MISCONDUCT IN THAT
## THE PROSECUTOR ARGUED FACTS NOT IN EVIDENCE.

The prosecutor, during closing arguments told petitioner's jury, that at the time petitioner had pointed out Cedric Turner to Mr. Brewer out at the scene of the crime (prior to the shooting of Mr. Johnson) petitioner took the oppertunity to modify his alleged contract with Brewer from a beating to a killing of Cedric Turner (RT.478 Ln.11-28). Know one ever testified or gave such a statement to police to support that proposition or theory, Based on the new evidence as outlined in ground 1, it could not be a reasonable inferrence that because the parties (petitioner and Brewer) later met(the day after the shooting) and reduced the price from $200 to $100 because Brewer allegedly shot the wrong man. That would be a false inferrence, because when Brewer was allegedly face with the accusation that he shot the wrong man, Brewer's response was he shot the victim (Mr. Johnson) for talking a mile a minute, " and pulling out a gun". ( Sup. ct. Evid. hr. Tr. 33-36); (Appendix A. pp.19-23); (Appendix B, 2010 U.S. LEXIS 52192 p.*59) In light of the new evidence it could not be reasonably be inferred that petitioner would reduce an alleged contract From $200 to $100 because Brewer allegedly killed a third party (Mr. johnson) for independent reasons, who, from Brewer's prospective was the right man.

### SUPPORTING AUTHORITIES
People v. Hill, 17 Cal. 4th 800 (1998) and Darden v. Wainwright,(1986) 477 U.S. 168.

**GROUND 5**

THE DOCTRINE OF TRANSFERRED INTENT
DID NOT APPLY TO THIS CASE AND THE PROSECUTOR
MISINTERPRETED THE LAW WITH RESPECT TO THE DOCTRINE
OF TRANSFERRED INTENT TO PETITIONER"S JURY

As stated above, the prosecutor's theory in this case was that petitioner had hired Francis lee Brewer to kill Cedric Turner, but Brewer mistakenly shot at Andrea Johnson,and killed him under the belief that Mr. Johnson was Cedric Turner. (RT. 478-479)

Petitioner's defense was that he did not hire Brewer to kill Turner and that Mr. Brewer had shot Johnson for independent reasons, having nothing to do with petitioner quarell with Mr. Turner. (RT. 494-503) (i.e. there was no trans-fered intent)  Petitioner was nevertheless, convicted of first degree murder on a theory of transfered intent and a special circumstance allegation that the murder was committed"for financial gain". The trial court instructed the jury on the doctrine of transfered intent pursuant to CALJIC No. 8.65. which states:

"when one attempts to kill  a certain person , but by mistake or inadvertence kills another person, the crime so committed is the same as though the person intended to be killed had been killed." (RT. 533)

The jury instruction does not tell petitioner's jury that "if" Brewer had an independent reason for shooting Johnson the doctrine of transfered intent does not apply. Therefore, the prosecutor, misstated the law when he interpreted the doctrine of transfered intent when he told petitioner's jury that"that means is, whatever crime it was, as long as one of the people was killed, you didn't kill the guy he wanted to kill or expected to kill, but somebody else was killed, whatever crime it is, i's the same had he killed the person he wanted to kill." (RT.475-476)

Be giving the standard transfered intent instruction and by having

27.

it misinterpreted by the prosecutor, the court in a sense told the jury that petitioner could be found liable for a first degree murder,even if,Brewer had killed Mr. Johnson for independent reasons, having nothing to do with petitioner's quarrel with Cedric Turner.  This was prejudicial error, because under the instructions that were given in this case, it would have taken a most sophisticated juror to understand that if Brewer had an independent motive in killing Johnson, the doctrine of transfered intent would not apply, since under the transfered intent doctrine only Brewer's criminal intent, or lack thereof, towards the intended victim, controlled petitioners culpability for any unintended result (see people v. levitt (1984) 156 cal. App. 3d 500, 509, fn. 1.) and Penal Code  sec.188. This also violates petitioner's Fourteenth Amendment and fifth Amendment Rights to Due Process of Law under state and federal law. This is so Because new evidence establish that Brewer did in fact kill Johnson for independent reasons demonstrating that petitioner is actually innocent of the killing of Andre Johnson. Petitioner incorporates the facts in ground 1 into this claim to show prejudice.

### Points and Authorities

People v. Bell,(1989) 49 Cal. 3d 502; Brown v. Payton, 544 U.S. 133 and Linares v. Evans, 2010 U.S. Dist. Lexis 142900.

28.

GROUND 6

## PETITIONER WAS DENIED  THE RIGHT
## TO EFFECTIVE ASSISTENCE OF COUNSEL AT TRIAL


At petitioners' trial, Detective Bawart was asked by the prosecutor to review the transcript of his interview with Jeffrey Taggart to refresh his recollection regarding what Jeffrey had told him that Lee Brewer said when petitioner told Brewer he had shot the wrong man. Bawart testified as follows:

> A. He indicated that Robert Henry had indicated he
>         shot the wrong man and [That he was talking
>    a mile a minute].
>
> Q. Who said that?
> A. Robert Henry-or Jester-Jeffrey Taggart said that of
>    Robert Henry.
> Q. No. Officer, take a look at line three.
> A. Yes. [Refers.] Oh, he said that Lee Brewer was talking a
>    mile a minute. (RT. 390-391)

The portion of the transcript of the interview with Jeffrey thatBawart used to refresh his recollection, however, reads as follows:

  " Oh, well, he was talkin', he was talkin' a mile a minute,  before...guns. Thats what he said". (see Exhibit 1. pp.34)

Petitioner's trial counsel cross-examined the detective thereafter, and did not Question the detective as to"why he refuse to agree,as to the contents of what the transcript actually states Brewer said,when he was told he shot the wrong man" (RT. 391-392) By doing so petitioners' trial counsel allowed petitioners' jury to believe (based on the detectives testimony) that when petitioner had allegedly told Brewer he shot the wrong man and that Lee Brewer was talking a mile a minute. When,in fact the transcript shows when Brewer was told he hit/ shot the wrong guy/man,[Brewer] had responded saying "Oh, Well, he (Johnson) was talkin', he was talkin' a mile a minute", The rest of that statement was unintelligible.                29.

In 2019 when petitioner was appointed new counsel on a habeas petition she had requested that the trial court allocate funds to hire an expert forensic audio and vvideo engineer to enhance the audio recording of Jeffrey Taggarts police interview. the court granted the request and the recording was enhanced and it was actually revealed  that Jeffrey had told the detective that, when Brewer was told he shot the wrong guy, Brewer had actually responded that he (Johnson) was talking a mile a minute and"[pulled out a gun]" (see Appendix A. pg.19-23) This Newly Discovered evidence highlights petitioners' denial of effective assistence of counsel during his trial because trial counsel did not inquire or investigate 1) whether the transcript of Jeffrey's police interview adequately convey what's on the recording, and, 2) whether the discrepancies between the detectives testimony on this point and what was convied on the transcript of Jeffrey Taggart police interview required a objection to the use of the transcribed version of the audio recording, without playing the actual recording. Because petitioners' trial counsel did neither false testimony was used at the trial of petitioner,and false evidence was introduced into evidence at petitioners' trial, and petitioner was denied a viable defense, as will be discussed in turn, and the resulting prejudice.

First, Detective Bawart testified falsely at petitioner's trial as discussed above and despite the detective reading from the Jeffrey's interview statement, the detective testified that Jeffrey told him when petitioner told Brewer he shot the wrong man, Brewer had also been talking a mile a minute. The transcript reflects however, that whe Brewer was told he shot the wrong man, Brewer responded that he (johnson) was talking a mile a minute. Even if we surmise that the detective meant to say " Brewer had responded, he (Johnson) wasTalking a mile a minute," the testimony would still be deemed false and misleading and petitioners' counsel would not have objected or had investigated the inaudible sections of the transcript despite the word"guns" ( although in a plural sense) being used in an inaudible section and out of place.

Second, Jeffrey Taggart testified at petitioners' trial as a witness for the prosecution and was given an immunity to testify (RT.318) based on statements he gave to police durring his interrogation. Jeffrey was the first to be interrogated by police"that was arrested";(petitioner and Jester Taggart was interviewed the same day,Jester was next then petitioner) Jeffrey told police that petitioner was robbed by Cedric turner and wanted some kind of retaliation, and that petitioner had a weapon at one point,out at the scene of the crime. Petitioners' trial counsel assumed for the sake of argument to the jury in this case that"petitioner did hire Brewer to Harm Cedric Turner"but that there was know transfered intent, in that,Brewer did not shoot and kill Mr. Johnson under the mistaken belief that Johnson was Turner, as theorized by the prosecution. (RT.480-484;494-504) Petitioner will make that assumption here for the sake of argument so that the court,to readily identify the issue and evidence leading to the theory of transfered intent. when Jffrey was interviewed about the events that took place after the shooting of Mr. Johnson, Jeffrey told police that Mr. Brewer and Bernard Oden came by Jester Taggart's home and that petitioner was present and allegedly informed Brewer that he had hit the wrong guy (i.e. killed the wrong man), When the detective asked Jeffrey what did Lee (Brewer) say when he was told he hit the wrong man? Jeffrey told police Brewer said "Oh, Well, he (johnson) was talking a mile a minute.(paraphrasing)

However, when Jeffrey was called to the stand to testify at petitioners'trial Jeffrey denied that petitioner was present when Brewer and Oden came by the day after the shooting (RT.355-356)and that it was alex who was there and spoke with Brewer and Oden and that he had mistook petitioner for alex (alex Taggart, petitioners' cousin). Therefore, the prosecutor sought to and did impeach Jeffrey with the transcript of his police interview transcript.

The prosecutor asked Jeffrey [do you remember tell the officer that the defendant told Brewer he killed the wrong man?...........That Mr. Brewer said, Oh, well, he was talking a mile a minute?], although Jeffrey recalled telling the police that, it is clear he struggled with the language used by the prosecutor because it was not verbatim to what he said and whats on the transcript. The question asked by the police was "what did Lee (Brewer) say when he was told he [hit the wrong guy]"That wording is not the same as [killed the wrong man], but Jeffrey nevertheless, recalled making the statement about Brewer saying Oh, Well he was talking a mile a minute. Jeffrey possition was that it was not the petitioner who told Brewer he hit/killed the wrong guy/man because petitioner was not there, he mistook petitioner for someone else. (RT.357-358)

31.

The prosecutor the called detective Bawart to testify as to what Jeffrey had told him at that interview regarding What Brewer said when he was told he hit/killed the wrong guy/man. As stated above, the detective testified falsely and mislead the court and jury as to the contents of Jeffreys statement on that subject. (RT.390-391). Petitioners' trial counsel later objected to Jeffrey's Statements coming in as admissions on different grounds than what petitioner is arging here. The court nevertheless, overruled the objection and stated:

Yes, I am letting it in because it comes in really as --I realize he denied it on the stand, said it before, but then it comes in impeaching what he said, and it would come in, then,as an admission. (RT. 394-395)

By the trial court admitting false evidence,whether unsworn or testimonial was All because trial counsel failed to do any adequate investigation as to the contents of Jeffrey Taggart's interview transcript with police that was riddled with inaudible sections and surely did not attempt to get the original audio Recording enhanced. As will be discribed below this conduct denied petitioner The ability to put on a viable defense.                    Third,

Petitioners' trial attorney made clear that petitioners' gereral defese was That there was no transfered intent in this case. (even if it is assumed that petitioner hired Brewer to kill Mr. Turner)

petitioners' trial attorney had admitted that he could not give any explanation Founded in presented evidence for the shooting of Mr. Johnson and reasoned that From the testimony of the prosecutions' other witness, Bernard Oden, that petitioner had pointed out Cedric Turner to Brewer out at the scene, that Brewer had To know who the intended victim was. Although, petitioners' trial attoney sought To produce evidence that Brewer had an independent motive when he shot Mr. Johnson based on prior conduct evidence pursuant to Evidence Code 1101(b), this Evidence was offered as an offer of proof and because the prosecutor argued pretty heavily against the admitting of that evidence the trial court gave the Attorney for petitioner an oppertunity to produce more evidence to show Brewer was proved directly by Johnson (RT.179-185),Because petitioners' counsel failed To produce any additional evidence to support the offer of proof evidence the Trial court excluded the only evidence that would give petitioner a viable defense agaist the transfered intent theory.(RT.253-255)

But for petitioners' trial attorney failure to investigate the inaudible section of Jeffrey Taggarts' police interview statements or have the orginal audio recording of Jeffrey's Enhanced at that time (if was possible), the Newly Discovered Evidence that was revealed in 2019,after enhancing Jeffrey's audio recording of

his police interview That Brewer had admitted he had shot Mr. Johnson for talk-
ing a mile a minute and"pulling out a gun" would have provided the trial court
the means to accept petitioners' offer of proof (RT. 182-183,184-185) and allow
even that additional evidence to come in, which would of gave petitioner an
acquittal, in presenting affirmative, if not viable defense to the transfered
intent theory presented in this case.

POINTS AND AUTHORITIES:

In re Long,2020 Cal. Lexis 8221, and Strickland v. Washington, 466 U.S. 668,687.

# APPENDIX A
## FIRST APPELLATE DISTRICT, DIVISION FOUR
### In re Robert Henry,(2021)
### Case No. A160596

Filed 9/29/21

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FOUR

| | |
|---|---|
| In re ROBERT HENRY,<br>on Habeas Corpus. | A160596<br><br>(Solano County Super. Ct.<br>Nos. VC19726 & FCR333123) |

## I. INTRODUCTION

Robert Henry, who was convicted of the murder of Andre Johnson in 1986, has filed a habeas petition seeking relief based on newly discovered evidence (Pen. Code, § 1473, subd. (b)(3)) and false evidence (*id.*, subd. (b)(1)).[1]  His conviction carried a special circumstance finding that the murder was intentional and committed for financial gain.  (§ 190.2, subd. (a)(1).)  Henry was sentenced to life imprisonment without the possibility of parole (LWOP).  This court affirmed the conviction in a 1988 unpublished opinion.  (*People v. Henry* (Sept. 21, 1988, A035447) [nonpub. opn.].)  As we recently outlined in an unpublished opinion affirming the denial of Henry's petition for resentencing under section 1170.95: "The prosecution's theory at trial was that Henry hired Francis Lee Brewer to kill Cedric Turner (who Henry believed had participated in a robbery of Henry), and Brewer instead shot and killed Johnson, believing Johnson to be Turner.

---

[1] Undesignated statutory references are to the Penal Code.

1

The prosecution argued Henry was guilty of aiding and abetting the murder of Johnson on a transferred intent theory." (*People v. Henry* (Feb. 26, 2021, A158921) [nonpub. opn.].)

In this, the most recent of five habeas petitions Henry has brought collaterally attacking his conviction, we are presented with eight claims alleging newly discovered evidence in the form of (1) witness testimony given at proceedings after Henry's trial, and (2) a recently enhanced audio recording of a witness interview. Henry contends the new evidence shows "that, contrary to the testimony presented at [Henry's] trial, Brewer was not the one who shot and killed Johnson but that the murder was committed by Bernard Oden, and was perpetrated for a reason other than an agreement with [Henry] to kill Turner." Henry also argues the new evidence (contradicting testimony given at his trial) shows the trial testimony was false. He states: "The false evidence consists of testimony at [Henry's] trial that Brewer had done the shooting and that [Henry] had admitted hiring Brewer to murder Turner but Brewer killed the wrong man."

The Attorney General filed an informal response arguing that we should deny relief summarily on the ground that Henry's claims are untimely. We agreed in part but issued an order to show cause directed to certain portions of the petition. In our order to show cause, we ordered supplemental briefing on specific issues concerning the timeliness of some of Henry's claims, and gave the parties the option to stand on their initial pleadings in lieu of filing a formal return and traverse. The parties having filed the requisite supplemental briefs and having elected to stand on their initial pleadings in lieu of filing a formal return and traverse, we heard argument on August 10, 2021, and took the cause under submission. The order to show cause denied relief as to some of Henry's claims. We now deny relief as to the remainder of the claims.

2

## II. BACKGROUND

To establish the baseline context, we quote from our unpublished decision filed September 21, 1988 (with appropriate bracketed adjustments) as follows:

The conviction at bench grew out of the killing of Andre Johnson who was shot from a passing car driven by Francis Lee Brewer (Brewer), a hired killer. The murder took place on Thanksgiving Day, 1985, in the vicinity of Country Club Crest in northern Vallejo and involved numerous members of the Henry and Taggart families, including [Henry], [his three brothers Gary and John Henry and Jeffrey Taggart (Jeffrey); as well as his cousins Jester Taggart (Jester) and Alex Taggart]. Stated most favorably to respondent as it must [be] *(People v. Johnson* (1980) 26 Cal.3d 557, 576; *People v. Mosher* (1969) 1 Cal.3d 379, 395, disapproved on other grounds in *People v. Ray* (1975) 14 Cal.3d 20, 30–31) the evidence reveals the following scenario.

At about 3 a.m. on November 28, 1985, Cedric Turner, the intended victim of the crime [(Turner)], stood at the corner of Gateway and Rounds Streets in the Country Club Crest area in Vallejo. Wyatt Shellmon came along in his car and asked Turner if he could get some "base rocks"[2] for him. After a yes answer, Shellmon picked up Turner and drove him to Sawyer Street to contact [Henry] who was selling cocaine. Moments later, [Henry] got into Shellmon's car. All three were heading towards the end of an isolated cul-de-sac in a remote area of the city. Shellmon suddenly stopped, pulled a gun and pointing it at [Henry] said, "Give me everything you have or I'll blow your head off." [Henry] complied by giving up $30 in cash and some cocaine. Shellmon then ordered [Henry] out of the car and shortly thereafter dropped off Turner as well.

---

[2] "Base rock" is a street term for cocaine.

3

Following the robbery, [Henry], Jeffrey and Jester met at [Henry]'s house to discuss retaliation against Turner. After hearing [Henry] recount that Turner had robbed him by putting a gun at his head, they unanimously decided to shoot (get) Turner.

For the apparent purpose of carrying out the plan, [Henry] during late afternoon arranged a meeting with Bernard Oden and the latter's friend, Brewer. At the meeting which took place in his house, [Henry] complained that he had been robbed of $400 at gunpoint and offered two "hubbas" (rock cocaine) to Brewer to give Turner "a good ass whipping." Brewer fully understood the true meaning of [Henry]'s request. Immediately following the discussion, Brewer went to his girlfriend's house on Stella Street, picked up a .22 caliber sawed-off rifle and ammunition, loaded the gun with bullets, placed it in the blue Plymouth he had stolen earlier and took off to Gateway Drive, the scene of the shooting.

Around 6 p.m. that evening, [Henry] and Jester confronted Turner on Gateway Drive and told him they were going to "take him out" and he "was gonna die." The duo then left and returned with Jeffrey, all three carrying guns. [Henry] came face to face with Turner and repeated his threat that Turner was going to die. By now a crowd had gathered and Turner retreated to the driveway of the Morgan residence at Gateway. Jester, with [Henry] standing close by, urged the crowd to move because "somebody's going to get shot."

Turner fled inside the house. Andre Johnson was also there and after listening to Turner's description of what was going on said: "Come on, we'll handle it" and offered to give Turner a ride home. They walked outside together. As Turner walked over to Johnson's car and occupied the front passenger seat, the crowd asked Johnson why he was helping Turner, instead of letting him fight his own battles. Johnson threatened them back shouting

that he and his brother would come back and tear up the place. Simultaneously Johnson and [Henry] were yelling and pushing each other; Johnson called [Henry] "wave set" an obvious slur on [Henry]'s permed hair.

Meanwhile, Brewer and Oden arrived at the scene in the blue Plymouth and parked in front of Johnson's car. Brewer got out of the car and stood on the sidewalk observing the argument between [Henry] and Johnson. [Henry] walked up to Brewer and pointed out Turner to him by saying: "That's the guy."

Thereafter, Brewer, with Oden as his passenger sitting in the front seat, drove down the street, made a U-turn and slowed down or stopped in the middle of the street next to Johnson's car. As Jester yelled "watch out, he's gonna shoot," Brewer leaned across Oden and fired numerous shots out of the passenger window of the car hitting and killing Johnson who was standing approximately 5 to 10-feet away. The evidence overwhelmingly demonstrates that at the time of the shooting Johnson was reaching for the door of his automobile and was facing toward the crowd in the street rather than the blue car from which the shots were coming.

After the shooting, Brewer disposed of the murder weapon, wiped the fingerprints off the blue Plymouth and abandoned the car. Then, accompanied by Oden, he returned to the crime scene to ascertain if the victim had been shot. As a next step, Brewer, Oden and Jeffrey went to [Henry]'s house on Sawyer Street. In the ensuing discussion, Brewer assured [Henry] that he had taken care of the job and that [Henry] did not have to worry any more. [Henry] indicated that he was willing to pay but added since Brewer had killed the wrong man, the original price would be reduced

in half from $200 to $100.[3] The fact that the Johnson killing occurred as a result of an agreement to kill Turner, was further corroborated by [Henry] himself. The record reflects that after his arrest for the Johnson homicide [Henry] stated to Detective Bawart: "I hired Lee Brewer to kill Cedric Turner. He killed the wrong guy. I can't understand why I'm being charged."

The thrust of [Henry]'s defense was that Brewer killed Johnson based on an independent motive. Under this hypothesis, since Brewer did not mistakenly or inadvertently shoot Johnson while intending to shoot Turner, the doctrine of transferred intent could not be applied to convict [Henry]. In support of this theory a defense criminalist testified that the angles and the bullet trajectories indicated that Johnson was the intended target and that he was struck while on the ground or falling towards the ground. The defense also examined a psychologist who administered an "I.Q." test to [Henry]. According to his testimony, [Henry]'s "I.Q." was at 75 which constituted borderline mental deficiency.

Based upon the foregoing evidence, [Henry] was convicted of first degree murder (Pen. Code, [footnote omitted] § 187) under the theories of

---

[3] The pertinent part of the record reads as follows: "Q. What happened the second time you'd been there now after the shooting, what took place? [¶] A. Just—Lee told—Lee Francis [Brewer] told him, Robert Henry that, uh, <u>he had tooken care of that.</u> [¶] Q. And what was said to him by Mr. Henry? [¶] A. He told him that he didn't have that right now, but he could come back later and he would give it to him. [¶] Q. Then what happened? [¶] A. Uh, shortly after that, asked exactly what happened. He said, '<u>You don't have to worry about him no more.</u>' [¶] Q. Who asked that? [¶] A. He asked Lee. [¶] Q. When you say 'he,' who are you referring to? [¶] A. Robert Henry. [¶] Q. Asked him what? [¶] A. Exactly what had happened, and Lee told him, replied to him, '<u>Well, you don't have to worry about him no more.</u> . . .' " [¶] "Q. And did they discuss the payment? [¶] A. Yes. They indicated that, because he had hit—shot the wrong man, that he was only going to pay half of the moneys; instead of paying $200, he was going to be paid only 100." (Emphasis added.)

6

aider and abettor and transferred intent. The jury found the special circumstance allegation of intentional murder for financial gain (§ 190.2, subd. (a)(1)) and the firearm use allegation (§ 12022, subd. (a)) to be true. [Henry]'s motion for a new trial and/or to dismiss the special circumstance finding was denied, and he was sentenced to [LWOP].

[We end our quotation from *People v. Henry, supra*, A035447.]

### A. *Henry's Habeas Corpus Petition*

Summarized generally, the petition before us alleges the following new evidence surfaced in proceedings that followed Henry's trial: (1) Evidence that Bernard Oden (the passenger in the car driven by Brewer), rather than Brewer, shot and killed Johnson. Henry argues this evidence conflicts with the prosecution's theory that Henry is guilty on a transferred intent theory because he hired Brewer to kill Turner. (2) Evidence that, whether Brewer or Oden was the shooter, each had his own reasons to shoot Johnson, such as Johnson's belligerent manner at the scene or his displaying of a gun. Henry argues this evidence conflicts with the theory that Johnson was shot pursuant to an agreement between Henry and Brewer to kill Turner. (3) Evidence that Brewer would not have mistaken Johnson for Turner. Henry argues this evidence undercuts the prosecution theory that Brewer shot Johnson by mistake as he attempted to fulfill his agreement with Henry to shoot Turner.

### B. *Henry's Specific Allegations of Newly Discovered Evidence*

Summarizing the petition somewhat more specifically in order to frame the issues we will be addressing here, we note that Henry alleges the following new evidence and further alleges he discovered it in the following circumstances.

First, two of Henry's alleged accomplices—his cousin Jester and the alleged shooter Brewer—were tried in connection with Johnson's murder.

7

Jester was tried in 1986 shortly after Henry's trial, and Brewer's trial began near the end of 1987 and concluded in early 1988. Some of the testimony at those trials differed from the testimony at Henry's trial.[4] In particular, Henry's brother Jeffrey (who was given immunity) gave different accounts at the three trials: (1) Jeffrey testified at Henry's trial that he was standing on the street, saw that the shots came from the car driven by Brewer and was sure the passenger fired them; (2) Jeffrey testified at Jester's trial that he was standing on the street and saw that Oden fired the shots; and (3) Jeffrey testified at Brewer's trial that he (Jeffrey) was in the car with Brewer and Oden, and he saw Oden fire the shots. The jury at Brewer's trial found him guilty of second degree murder and found he did not personally use a firearm.

Second, Henry sought federal habeas relief and initially suffered a denial, but obtained an order on appeal to the Ninth Circuit remanding the proceeding for an evidentiary hearing. (*Henry v. Marshall* (9th Cir. 2007) 224 Fed. Appx. 635, 636–637.) On remand, the federal district court referred the case for an evidentiary hearing before a magistrate judge. (See *Henry v. Marshall* (E.D. Cal., May 27, 2010, No. CIV S-94-0916 JKS EFB P) 2010 U.S. Dist. LEXIS 52192, p. *10.) At that evidentiary hearing in 2009, Brewer testified that Henry did not hire him, or offer him money or drugs, to kill or

---

[4] This court previously granted Henry's request for judicial notice of certain records from prior and related proceedings, while denying his request as to other records that were not available to this court (without prejudice to the ability of the parties to submit, and ask this court to take judicial notice of, additional relevant records).

Henry has now submitted a request that this court take judicial notice of additional materials, specifically partial reporter's transcripts from Henry's and Jester's trials. We grant that second request to the extent it pertains to the partial transcripts of Jester's trial. We deny the second request as it pertains to partial transcripts of Henry's trial, because this court (in response to Henry's first judicial notice request) has already taken notice of a more complete set of those transcripts that was filed in one of Henry's recent appeals.

8

hurt Turner. Brewer testified that Oden shot Johnson. Brewer testified he was familiar with both Johnson and Turner, although he had met Johnson once and had not met Turner. He testified he would not have mistaken one of them for the other. Henry's brother Jeffrey testified he was in the car with Brewer and Oden, and that Oden shot Johnson. Henry testified that, after he was robbed, he discussed retaliating against Turner with his brother Jeffrey and their cousin Jester. But they only discussed beating Turner up, not shooting or killing him. Henry said he jokingly said to Brewer he would give him some cocaine if he helped beat up Turner. In May 2010, the magistrate judge issued a detailed decision recommending the denial of relief and finding the new evidence supporting Henry's innocence claim was not credible. (*Henry v. Marshall*, *supra*, 2010 U.S. Dist. LEXIS 52192, at p. *81.) And in September 2010, the federal district court adopted the magistrate judge's findings and recommendations in their entirety.

Third, in October 2017—following the Legislature's enactment in 2016 of an amendment to section 1473 adding new subdivision (b)(3), which revised the applicable standard for showing entitlement to relief based on "[n]ew evidence" that would have "more likely than not changed the outcome at trial"—Henry filed a habeas petition in the Solano County Superior Court, seeking relief based on newly discovered evidence (i.e., the evidence developed in the proceedings discussed above).[5] The superior court issued an order to show cause and held an evidentiary hearing in December 2019. The court considered Henry's claim for relief in light of the amendment to

---

[5] This was the third petition for habeas corpus attacking his conviction that Henry filed in the California courts. In 2013, Henry filed a habeas petition in Solano County Superior Court, arguing that new evidence developed at the 2009 federal hearing showed his actual innocence. The court denied that petition as untimely. A second petition was denied in 2016 as a successive petition.

9

section 1473 (effective January 1, 2017). Jeffrey testified that, after Henry was robbed, there was only a discussion of beating Turner up, not shooting or killing him. In addition, Jeffrey testified he was in the car with Brewer and Oden, and that Oden fired the shots at Johnson. Henry also testified in the evidentiary hearing held by the superior court. In part, he denied making the statement to the police, " 'I hired Lee Brewer to kill Cedric Turner. He . . . killed the wrong guy. I don't understand why I am being charged.' "

Another new piece of evidence, an enhanced audio recording of Jeffrey's interview by Detective Bawart and another detective in the investigation of Johnson's murder, emerged for the first time at the 2019 hearing. The enhanced audio recording (which was enhanced by a forensic video and audio analyst in 2019 at the request of Henry's superior court habeas counsel) was not considered in the trials of Henry's accomplices or in the federal habeas proceedings. On the recording, Jeffrey is asked what Brewer said when he was told he shot the wrong man; in response, Jeffrey can be heard saying that Brewer said Johnson "was talking a mile a minute and [] pulled out a gun." The transcript of the unenhanced version of the recording, which was used to refresh Detective Bawart's recollection when he testified at Henry's 1986 trial, omits some of this language, and the statement that Johnson "pulled out a gun" was not in evidence at the 1986 trial. Henry argues the new evidence that Brewer said Johnson had a gun bolsters the view that Brewer had an independent reason for shooting Johnson that had nothing to do with an agreement between Brewer and Henry.

On December 30, 2019, the superior court issued an order denying relief. Like the federal district court, the superior court found in part that Henry's new evidence was not credible. Henry's superior court habeas counsel filed a notice of appeal in January 2020. This court dismissed that appeal (No. A159396) because the superior court's denial of habeas relief is

10

not an appealable order.  (*People v. Henry* (Sept. 18, 2020, A159396) [nonpub. opn.].)  On July 31, 2020, after appointment of appellate counsel, Henry filed the original habeas proceeding that is now before us.

### C. *The Claims Alleged in Henry's Petition and Our Order To Show Cause of May 25, 2021*

Henry now alleges he is entitled to habeas relief based on "new evidence" (mostly the evidence developed in the prior proceedings) and the presentation of "false evidence" at his 1986 trial (a ground for relief not raised in his prior habeas petitions).  In the memorandum attached to his petition, Henry states he is presenting the following eight claims:

"(1) that [Henry] is entitled to relief based upon newly discovered evidence that Oden, rather than Brewer, was the person who shot Johnson, which is evidence that Johnson was not shot because [Henry] had hired Brewer to shoot [Turner];

"(2) that [Henry] is entitled to habeas corpus relief because false evidence was introduced at [his] trial that it was Brewer who shot Johnson, which supported the prosecution's theory that [Henry] had hired Brewer to shoot Turner but Brewer shot Johnson in the mistaken belief that Johnson was Turner;

"(3) that [Henry] is entitled to habeas corpus relief based upon newly discovered evidence that Brewer was familiar with both Turner and Johnson at the time of the shooting and therefore would not have mistaken Johnson for Turner;

"(4) that regardless of whether it was Brewer or Oden who shot Johnson, [Henry] is entitled to habeas corpus relief based upon newly discovered evidence that [Oden and Brewer each] had a reason to shoot Johnson based upon Johnson's statements and behavior at the scene of the shooting, rather than an alleged agreement with [Henry] to commit the shooting;

"(5) that [Henry] is entitled to habeas corpus relief based upon false evidence that he had entered into an agreement to pay Brewer to shoot [Turner];

"(6) that [Henry] is entitled to habeas corpus relief based upon newly discovered evidence that Oden believed Johnson had a gun, which gave Oden a reason to shoot Johnson that had nothing to do with an alleged agreement with [Henry];

"(7) that [Henry] is entitled to habeas corpus relief based upon newly discovered evidence that Brewer saw Johnson pull out a gun right before Brewer shot Johnson, which gave Brewer his own reason to shoot Johnson—rather than an agreement with [Henry];  [¶] and

"(8) that [Henry] is entitled to habeas corpus relief based upon false evidence that Brewer had only mentioned 'talking a mile a minute' before Johnson was shot when Brewer also had stated that Johnson pulled out a gun, which gave Brewer a reason to shoot Johnson that had nothing to do with an alleged agreement with [Henry]."

Our order to show cause, filed May 25, 2021, was limited to: (1) Henry's claims for relief based on newly discovered evidence under section 1473, subdivision (b)(3); and (2) his claims for relief—on grounds of both "false evidence" and "new evidence" (§ 1473, subds. (b)(1), (3))—based on the enhanced audio recording that was admitted into evidence at the superior court evidentiary hearing in 2019.  We specifically stated that our order to show cause "does not extend to the remaining 'false evidence' claims asserted in the petition because those claims are untimely" and that "[a]side from the claims that are the subject of [our] order to show cause, the petition is denied."  Thus, claims 2 and 5—both "false evidence" claims that are not based on the enhanced audio recording—are outside the scope of the order, and relief on them has already been denied.

12

## III. DISCUSSION

The claims in Henry's petition that have not already been denied break down into one of two categories.  First, Henry pleads claims alleging a variation on the theories that Oden, not Brewer, shot Johnson; that Brewer could not have mistaken Johnson for Turner because he was familiar with Johnson and Turner, and thus Brewer must have had his own reasons to shoot Johnson; and that there was no murder for hire agreement between Henry and Brewer.  Second, Henry pleads claims alleging that Brewer was motivated to shoot Johnson because of Johnson's threatening behavior and therefore Brewer did not carry out the shooting pursuant to any murder for hire agreement.

### A. *Claims Based on Evidence Other Than the Enhanced Audio Recording*

Falling in the first category are claims 1, 3, 4—in part (to the extent it is premised on the allegation that Oden was the shooter)—and 6.  As Henry acknowledges in his petition, these claims all rest on evidence that surfaced years ago in the trials of Henry's alleged accomplices or in the federal habeas proceeding.  They all fail on one or both grounds that they are untimely (*In re Reno* (2012) 55 Cal.4th 428, 460–463) or that they are not subject to section 1473, subdivision (b)(3) because the statute covers only claims based on evidence that is both "new" and "credible."

Here, we will defer to prior adverse credibility findings in previous habeas proceedings.  When a habeas claim comes to us in original proceedings following a previous habeas proceeding on the same claim in the superior court, we may defer to the findings of the superior court where those findings turned on an assessment of credibility.  "While our review of the record is independent and 'we may reach a different conclusion on an independent examination of the evidence . . . even where the evidence is conflicting' [citation], any factual determinations made below 'are entitled to

13

great weight . . . when supported by the record, particularly with respect to questions of or depending upon the credibility of witnesses the [superior court] heard and observed.' " (*In re Resendiz* (2001) 25 Cal.4th 230, 249 (lead opn. of Werdegar, J.).)[6] We see no reason the same principle ought not to apply to a prior determination made on habeas claims in federal court.

The key witnesses supplying evidence that Oden, not Brewer, shot Johnson, that there was no murder for hire agreement to kill Turner, and that Brewer would not have mistaken Johnson for Turner, are Jeffrey, Brewer, and Henry himself.[7] The testimony proffered from each of these three witnesses has repeatedly been found not credible in prior habeas proceedings. (*Henry v. Marshall, supra,* 2010 U.S. Dist. LEXIS 52192, at pp. *29–*50, *70–*72.) On the various occasions Jeffrey made statements to the police and testified about the murder of Johnson, Jeffrey's versions of events were, to put it mildly, all over the lot. He initially told Detective Bawart he was 90 feet away from the shooting and did not see it happen. Then, at trial, he testified that he had lied about some issues in his police

---

[6] Justice Mosk concurred in the relevant portion of Justice Werdegar's lead opinion in *Resendiz.* (See *In re Resendiz, supra,* 25 Cal.4th at p. 255 (conc. & dis. opn. of Mosk, J.).)

[7] Henry cites and relies upon testimony given after his trial from various others, including Charles Austin and Pamela Conyers, but we view all of that testimony as "merely cumulative, corroborative, [or] collateral" to the evidence that was presented at Henry's trial. (§ 1473, subd. (b)(3)(B).) None of it constitutes "new evidence" within the meaning of section 1473, subdivision (b)(3). In addition, the federal magistrate judge found there were problems with Conyers's credibility because she recanted part of her prior statement to an investigator (*Henry v. Marshall, supra,* 2010 U.S. Dist. LEXIS 52192, at pp. *64–*65), and found credibility problems with Austin's testimony as well (*id.* at pp. *50–*53). The superior court similarly found that "[t]he admitted transcripts of Pamela Conyers and Charles Austin add little to this factual analysis and are not supported by the additional evidence presented to this Court."

14

interview, that he was at the scene of the shooting, and that he saw Oden fire the shots from the driver's window of a blue car Brewer was driving. Then, at Brewer's trial, he testified he was in the backseat of the blue car when Oden fired the shots.

These are just some of the most glaring inconsistencies in Jeffrey's testimony about the circumstances of Johnson's murder. There were a number of others. (*Henry v. Marshall, supra,* 2010 U.S. Dist. LEXIS 52192, at pp. *32–*40.) To explain all of these discrepancies, Henry argued that Jeffrey, a youth of 16 at the time of the Johnson murder, was intimidated in his police interview and did not want to identify Oden as the shooter due to fear of retaliation. (*Id.* at p. *40.) But the magistrate judge found neither explanation persuasive. (*Id.* at pp. *40–*42.) He summed up his assessment of Jeffrey's credibility as follows: "Not only [were] Jeffrey's varying accounts wildly inconsistent, and his memory repeatedly unreliable, his demeanor at the evidentiary hearing was not at all convincing. He repeatedly stated that he did not remember various details of the shooting, only to claim that he remembered them once he had reviewed his previous testimony in which he gave varying accounts. It was apparent that what he struggled to remember was what he previously had said in prior testimony. The more probable explanation for Jeffrey's inability to recall who fired the gun is the account that he first told the police; he was not in the car at the time and did not see who did the shooting. Also, as [Henry's] brother, Jeffrey clearly has a motive for fabrication. The court finds that Jeffrey is not a credible witness." (*Id.* at pp. *45–*46.)

Jeffrey testified again in the 2019 evidentiary hearing on Henry's subsequent habeas petition in superior court. There, the superior court found that the evidence presented by Henry was "not, by and large, new evidence," and noted Jeffrey testified at Henry's original trial. With respect to Jeffrey's

credibility, the court noted that the key witnesses (Henry, Jeffrey, and Brewer) testified to inconsistent versions of events, and the magistrate judge in the prior federal habeas proceeding found this evidence not credible. We, too, will defer to the assessment of the magistrate judge as adopted by the federal district court in 2010 that Jeffrey, who has a filial bias in favor of Henry, is not believable. (*Henry v. Marshall, supra*, 2010 U.S. Dist. LEXIS 52192, at p. *46.)

Brewer's version of events also suffers from credibility problems. After exercising his right to remain silent when Henry was tried, at his own trial, and for many years thereafter, Brewer testified about the murder of Johnson for the first and only time in the federal habeas evidentiary hearing in 2009. There, he testified that Henry did not hire him, or offer him money or drugs, to hurt or kill Turner; that Oden shot Johnson; that Brewer was familiar with Turner and Johnson (although he did not know them well) and would not have mistaken one for the other; that Jeffrey was in the car with Brewer and Oden; that Brewer and Oden went to Jester's house the day after the shooting; and that Brewer did not see Henry there. The magistrate judge found Brewer's testimony was not credible because it contained internal inconsistencies; because Brewer's claim that he was never offered drugs to beat up or kill anyone is inconsistent with Henry's claim that he offered Brewer drugs to beat up Turner; that Brewer has a motive to say Oden is the shooter, to take blame off himself; and that Brewer was impeached by prior felony convictions. (*Henry v. Marshall, supra*, 2010 U.S. Dist. LEXIS 52192, at pp. *46–*50.) We will defer to the magistrate judge's assessment of Brewer's credibility.

Henry, for his part, exercised his privilege to remain silent at his own trial, and eventually decided to testify about Johnson's murder for the first time at the federal evidentiary hearing. He testified that after being robbed

16

the night before the murder, he discussed retaliating against Turner with Jeffrey and Jester, but that they only discussed beating Turner up (not shooting or killing him). He testified that he jokingly said to Brewer he would give him some cocaine if he helped beat up Turner, but neither Henry nor Brewer took the offer seriously. The magistrate judge did not make the same type of detailed explicit credibility findings about Henry that he did about Jeffrey and Brewer. But the magistrate judge did note that Henry made highly incriminating statements to the police about having hired Brewer to kill Turner, and to the extent he provided testimony attempting to explain away these statements, the credibility of that testimony was undercut by his inconsistent statements and by inconsistencies between his and Brewer's testimony. (*Henry v. Marshall, supra*, 2010 U.S. Dist. LEXIS 52192, at pp. *66–*72.)

Henry testified again about Johnson's murder in the evidentiary hearing held by the superior court. There, he testified that after he was robbed by Shellmon, he talked with Jester and Jeffrey about beating Turner up, but not about shooting or killing him; in the late afternoon, Brewer and Oden came by Jester's house; in the presence of Brewer and others, Henry "threw out" a statement that he would give a couple rocks of cocaine to anyone who would help beat up Turner ("kick his ass"); there was no discussion of shooting or killing Turner; no agreement was reached with Brewer; later at the scene of the shooting, Henry saw the barrel of a gun come out the passenger side of Brewer's car, and shots were fired; and he was not present at any meeting with Brewer the day after the shooting. Henry specifically denied making the statement to the police (after the tape recording was turned off), " 'I hired Lee Brewer to kill Cedric Turner. He . . . killed the wrong guy. I don't understand why I am being charged.' " Instead, he testified that the police were speaking in hypotheticals and Henry asked:

17

" 'How can I be guilty of murder if I hired Brewer and he shot somebody else?' "  As to his incriminating statements that *were* on the recording of his interview, Henry said the police asked compound questions and he just answered the last part; he did not intend to concede he hired Brewer to kill Turner.

As to Henry's credibility, the superior court found that (1) he could have testified at trial but chose not to; (2) his testimony in the 2019 hearing was "inconsistent with his recorded interview with Detective Bawart (notwithstanding admitted errors in the proffered transcript), his previous testimony in 2009, and his own verified factual summary in support of his writ"; (3) his 2019 testimony was also inconsistent with Jeffrey's various statements and testimony, and with Brewer's testimony at the federal hearing; (4) Henry presented much of the same evidence at the federal hearing, and the federal magistrate judge found it not credible.

None of Henry's testimony in either of these two prior habeas proceedings can be considered "new," since he elected to withhold it at his trial.  And even if Henry's testimony qualifies as "new" within the meaning of section 1473, subdivision (b)(3)(B) when evaluated in the context of testimony from others that does meet that standard, we agree with the assessments of the magistrate judge and the superior court that Henry's testimony conflicts with his own prior statements, with his prior testimony, and with the testimony of Jeffrey and of Brewer.  (See *Henry v. Marshall, supra*, 2010 U.S. Dist. LEXIS 52192, at pp. *70–*72.)  In light of the inherently self-serving bias Henry has, and giving great weight to the adverse credibility findings against Henry by both the magistrate judge and the superior court, we find his proffered testimony in this proceeding to be neither "new" nor "credible." (§ 1473, subd. (b)(3).)

18

Accordingly, we conclude that none of claims 1, 3, 6, or 4 (to the extent it alleges Oden was the shooter) is covered by section 1473, subdivision (b)(3) and that, insofar as those claims are based on a request for habeas relief outside of that particular statutory subdivision, they are untimely. All that remains are the claims alleging that, based on the enhanced audio recording Henry alleges was unavailable to him prior to 2019, Brewer shot Johnson because of Johnson's belligerent conduct, not pursuant to a murder for hire agreement (claims 7 and 8 and that portion of claim 4 premised on the allegation that Brewer was the shooter). We now turn to those claims.

## B. *Claims Based on the Enhanced Audio Recording*

We asked the parties to submit supplemental briefing on the question whether Henry's claims based on the enhanced audio recording are timely. Having reviewed the parties' submissions, we shall assume arguendo that these claims are timely and proceed to resolve all of them on the merits.

Claim 7 and the portion of claim 4 that we consider here are newly discovered evidence claims, while claim 8 is a false evidence claim. The applicable legal standards governing these two types of claims are different. Habeas corpus relief based on newly discovered evidence may be granted when "[n]ew evidence exists that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome at trial." (§ 1473, subd. (b)(3)(A); *In re Masters* (2019) 7 Cal.5th 1054, 1081 (*Masters*).) The statute defines " 'new evidence' " to mean "evidence that has been discovered after trial, that could not have been discovered prior to trial by the exercise of due diligence, and is admissible and not merely cumulative, corroborative, collateral, or impeaching." (§ 1473, subd. (b)(3)(B).) Prior to the 2016 legislation (effective January 1, 2017) that added these provisions to section 1473 (Stats. 2016, ch. 785, § 1), the standard for relief based on newly discovered evidence was

more stringent. "[A] habeas corpus petitioner proceeding on this ground had to show the new evidence pointed ' "unerringly to innocence" ' and 'undermine[d] the entire case of the prosecution.' (*In re Hall* (1981) 30 Cal.3d 408, 423.) That former standard required a petitioner to conclusively establish innocence. (*Ibid.*)" (*In re Sagin* (2019) 39 Cal.App.5th 570, 579.)

A different standard applies to claim 8, the false evidence claim. A 1975 amendment to Penal Code section 1473 set forth in substance the current standard for false evidence claims, providing that habeas relief is available if "[f]alse evidence that is *substantially material or probative on the issue of guilt or punishment* was introduced against a person at a hearing or trial relating to the person's incarceration." (§ 1473, subd. (b)(1), italics added; see *In re Wright* (1978) 78 Cal.App.3d 788, 807–808.) "The remedial purpose of the statute is to afford the petitioner relief if the 'false evidence [was] of such significance that it may have affected the outcome of the trial . . . .' " (*In re Richards* (2016) 63 Cal.4th 291, 312.) " 'Determining that the evidence was false clears the first hurdle to relief. "The statute and the prior decisions applying section 1473 make clear that once a defendant shows that false evidence was admitted at trial, relief is available under section 1473 as long as the false evidence was 'material.' " [Citation.] Materiality is shown if there is a reasonable probability the result would have been different without the false evidence.' [Citation.] 'This required showing of prejudice is the same as the reasonably probable test for state law error established under *People v. Watson* (1956) 46 Cal.2d 818, 836. [Citation.] We make such a determination based on the totality of the relevant circumstances.' " (*Masters*, *supra*, 7 Cal.5th at p. 1078.)

We need not delve into subtle differences between these two standards because Henry cannot meet the prejudice element of either one. The question here is whether we are prepared to say Jeffrey's unsworn statement to

Detective Bawart that Brewer said Johnson pulled out a gun is "of such decisive force and value that it would have more likely than not changed the outcome at trial" (§ 1473, subd. (b)(3)(A)), or that it was " ' " ' 'material' " ' " in the sense that, in the totality of the circumstances without the allegedly false evidence (i.e., the allegedly incomplete description of Brewer's statement that was in evidence at trial), " 'there is a reasonable probability the result would have been different' " (*Masters, supra,* 7 Cal.5th at p. 1078). For two reasons, we think not.

First, because Jeffrey is the only witness who is alleged to have said anything about Brewer believing Johnson pulled a gun, the credibility of his statement on this point is bound up with Jeffrey's credibility in general, and in our view Jeffrey is the least believable of any witness Henry relies upon. When Brewer finally testified about the murder of Johnson, not even he said that Johnson engaged in the provocative act of pulling a gun. Brewer's version of what happened was simply that Oden shot Johnson. Brewer gave no explanation for why Oden killed Johnson; he just laid the blame on Oden, and denied being party to any murder for hire agreement. There was evidence at trial—corroborated by Henry's statements to police—of a quid pro quo agreement between Henry and Brewer to harm Turner. There was also strong evidence of conduct by Brewer both before the shooting (arming himself with a rifle and driving to the location where Turner was) and in its aftermath (trying to collect for what he had done) showing that the object of the agreement was to do more than administer a beating. The evidence at trial also included testimony from Jeffrey that 15–20 minutes before the shooting he, *Jeffrey,* saw Johnson in possession of a chrome gun, that the gun was tucked in Johnson's rear waistband, and that Johnson pulled it out of his waistband and then stuck it back in. Jeffrey's belief that Johnson had a gun well before the shooting obviously proves little or nothing about what *Brewer*

saw or was thinking when the shooting took place. We think it implausible that any rational juror would accept a double hearsay statement in which Jeffrey attributes to Brewer a belief about Johnson pulling a gun just before being shot—an observation no witness testifying from personal knowledge, including Jeffrey himself, ever made—and then rely on that sliver of hearsay to justify the conclusion that Brewer shot Johnson for his own reasons rather than by mistake in the course of executing his assigned task.

Second, the nature of the "proof" Henry now relies upon must be kept in mind. We are dealing with an unsworn interview statement that, at Henry's trial, the prosecutor used in an effort to refresh Detective Bawart's recollection of hearsay statements allegedly made by Brewer. After Detective Bawart reviewed the specific portion of the statement that mentions the word "guns," his memory of what Jeffrey said in the interview about Brewer's statements did not include anything about "guns." (He recalled the part about "talking a mile a minute" but nothing about "guns.") Henry's counsel never tried to offer the transcript itself into evidence, presumably because it included many statements that inculpated Henry in various ways, including Jeffrey's admission that he believed there was a quid pro quo agreement with Brewer (although he denied being present when it was reached), that Henry was present when Brewer came to collect the next day, that Henry offered to pay a discounted amount ($100) for the botched attempt at murder, and that Henry brought guns to the confrontation with Turner. The idea that, had the transcript been more complete, Detective Bawart's recollection would have been any clearer, or that competent defense counsel would have offered the enhanced transcript into evidence, is sheer speculation. And in any event, Henry presented expert testimony and argued from it that Turner was not in Brewer's line of fire when Johnson was shot, and thus that Johnson—who suffered multiple gunshot wounds—must have been shot intentionally for

22

some reason other than an attempt to murder Turner. In the absence of corroborating testimony from Brewer himself about what was going through his mind, Jeffrey's hearsay statement that Brewer said Johnson pulled out a gun is attenuated proof of intent at best and adds very little to the physical evidence Henry's counsel already had available to rely upon in closing at trial.

Henry has pointed to none of the traditional indicia suggesting that, in convicting him, his jury saw his case as close (e.g., split verdict, lengthy deliberations, reported impasse, questions to the trial judge suggesting it was struggling with the issue of transferred intent). We acknowledge and find it understandable that from his perspective as an LWOP defendant, having seen Brewer succeed in convincing a later jury to return a second degree murder verdict with no finding of personal use of a firearm, Henry may be convinced he, too, could have been more persuasive in arguing Brewer's intent and role in the murder of Johnson. But we are not empowered to equalize the results coperpetrators obtain from separate juries on different occasions and different records. In this proceeding, we are focused on Henry's jury, Henry's trial record, and whether there is reason to believe the enhanced audio recording Henry relies upon in his claims 7, 8 and 4 (to the extent premised upon Brewer as the shooter) would have brought about a better result for him had that piece of evidence been a part of Henry's trial record. All in all, we must say no. The enhanced audio recording is not "[n]ew" evidence of such "decisive force and value that it would have more likely than not changed the outcome at trial." (§ 1473, subd. (b)(3)(A).) Nor is it material in the sense there is a reasonable probability the result would have been different had the enhancement been available at trial. (*Masters, supra*, 7 Cal.5th at p. 1078.)

## IV. DISPOSITION

The petition for a writ of habeas corpus is denied.

STREETER, Acting P. J.

WE CONCUR:

TUCHER, J.*
BROWN, J.

---

\* Presiding Justice of the Court of Appeal, First Appellate District, Division Three, sitting by assignment pursuant to article VI, section 6 of the California Constitution.

APPENDIX B

FEDERAL DISTRICT COURT,(EASTERN DISTRICT OF CALIFORNIA)

ROBERT HENRY V. CHARLES D. MARSHALL, (2010)

CASE No. CIV. S-94-0916 JKS EFB P

OPINION ADOPTED

SEPTEMBER 13, 2010

(DOCKET # 199)

Ⓐ Neutral
As of: July 6, 2018 7:40 PM Z

## *Henry v. Marshall*

United States District Court for the Eastern District of California

May 27, 2010, Decided; May 27, 2010, Filed

No. CIV S-94-0916 JKS EFB P

**Reporter**
2010 U.S. Dist. LEXIS 52192 *; 2010 WL 2179896

ROBERT HENRY, Petitioner, vs. CHARLES D. MARSHALL, Respondent.

**Prior History:** *Henry v. Marshall, 2009 U.S. Dist. LEXIS 14972 (E.D. Cal., Feb. 12, 2009)*

## Core Terms

shooting, evidentiary hearing, shot, kill, actual innocence, credibility, shooter, witnesses, gun, innocent, interview, argues, hired, contends, fired, freestanding, cocaine, remember, guilt, murder, confession, talking, rocks, beat, statement to police, police interview, inconsistencies, passenger, minutes, picked

**Counsel:** [*1] Robert Henry, Petitioner, Pro se, CORCORAN, CA.

For Charles D Marshall, Respondent: Michael D. O'Reilley, LEAD ATTORNEY, Department of Justice, Office of the Attorney General, San Francisco, CA.

**Judges:** EDMUND F. BRENNAN, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** EDMUND F. BRENNAN

## Opinion

### FINDINGS AND RECOMMENDATIONS

Petitioner is a state prisoner seeking a writ of habeas corpus. *See 28 U.S.C. § 2254.* He proceeds

*pro se* and *in forma pauperis*. [1] *See 28 U.S.C. § 1915.* Following remand from the U.S. Court of Appeals for the Ninth Circuit, an evidentiary hearing was held on April 20, 21, and 23, 2009 to address whether petitioner has a valid freestanding claim of actual innocence, and specifically, whether petitioner's newly discovered evidence which would suggest that petitioner has such a claim is credible. For the reasons stated herein, this court finds that petitioner's newly discovered evidence is not credible and that petitioner has not met his burden of affirmatively proving that he is probably innocent. Accordingly, this court recommends that petitioner's application for a writ of habeas corpus be denied. [2]

---

[1] Petitioner was appointed counsel in July 1995, and was represented by the Federal Defender's Office for [*2] much of this action, including his successful appeal which resulted in a remand for an evidentiary hearing. However, in August 2008 he filed a motion for new counsel or to proceed pro se. An *in camera* hearing was held in which the undersigned questioned petitioner regarding his reasons for seeking new counsel. The court explained to petitioner that although he was entitled to counsel at his evidentiary hearing, *Bashor v. Risley, 730 F.2d 1228, 1234 (9th Cir. 1984); see also Rule 8, 28 U.S.C. foll. § 2254,* he was not entitled to choose his counsel. Neither did petitioner show good cause for a substitution of his attorneys. Indeed, there was no suggestion of a conflict of interest or a breakdown of communication with his appointed attorneys and those attorneys had quite ably represented petitioner. However, after fully admonishing petitioner regarding the effect of appearing pro se and ensuring that petitioner's decision to appear pro se was knowing and voluntary, the undersigned granted petitioner's request to proceed pro se. *Faretta v. California, 422 U.S. 806, 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562; United States v. Farhad, 190 F.3d 1097, 1099-1100 (9th Cir. 1999).*

[2] Petitioner has also filed a motion for bail. Dckt. [*3] No. 192. As petitioner does not have a valid claim of actual innocence, the

2010 U.S. Dist. LEXIS 52192, *3

## FACTUAL BACKGROUND

In 1986, petitioner was convicted of first degree murder with special circumstances and was sentenced to life without the possibility of parole. The prosecution's theory of the case was that petitioner hired Francis Lee Brewer ("Brewer") to kill Cedric Turner ("Turner"), whom petitioner believed engineered a robbery of him (during a cocaine sale). In attempting to carry out his contract to kill Turner, Brewer mistakenly shot and killed Andre Johnson ("Johnson"). The prosecution therefore proceeded on a theory of transferred intent.

The following factual background is based on the tentative order issued in this action on January 25, 2005 by United States District Judge Singleton, which was based on facts taken from the September 21, 1998 opinion of the California Court of Appeal. Many of the facts below were contradicted by the testimony of witnesses at the evidentiary hearing, and petitioner argues that this statement of facts is "for all purposes unreasonable in light of the new evidence" presented at the evidentiary hearing. *See* Dckt. No. [*4] 191 at 5.

Following the robbery of petitioner, petitioner and two relatives, Jeffrey Taggart ("Jeffrey") and Jester Taggart ("Jester"), [3] met at petitioner's house to discuss retaliation. After petitioner recounted his tale of having been robbed at gunpoint, the three decided to shoot Turner. Petitioner told Brewer that Turner had robbed him of $ 400 and offered Brewer two "Hubbas" (slang for crack cocaine) to give Turner "a good ass whipping." According to the Court of Appeal, Brewer fully understood the true meaning of petitioner's request, i.e., to kill Turner. Brewer immediately went to his girlfriend's house to pick up a .22 caliber sawed-off rifle and ammunition, loaded the gun, placed it in the blue Plymouth he had stolen earlier, and drove to Gateway Drive, the prearranged place for the

---

undersigned recommends his motion for bail be denied.

[3] Because there are several witnesses with the surname "Taggart," those witnesses will be referred to by their first names.

---

shooting.

At 6:00 p.m., petitioner and a relative accosted Turner on Gateway Drive and told Turner that they were going "to take him out," and that he "was gonna die." Petitioner and his relative then left to meet a second relative and then the three, all armed with guns, returned [*5] to Gateway Drive. Petitioner confronted Turner a second time, repeating his threat that Turner was going to die. Turner retreated to a nearby driveway. One of petitioner's relatives, in petitioner's presence, warned the gathering crowd to disperse because "somebody's going to get shot."

Turner fled into a nearby house where he met Johnson. Johnson persuaded Turner to leave saying, "come on, we'll handle it." Johnson offered Turner a ride to Turner's home, and Turner accepted. They left the residence together. Turner entered Johnson's vehicle and sat in the front passenger seat. In the meantime, Johnson and petitioner engaged in a shouting match and began to push each other.

Meanwhile, Brewer and Bernard Oden ("Oden") arrived at the scene in the blue Plymouth and parked in front of Johnson's car. Brewer got out of the car and stood on the sidewalk observing the argument between petitioner and Johnson. Petitioner walked up to Brewer and pointed out Turner saying, "that is the guy."

Thereafter, Brewer, with Oden sitting in the passenger seat, drove down the street, made a U-turn, and stopped in the middle of the street next to Johnson's car. As one of petitioner's relatives shouted "watch [*6] out, he is gonna shoot," Brewer leaned across Oden and fired numerous shots out of the passenger window of the car, hitting and killing Johnson who was standing approximately 5 to 10 feet away. In the view of the appellate court, the evidence overwhelmingly demonstrated that at the time of the shooting, Johnson was reaching for the door of his automobile and was facing toward the crowd in the street rather than toward the car from which the

shots were coming.

After the shooting, Brewer disposed of the murder weapon, wiped the fingerprints off the blue Plymouth, and abandoned the car. Then, accompanied by Oden, he returned to the crime scene to ascertain if the victim had been shot. As a next step, Brewer, Oden, and a third man went to petitioner's house on Sawyer street. Brewer and petitioner discussed the shooting and Brewer assured petitioner that he did not have to worry anymore because he (Brewer) had taken care of the job. Petitioner told Brewer that he was willing to pay him, but wished to negotiate the price because the wrong person was shot. They agreed that the price would be reduced from $ 200 to $ 100. The Court of Appeal found this version of the facts corroborated by petitioner's [*7] statements to Detective Bawart after petitioner's arrest. In those statements petitioner said "I hired Lee Brewer to kill Cedric Turner. He killed the wrong guy. I can't understand why I am being charged."

Shortly after petitioner's trial, petitioner's cousin, Jester, was tried as an adult and convicted of second degree murder for his role in Johnson's murder, and was sentenced as a juvenile to the California Youth Authority for a term of eight years. In late 1987/early 1988, Brewer was tried for his role in Johnson's murder, was convicted of second degree murder, and was sentenced to a term of 15 years to life. An allegation that he had personally used a firearm was found to be not true.

PROCEDURAL HISTORY

Petitioner filed the initial habeas petition in this court on June 9, 1994 and filed an amended petition on July 15, 1999, asserting four claims: (1) "newly discovered" evidence presented at Brewer's trial, subsequent to his own trial, resulted in an inconsistent verdict entitling him to a new trial; (2) his *Fifth Amendment* rights were violated when the prosecutor pointed out at trial that petitioner had not denied involvement in the murder in his statement to the police, and the trial [*8] court gave an instruction on adoptive admissions from

silence in the face of accusations; (3) there was insufficient evidence at trial to prove that he hired Brewer to kill Turner, rather than just assault him; and (4) the prosecutor misstated the evidence at trial. On January 25, 2005, the district judge entered an order tentatively denying the amended petition. By order filed September 7, 2005, the tentative order became final and judgment was entered for respondent.

On October 5, 2005, petitioner filed an appeal to the Ninth Circuit. In the appeal, petitioner argued that the prosecutor's impermissible comment on petitioner's post-arrest silence and the jury instruction on adoptive admissions violated petitioner's *Fifth Amendment* rights (an issue which was certified for appeal by Judge Singleton); that evidence discovered after petitioner's trial indicates that petitioner was actually innocent of the crime of murder and the special circumstance (an issue which was *not* certified for appeal); and that there was insufficient evidence to support a verdict of guilty on a theory of transferred intent (an issue which was *not* certified for appeal). Appellant's Opening Br. at *18-35, 2005 WL 4838037 (9th Cir. Dec. 19, 2005). [*9] Respondent countered petitioner's first claim, but declined to address petitioner's actual innocence claim and insufficient evidence claim because those issues had not been certified for appeal by Judge Singleton. Appellee's Br. at *2, n.2, 2006 WL 2630136 (9th Cir. Feb. 22, 2006).

On May 25, 2007, the Ninth Circuit affirmed the district court's decision with regard to petitioner's first claim on appeal (violation of his *Fifth Amendment* rights with regard to his post-arrest silence), but remanded to the district court with directions to hold an evidentiary hearing on petitioner's uncertified issue of actual innocence. [4]

---

[4] The Ninth Circuit decided to address petitioner's uncertified actual innocence claim by construing the briefing on appeal as a request for an expanded certificate of appealability ("COA") and granting the COA. The panel declined to grant a COA to petitioner's insufficiency of the evidence claim. *Henry v. Marshall, 224 Fed. Appx. 635, 637 (9th Cir. Mar. 12, 2007).*

The Ninth Circuit stated:

> Henry seeks an evidentiary hearing on his actual innocence claim. Habeas petitioners must meet "a reasonably low threshold" in order to receive an evidentiary hearing, showing only a colorable claim for relief and the lack of a factual finding below. *Phillips v. Woodford, 267 F.3d 966, 973 (9th Cir. 2001).* Here, there is no evidence in the record that Henry received an evidentiary hearing in state court to allow the state court to find facts relevant to the newly-discovered evidence. Henry is entitled to an evidentiary hearing in the district [*10] court because if the newly-discovered evidence proves to be true, he would have made out a valid freestanding claim of actual innocence by "affirmatively prov[ing] that he is probably innocent." *Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997); Herrera v. Collins, 506 U.S. 390, 417-19, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).* If truthful, the testimony of Jeffrey Taggart and Charles Austin would prove that Henry, while possibly guilty of solicitation, conspiracy, and attempt for hiring a hit man, is not guilty of first degree murder. We therefore remand to the district court to hold an evidentiary hearing.

*Henry v. Marshall, 224 Fed. Appx. 635, 637 (9th Cir. Mar. 12, 2007).* On remand, the district judge referred this matter to the undersigned for the taking of testimony and making of findings and recommendations.

SUMMARY [*11] OF EVIDENTIARY HEARING

An evidentiary hearing was held in this action on April 20, 21, and 23, 2009 to address petitioner's actual innocence claim. At the hearing, petitioner offered various exhibits; his own testimony; and the testimony of several witnesses, including Brewer, Mary Gardner ("Gardner"), Jeffrey, Alex Taggart

("Alex"), and Cherry Taggart ("Cherry"). [5] Petitioner and respondent also stipulated to the admissibility of the state court records from petitioner's trial and from Brewer's trial.

DISCUSSION

Petitioner argues that Brewer did not shoot and kill Johnson, but that Oden, the passenger in Brewer's car, did. Petitioner argues that this theory is supported by the testimony of Jeffrey, Austin, and Brewer, as well as the testimony of other witnesses and various exhibits offered at the evidentiary hearing. *See* Pet'r's Post-Hrg. Br. at 8-18. [6] At Brewer's trial, and again at the evidentiary hearing, Jeffrey, petitioner's brother, testified that he was in the car with Brewer and Oden at the time of the shooting and that Oden was the shooter. At the evidentiary hearing, Brewer testified that Oden was the shooter. At Brewer's trial, Austin, who met Brewer in jail prior to Brewer's [*13] trial, testified that he saw Oden holding a gun and saw shots fired from the passenger (Oden's) window, and that Brewer looked shocked after the shots were fired. At the evidentiary hearing, petitioner testified that

---

[5] Petitioner did not offer the testimony of Charles Austin at the hearing because Austin could not be located. Petitioner indicated at the hearing that he could not locate a contact address for Austin. The U.S. Marshal made multiple attempts to locate and serve Austin, but was unsuccessful. Petitioner concedes in his post-hearing brief that the court "has utilized the services of the US Marshalls [sic] office to secure Charles Austins [sic] attendance and was not successful despite due diligence." Dckt. No. 188 at 8; *see also* Transcript of Evidentiary Hearing ("EH Tr.") at 356-57.

Petitioner also attempted to call as witnesses Hicks, an investigator who had interviewed Oden, Cramer, a correctional [*12] counselor who could testify to petitioner's character in prison, and Kinnicut, the prosecutor at petitioner's trial, who could testify to Oden's inconsistent testimony at petitioner's, Jester's, and Brewer's trials. EH Tr. at 7-20. The court did not allow petitioner to call these witnesses, as Hicks' interviews with Oden were memorialized in his written reports, Cramer had no knowledge of the crime, and Kinnicut's testimony would have only explained what was already recorded in the trial transcripts.

[6] The page numbers assigned via the court's electronic filing system (CM/ECF) and the page numbers assigned by the parties are often inconsistent. For ease of reference, all references to page numbers are to those assigned via CM/ECF.

he had in jest offered Brewer cocaine to beat up Turner, but that neither party took the offer seriously. [7]

Respondent counters that petitioner's claim that Oden, not Brewer, shot Johnson and that Oden did so for an independent reason "is fabricated and totally unsupported by any reliable evidence." [8] Resp.'s Post-Hrg. Br. at 9-10. Respondent contends that petitioner's witnesses-specifically, his brother Jeffrey, Brewer, and Austin -- contradict themselves and each other, and are not trustworthy. *Id.* at 10.

Respondent further argues petitioner's own admissions substantially led to his conviction and that any reasonable doubt of petitioner's guilt was eliminated by the totality of the evidence, namely: the timing and location of the murder and the statements to police by petitioner's brothers and cousin. [9] Resp.'s Suppl. Pre-Hrg. Br., Dckt. No.

159, at 19.

Respondent also argues that regardless of the credibility of the newly discovered witnesses, the newly discovered evidence that Oden was the alleged shooter rather than Brewer is irrelevant because of California's "natural and probable consequences" doctrine. The gist of respondent's argument is that California law imposes criminal liability upon all persons "concerned" in the commission of a crime and that petitioner was an aider and abettor who was responsible not only for the particular crime that to his knowledge Brewer contemplated committing, but he is also liable for the natural and reasonable consequences of any act that petitioner knowingly aided and encouraged, including Oden's alleged shooting of Johnson. [10] Resp.'s Post-Hrg. Br., Dckt. No. 189, at 23-24. However, as discussed below, the court finds that petitioner has not made a sufficient evidentiary showing [*17] that Brewer was not the shooter. Accordingly, this argument need not be addressed. [11]

---

[7] Petitioner also argued at the hearing that he is innocent because he did not hire Brewer to kill Turner, but merely to beat him up. The court addresses this argument *infra* at p. 35.

[8] Respondent points out that this theory is directly opposite [*14] of the defense theory at petitioner's trial. At trial, the defense contended that Brewer shot Johnson and even sought to introduce evidence regarding a prior shooting by Brewer in order to show that Brewer does not like to be challenged and that when he was challenged by Johnson, he shot him. Resp.'s Post-Hrg. Br. at 10 (citing Henry RT at 179-81).

[9] Petitioner argues that the police interviews of John Henry and Jester Taggart should not be considered by this court because they were not admitted into evidence at his trial and the witnesses did not testify at the evidentiary hearing. Dckt. No. 191 at 25.

John Henry, petitioner's brother, told police in a recorded interview that petitioner called him after the shooting and stated that he had hired a man to kill another man, but that he killed the wrong guy. John Henry testified at petitioner's [*15] trial and claimed he did not recall making a statement to the police at all and denied talking to petitioner. Henry RT at 268-77. The interview was excluded at petitioner's trial after a neuropsychologist testified that John Henry had a brain tumor, was an alcoholic, and had a "spotty and bizarre memory picture." *See* EH Tr., Ex. 8. Petitioner testified at the hearing that his brother was lying about this telephone call. EH Tr. at 261-62. Petitioner further argued that John Henry may have been coerced or tricked into making the statement, saying that "the interview starts out with John Henry saying that I called the house

and made this--allegedly made this statement that the wrong individual was shot. But the officers on tape seem to be talking to the man before they even taped him. And I'm just wondering what that could have been talking about before he even got on tape . . . . So I personally believe that a lot of things Detective George Bohert [sic] was doing was not only illegal but morally wrong. He didn't care about these three teenagers that he had in front of him." EH Tr. at 413. Jester Taggart, petitioner's cousin, also gave a statement to the police, but he did not testify [*16] at petitioner's or Brewer's trial and the statement was not admitted in those trials. Because John Henry's and Jester Taggart's statements to the police were not admitted by the trial courts, this court has not considered them in finding that petitioner has failed to meet his burden of proving his actual innocence.

[10] Respondent points out that this theory is directly opposite of the defense theory at petitioner's trial. At trial, the defense contended that Brewer shot Johnson and even sought to introduce evidence regarding a prior shooting by Brewer in order to show that Brewer does not like to be challenged and that when he was challenged by Johnson, he shot him. Resp.'s Post-Hrg. Br. at 10 (citing Henry RT 179-81).

[11] Respondent also argues that Jeffrey's testimony does not constitute "newly discovered evidence." Resp.'s Suppl. Pre-Hrg. Br., Dckt. No. 159, at 7. However, respondent indicated at the November 18, 2008 hearing that whether or not the evidence is newly discovered is a not an issue based on the language in the Ninth Circuit's remand order. Nov. 18, 2008 Tr., Dckt. No. 148, at 6-7.

2010 U.S. Dist. LEXIS 52192, *16

## I. Standard of Review

Petitioner filed his initial application for federal habeas corpus on June 2, 1994, nearly two years before the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Accordingly, the substantive provisions of AEDPA do not apply to this case. *Phillips v. Woodford, 267 F.3d 966, 973 (9th Cir. 2001).* [*18] Nonetheless, the pre-AEDPA standards are deferential. Under pre-AEDPA standards, a federal court presumes the correctness of a state court's findings of fact and its application of its own law, rather than engage in a *de novo* review. *Lewis v. Jeffers, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990); Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).* However, a federal court reviews questions of law and mixed questions of law and fact *de novo,* owing no deference to a state court's legal conclusions. *Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)* (O'Connor, J., concurring); *McKenzie v. McCormick, 27 F.3d 1415, 1418 (9th Cir. 1994)* (en banc) ("On habeas review, state court judgments of conviction and sentence carry a presumption of finality and legality, . . . and may be set aside only when a state prisoner carries his burden of 'proving that [his] detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution.'"). A petitioner "must convince the district court 'by a preponderance of evidence' of the facts underlying the alleged constitutional error." *McKenzie v. McCormick, 27 F.3d at 1418-19* (citing *Johnson v. Zerbst, 304 U.S. 458, 469, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938)* and *Bellew v. Gunn, 532 F.2d 1288, 1290 (9th Cir. 1976)).*

## II. [*19] Freestanding Actual Innocence -- *Herrera v. Collins*

The Ninth Circuit remanded this case to the district court to hold an evidentiary hearing regarding petitioner's actual innocence claim. In doing so, the Circuit stated that if petitioner's newly discovered evidence proves to be true, petitioner "would have made out a valid freestanding claim of actual innocence by 'affirmatively prov[ing] that he is probably innocent,'" and cited two cases supporting that proposition: *Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997)* and *Herrera v. Collins, 506 U.S. 390, 417-19, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993).*

In *Herrera v. Collins, 506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203,* the Supreme Court assumed, without deciding, that a freestanding claim of actual innocence is cognizable under federal law. In this regard, the court observed that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id. at 417.* A different majority of the Supreme Court explicitly held that a freestanding claim of actual innocence is cognizable in a federal habeas proceeding. *Compare 506 U.S. at 417* [*20] with *506 U.S. at 419* and *430-37; see also Jackson v. Calderon, 211 F.3d 1148, 1165 (9th Cir. 2000)* (noting that a majority of the Justices in *Herrera* would have supported a free-standing claim of actual innocence). Although the Supreme Court did not specify the standard applicable to this type of "innocence" claim, it noted that the threshold would be "extraordinarily high" and would have to be "truly persuasive." *Herrera, 506 U.S. at 417.* More recently, the Supreme Court declined to resolve whether federal courts may entertain independent claims of actual innocence but concluded that the petitioner's showing of innocence fell short of the threshold suggested by the Court in *Herrera. House v. Bell, 547 U.S. 518, 554-55, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006).* Respondent petitioned the Supreme Court for a writ of certiorari on this issue, but the Supreme Court denied certiorari review. [12]

---

[12] Although the Supreme Court has never clearly stated that a freestanding claim of actual innocence in a noncapital case is cognizable on federal habeas corpus review, the Ninth Circuit has assumed in this and other cases that freestanding innocence claims are cognizable in both capital and non-capital cases and has also

2010 U.S. Dist. LEXIS 52192, *20

"A habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove [*22] that he is probably innocent." *Carriger, 132 F.3d at 476-77; see also Jackson, 211 F.3d at 1165*. The petitioner's burden in such a case is "extraordinarily high" and requires a showing that is "truly persuasive." *Carriger, 132 F.3d at 476* (quoting *Herrera, 506 U.S. at 417*).

Requiring affirmative proof of innocence is deemed to be appropriate because when a petitioner makes a freestanding claim of innocence, he is claiming that he is entitled to relief despite a constitutionally valid conviction. *See Carriger, 132 F.3d at 476*. The court must consider the evidence "in light of the proof of petitioner's guilt at trial." *Herrera, 506 U.S. at 418*. Where the veracity of witnesses is at issue, the court must make a credibility determination by listening to the witnesses, testing their story, and gauging their demeanor. [13] *Earp v.*

*Ornoski, 431 F.3d 1158, 1169-1170 (9th Cir. 2005); see also Carriger, 132 F.3d at 476* (discussed *infra*). In evaluating credibility, the court should consider factors such as the opportunity and ability of the witness to see or hear or know the things testified to; the witness' memory; the witness' manner while testifying; the witness' interest in the outcome of the [*23] case and any bias or prejudice; whether other evidence contradicted the witness' testimony; the reasonableness of the witness' testimony in light of all the evidence; and any other factors that bear on believability. *See* Model Crim. Jury Instr. 9th Cir. 3.9 (2003).

In *Herrera*, the Supreme Court rejected the petitioner's claim of actual innocence. In doing so, it explained the petitioner's burden as follows:

> We may assume, for the sake of argument in deciding [*24] this case, that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim. But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high. The showing made by petitioner in this case falls far short of any such threshold.
>
> Petitioner's newly discovered evidence consists of affidavits . . . . the affidavits themselves contain inconsistencies, and therefore fail to provide a convincing account of what took place on the night Officers Rucker and Carrisalez were killed. For instance, the affidavit of Raul, Junior, who was nine years old at the time, indicates that there were three

---

articulated [*21] a minimum standard of proof in order to prevail on such a claim. *Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997)* (en banc); *Osborne v. District Attorney's Office for Third Judicial Dist., 521 F.3d 1118, 1131 (9th Cir. 2008)*, cert. granted, *129 S. Ct. 488, 172 L. Ed. 2d 355 (2008)*.

Here, respondent disputes whether petitioner's freestanding claim is cognizable. However, because petitioner has not made an adequate evidentiary showing of actual innocence, as discussed below, the court need not address whether the freestanding claim is cognizable. *Osborne, 521 F.3d at 1131* ("*Herrera, House, Carriger, and Jackson* all support the practice of first resolving whether a petitioner has made an adequate evidentiary showing of actual innocence before reaching the constitutional question of whether freestanding innocence claims are cognizable in habeas."); *see also Majoy v. Roe, 296 F.3d 770, 776-77 (9th Cir. 2002)* (holding that the evidentiary basis of a petitioner's innocence claim should be developed before considering whether that claim was jurisdictionally barred).

[13] Respondent argues that when the relief sought at an evidentiary hearing is based on a claim of newly discovered evidence consisting of witness recantations of trial testimony or confessions of others to the crime, most courts decline to consider it in the absence of a showing that the prosecutor knowingly proffered false testimony, failed to disclose exculpatory evidence, or that petitioner's counsel was ineffective. *Johnson v. Bett, 349 F.3d 1030 (7th Cir. 2003)*. Respondent contends that there is no evidence here, nor even an allegation, that the prosecutor engaged in any such misconduct. However, it is clear from the remand order that the Ninth Circuit has foreclosed this issue and the district court is to consider the new

testimony.

2010 U.S. Dist. LEXIS 52192, *24

people in the speeding car from which the murderer emerged, whereas Hector Villarreal attested that Raul, Senior, told him that there were two people in the [*25] car that night. Of course, Hernandez testified at petitioner's trial that the murderer was the only occupant of the car. The affidavits also conflict as to the direction in which the vehicle was heading when the murders took place and petitioner's whereabouts on the night of the killings.

Finally, the affidavits must be considered in light of the proof of petitioner's guilt at trial -- proof which included two eyewitness identifications, numerous pieces of circumstantial evidence, and a handwritten letter in which petitioner apologized for killing the officers and offered to turn himself in under certain conditions . . . . That proof, even when considered alongside petitioner's belated affidavits, points strongly to petitioner's guilt.

This is not to say that petitioner's affidavits are without probative value. Had this sort of testimony been offered at trial, it could have been weighed by the jury, along with the evidence offered by the State and petitioner, in deliberating upon its verdict. Since the statements in the affidavits contradict the evidence received at trial, the jury would have had to decide important issues of credibility. But coming 10 years after petitioner's trial, [*26] this showing of innocence falls far short of that which would have to be made in order to trigger the sort of constitutional claim which we have assumed, *arguendo*, to exist.

*Herrera, 506 U.S. at 417-19.*

*Carriger* also illustrates the extraordinarily high burden a petitioner attempting to prove a claim of actual innocence must meet--affirmative proof of actual innocence. *132 F.3d at 477.* The physical evidence at Carriger's trial was not strong, and the prosecution primarily relied upon the testimony of a witness, Robert Dunbar, who had contacted the police the morning following the murder with an offer of information in exchange for immunity. *Id. at 470.* With immunity, Dunbar testified that Carriger had admitted to him committing the crime immediately after it happened. *Id.* Almost all of the physical evidence used at trial was evidence to which Dunbar had led police the morning following the crime. *Id.*

Evidence discovered after the trial showed that Dunbar was a career criminal with a pattern of lying to police and shifting blame to others and a long history of violence. *Id. at 471-72.* Dunbar later confessed in an evidentiary hearing in Carriger's post-conviction proceedings that he had [*27] committed the crime, not Carriger. *Id. at 471.* He described the crime scene in detail. *Id.* At the time, Dunbar was not granted immunity, and acknowledged that he was opening himself to prosecution for capital murder. *Id. at 475.* Dunbar's wife also testified at the evidentiary hearing that Dunbar had confessed the crime to her. *Id. at 471.* Dunbar also confessed that he had committed the crime in a letter to a woman with whom he corresponded, and to his cellmate. *Id. at 471-72.*

Dunbar recanted his confession three weeks after the evidentiary hearing. *Id. at 473.* He claimed that the reason that his testimony had been accurate and detailed was that Carriger's lawyers had shown him diagrams of the crime scene. *Id.* The lawyers testified that he had not been shown such diagrams, and his testimony was never explained by any other evidence. *Id. at 475.*

The Ninth Circuit held that, despite Dunbar's confession, Carriger had not made out a freestanding claim of actual innocence. The court explained:

Although the postconviction evidence he presents casts a vast shadow of doubt over the reliability of his conviction, nearly all of it serves only to undercut the evidence presented at trial, not affirmatively [*28] to prove Carriger's innocence. Carriger has presented no evidence, for example, demonstrating he was elsewhere at the time of the murder, nor is there

2010 U.S. Dist. LEXIS 52192, *28

any new and reliable physical evidence, such as DNA, that would preclude any possibility of Carriger's guilt. Although Dunbar's confession exonerating Carriger does constitute some evidence tending affirmatively to show Carriger's innocence, we cannot completely ignore the contradictions in Dunbar's stories and his history of lying. Accordingly, the confession by itself falls short of affirmatively proving that Carriger more likely than not is innocent. Carriger's freestanding claim of actual innocence must fail.

*Id. at 477.* Thus, even though another person had made a sworn confession to the crime in open court, and there was little evidence of petitioner's guilt that was not discounted by this confession, petitioner had still failed to meet his burden of making a freestanding claim of actual innocence.

Keeping this precedent in mind, the court turns to the evidence in this case.

A. Petitioner's claim that he is innocent because Oden shot Johnson, not Brewer

It is undisputed that Andre Johnson was shot and killed on Thanksgiving Day in 1985, [*29] that the shots were fired from a stolen car that was occupied by Brewer and Oden, and that Brewer was the driver and Oden was sitting in the passenger seat. Pet'r's Post-Hrg. Br., Dckt. No. 187, at 4. The dispute surrounds who fired the gun -- Brewer or Oden. Petitioner contends that various evidence shows that Oden was the shooter, including the testimony of Jeffrey at Brewer's trial and in the evidentiary hearing, the testimony of Brewer at the evidentiary hearing, and the testimony of Austin at Brewer's trial. [14] For the reasons stated below, the

court finds none of those witnesses are credible [15] and finds that petitioner has not made a showing of actual innocence under *Herrera* on the ground that Brewer was not the shooter.

1. Evidence to support petitioner's claim that Oden was the shooter

a. Jeffrey Taggart' s testimony

Petitioner contends that Jeffrey's testimony at Brewer's trial and at the evidentiary hearing supports petitioner's claim of actual innocence. At Brewer's trial, Jeffrey testified that he was in Brewer's car at the time of Johnson's shooting and that he saw Oden fire the gun that killed Johnson. Brewer RT at 321. At the evidentiary [*31] hearing, Jeffrey testified that he got into Brewer's car after Johnson pulled out a firearm, [16] that Oden said as they were driving away that they should turn around because Johnson was "talking too much shit," and that he saw Oden bring up the gun to shoot, and that he was lying down in the backseat of the car when he heard the gunshots. EH Tr. 172, 177, 317.

Petitioner notes that Jeffrey's testimony that he was in the car at the time of the shooting is consistent with Brewer's testimony at the hearing that Jeffrey

judgment was denied at the evidentiary hearing. EH Tr. at 25.

[15] Petitioner notes that the Ninth Circuit stated that if his witnesses' testimony was truthful, their testimony would prove his actual innocence. He contends that there is a difference between truthfulness and credibility, and then argues that his witnesses need not be credible. *See* Dckt. No. 192 at 3, n.2. He points out that the Ninth Circuit was fully aware of Jeffrey's inconsistent statements, as they had been described in his briefing to that court. Petitioner's distinction is one that lacks meaningful difference. The court's ultimate goal of determining the truthfulness of a witness' testimony is achieved by assessing the witness' credibility.

[16] Petitioner points out that this is consistent with Alex's testimony at Brewer's trial that Johnson pulled out a firearm, Henry RT at 211, and at the hearing that at the time of the shooting, he did not recall exactly where Jeffrey was, EH Tr. 164, 165. Pet'r's Post-Hrg. Suppl. Br., Dckt. No. 188, at 3. But, these things do not establish that Jeffrey was in the car at the time of the shooting, that he saw the shooting, or that Oden was the shooter. Accordingly, these consistencies in testimony between the witnesses are of little relevance.

[14] Petitioner also moved for summary judgment on his actual innocence claim, arguing that because the jury in Brewer's trial found Brewer not guilty of firing the gun that killed Johnson, the jury necessarily found the testimony of Austin and Jeffrey to be credible and contending that if the jury found that Brewer did not fire the gun, petitioner cannot be guilty of first degree murder for allegedly hiring Brewer to shoot Turner. *See* Pet'r's Mot. for Summ. J., [*30] Dckt. No. 157, at 2, 15-16. Petitioner's motion for summary

was in the car, EH Tr. 32:7, with Oden's initial statements to the police that Jeffrey was in the car, EH Tr., Ex. 13, and with Mary [*32] Gardner's testimony at the hearing that there may have been three or four people in the car, EH Tr. 98-99. [17] Petitioner also notes that Jeffrey's testimony that Oden was the shooter is consistent with Brewer's testimony that Oden was the shooter, EH Tr. 42:6-10, with Austin's testimony that Oden was the shooter, Brewer RT 650-52, and with Alex's testimony that although he no longer had an independent recollection of it, he had seen the passenger shoot, EH Tr. 146. Petitioner also notes that Jeffrey's testimony that the shooting was out of the passenger window is consistent with Alex's testimony that the shots came out of the passenger's window, EH Tr. at 133, and that Jeffrey's testimony that Oden said Johnson was talking too much shortly before Oden shot him is consistent with his testimony at Brewer's trial that "Oden didn't like the way [Johnson] was talking," Brewer RT 324. Therefore, petitioner contends, Jeffrey's testimony should be credited. However, as discussed below, there are many reasons why Jeffrey's testimony is simply not credible.

First, as explained in detail in respondent's post-evidentiary [*33] hearing brief, Jeffrey told inconsistent stories during his interview with the Vallejo police, petitioner's trial, Brewer's trial, and at the evidentiary hearing. Both Jeffrey and petitioner have admitted that some of Jeffrey's statements were lies. *See, e.g.,* Am. Pet., Ex. A (Jeffrey's declaration, stating that he lied at petitioner's and Jester's trials); Dckt. No. 151 at 14 n.3 (petitioner's evidentiary hearing brief noting "[i]ndeed, an examination of the full transcript of Jeff's statement to police shows numerous internal inconsistencies and, at times, a near-incoherence"). For that reason alone, the court finds it difficult to credit Jeffrey's testimony that he was in the backseat of Brewer's car at the time of the shooting and saw that Oden was the shooter, or to find that

Jeffrey's testimony establishes that petitioner is "probably innocent" of his crimes.

Jeffrey first told the Vallejo police on November 30, 1985 that he was in the North Crest area at approximately 8:00 pm on Thanksgiving evening trying to buy some "weed," that he suddenly heard gunshots, and that he "hit the ground." EH Tr., Ex. S at 2. He told the police that he was a "half mile" from the shooting. *Id.* at 4. [*34] During that same interview, Jeffrey then told the police that he was approximately 90 feet from the shooting, but claimed he did not see who did the shooting and had no idea why it occurred. *Id.* at 4-5. Toward the end of the interview, Jeffrey told police that he was standing near Johnson when Johnson was killed and that the shots were fired by Brewer from the driver's side of the car. *Id.* at 36, 41. [18]

Jeffrey admitted that petitioner had been robbed of rock cocaine and money by Turner and another individual; that the robbery led to a meeting involving Jeffrey, his cousin Jester, and petitioner; and that at the meeting, the three of them decided they were "gonna get [Turner]" and were "gonna beat him up." *Id.* at 14-17, 20. When police asked if he, Jester, and petitioner had decided to kill Turner, Jeffrey said, "They probably said they was gonna shoot him." *Id.* at 20. When asked who said they were planning to kill Turner, Jeffrey responded, "Everybody was saying it. We all said it." *Id.*

Jeffrey also [*35] stated that before the shooting, petitioner was armed with a .25 caliber handgun which was wrapped in a towel, and also had either a rifle or a shotgun, or both. *Id.* at 21-28. Jeffrey said the guns belonged to John Henry (petitioner's brother) and were brought to the scene by petitioner and Gary Henry (another of petitioner's brothers). *Id.* at 26-27. When asked why, with all that weaponry, they did not kill Turner at that time, Jeffrey responded, "They probably had Lee Brewer to do it." *Id.* at 29.

---

[17] Turner also testified that there were four people in the car. Henry RT at 109.

[18] Jeffery's wildly varying accounts of where he was, what he saw and did not see, and who actually did the shooting make it very difficult to take seriously anything he says about the event.

Following Johnson's shooting, Brewer came to Jeffrey's house to collect his fee. *Id.* at 30. Jeffrey said in his police interview that Jester, who was also present, told Brewer, "I don't know. [Petitioner] set it up." *Id.* at 31. Jeffrey said that petitioner informed Brewer that he killed the wrong man, but that he would take care of working out the payment. *Id.* at 30, 34-35.

At petitioner's trial, Jeffrey denied that he, petitioner, and Jester sold drugs. Henry RT at 322. He claimed that he was truthful in his statement to police detectives "most of the time." *Id.* However, he denied telling the detectives in his interview that there was a plan to kill Turner. When shown the transcript, Jeffrey [*36] claimed, "I don't remember that. I really don't. He probably wrote it in there himself." *Id.* at 330. He stated he did not remember telling the officers that petitioner had been armed with a gun. *Id.* at 333. The court took a recess in petitioner's trial and ordered Jeffrey to listen to the recording of his police interview. *Id.* at 334. Jeffrey then admitted that there in fact had been a meeting in which he, petitioner, and Jester reached an agreement to shoot Turner. *Id.* at 338-39. However, he denied that petitioner was ever armed with a gun at the scene and explained that he only had said that to the detectives because they were "harassing" him and "hollering" at him. *Id.* at 340-41. Jeffrey testified that, when the fatal shots were fired, he was standing on the sidewalk and that he saw Oden fire the shots out the driver's window. *Id.* at 352. He testified that he was sure that Brewer did not do the shooting. *Id.* Jeffrey testified that when Brewer came by the residence to collect payment the day after the murder, petitioner was not present. He testified that he was mistaken when he told police that petitioner was present because he had misidentified his cousin Alex for petitioner, his [*37] brother. *Id.* at 355-58.

In the Brewer trial, Jeffrey testified that in his statement to police, "I didn't tell them nothing that was true, because I was -- they was, you know, interrogating me. I didn't know what to say you know. I just told 'em anything." Brewer RT at 263.

He emphasized that "everything" he told the police detectives was false. *Id.* at 263-64. Jeffrey testified that there was no plan to shoot Turner. Instead, he said that the plan was to "beat [Turner] up." *Id.* at 269-70. Jeffrey told the court that he had made up the story about petitioner being armed at the scene of the shooting so that police would leave him alone. *Id.* at 277. Jeffrey testified for the first time in the *Brewer* trial that he was actually in the car when the shots were fired that killed Johnson. He said he had lied before because he did not understand what "immunity" meant and that he was afraid to admit that he had been a passenger in the car. Brewer RT at 297-98.

When asked if, after the shooting, Brewer and Oden had come by his cousin's residence, Jeffrey responded that they had, but he forgot why they did so. When asked if they had come to get paid, Jeffrey answered, "Yes, I suppose so. Yeah, he [*38] asked me." *Id.* at 304. Jeffrey admitted that he told the police that petitioner told Brewer that he had killed the wrong man but that was a lie. Jeffrey said he lied to the police because they were "yelling," "cursing," and "they threw their guns on the table." *Id.* at 310-11. Jeffrey testified that although he had told the police that, when petitioner told Brewer he had killed the wrong man, Brewer had responded, "Oh well, he was talking a mile a minute," it had actually been Oden who made the statement. *Id.* at 312-13. Jeffrey further testified that he had told the police that Oden had done the shooting. *Id.*

Jeffrey stated that when he told the police that petitioner had agreed he was going to handle the matter of payment and, because the wrong man had been killed, he was going to pay Brewer $ 100 (half of what they had agreed to), it was all a lie and the $ 100 figure was just made up. *Id.* at 314-16.

Jeffrey also testified that before the shooting, he had told Brewer about petitioner being robbed by Turner. *Id.* at 323. Jeffrey admitted that Brewer was a friend of his and that he had not even known Oden, but said that he had told the officer that

2010 U.S. Dist. LEXIS 52192, *38

Brewer had done the shooting because "all [*39] that officer wanted to know was Brewer." *Id.* at 326-28.

In the evidentiary hearing before the this court, Jeffrey initially testified that the passenger of the car did the shooting, but he no longer remembered "which one was in the passenger seat." EH Tr. at 173. After petitioner refreshed Jeffrey's memory by showing him his declaration, Jeffrey testified that Oden did the shooting. *Id.* at 175-176.

Jeffrey's testimony contained other miscellaneous inconsistencies. In his police interview, Jeffrey stated that, after petitioner was robbed, they all walked to 315 Sawyer. Jester's father let them in, and they discussed what happened. Then petitioner left, but he did not know where petitioner went. EH Tr., Ex. S at 18. At petitioner's trial, Jeffrey testified that after petitioner informed him and Jester that he had been robbed, the three walked to 315 Sawyer and talked for a few minutes about how Turner should not have done what he did. Then all three walked to 832 Stanford. Henry RT at 327-28. In the Brewer trial, Jeffrey testified that after petitioner was robbed, all three sat down in the area of Gateway and Rounds. He testified that they then walked to 315 Sawyer when the sun "was coming [*40] up." He said his aunt let them in. Brewer RT 267-68.

In his police interview, Jeffrey stated, "I don't sell dope." *Id.* at 17. In his testimony at the hearing, Jeffrey admitted that he, petitioner, and Jester were all selling crack cocaine. EH Tr. at 106.

Petitioner argues that Jeffrey lied because he was intimidated by the detectives who interviewed him, was afraid to tell the truth because he did not know what immunity meant, was afraid that he would be prosecuted for being in the car with the shooter, and was afraid that Oden would harm him if he implicated Oden in the shooting. Petitioner notes that Jeffrey was 16 at the time and was without a lawyer or parent during the interviews, was uneducated and incompetent, and the detective that was interviewing him had over 20 years' experience

and was yelling and cursing at him. Pet'r's Post-Evid. Hrg Br. at 11. [19] Jeffrey also testified at Brewer's trial that the officers threw their guns on the desk during the interview. *Id.* Although Jeffrey may have been intimidated during the interview, as respondent points out, the jury at petitioner's trial heard the recording of the interview and were provided the transcript, yet still found petitioner [*41] guilty. Moreover, Jeffrey was not so intimidated that he agreed with everything that the detectives said. *See* Resp.'s Post-Evid. Hrg Br. at 8-9 (noting that Jeffrey repeatedly denied that he was given a gun or otherwise was armed at the scene; repeatedly denied that his cousin Jester was armed; denied John Henry was at the scene; and denied that he was present when Brewer was hired to carry out the murder, citing EH Tr., Ex. S at 23, 25-26, 29-30).

Jeffrey testified that he lied at petitioner's trial because he did not understand what it meant to be granted immunity. EH Tr. at 105. But Jeffrey was represented by counsel at the time he was granted immunity, and before he testified in petitioner's trial, the court told him that he was testifying under a grant of immunity, stating that, "if [*42] you testify in this matter, you cannot be prosecuted for anything about which you're questioned." Henry RT at 318. The prosecutor also told Jeffrey that he had personally dismissed a pending case against Jeffrey and that anything Jeffrey testified to would not be used against him. Jeffrey stated that he understood. *Id.* at 318-19. In Brewer's trial, Jeffrey asked the court, "Your Honor, am I -- do I still have immunity? They gave me immunity when I was at my brother's trial." He was assured that he did. Brewer RT at 285-94.

Petitioner also contends that Jeffrey was afraid Oden would harm him if he testified that Oden was

_____

[19] Petitioner further alleges that Detective Bawart "has no problem with even falsifying police reports . . . which brings into question Detective Bawart's tactics and credibility." Pet'r's Post-Evid. Hrg Br. at 11. But Bawart's tactics are irrelevant except insofar as they relate to Jeffrey's credibility, and petitioner does not allege that Bawart falsified the recording of the interview with Jeffrey.

involved in the shooting. Pet.'s Post-Evid. Hrg Br. at 12. Petitioner contends that Jeffrey could come forward at the time of Brewer's trial because he knew Oden had left the state. *Id.* at 12. But petitioner does not explain why Jeffrey did not equally fear Brewer, who was rumored to have killed.

Moreover, Jeffrey's stories are not only internally inconsistent, but also conflict with the stories of various other witnesses. For example, Jeffrey testified that the car did not stop when the shots were fired, but kept moving. Brewer RT 299. In the evidentiary hearing, Alex [*43] contradicted that statement by testifying that the car did in fact stop when the shots were fired. EH Tr. at 157. Brewer also testified that the car was stopped, explaining that both he and Oden were standing partially outside the car, each with one foot one the pavement at the time the shooting occurred. *Id.* at 45.

Also, Jeffrey testified at the evidentiary hearing that after the shooting, he helped wipe down the stolen car and then went home to Stanford drive and stayed there all night. *Id.* at 178. When asked, he testified that he believed that he went back to Jester's house, but did not know when. *Id.* Cherry Taggart testified that Jeffrey came to her home "not too long after" the shooting. *See* EH Tr. 338. Petitioner argues it was Jester that was in Cherry's presence right after the shooting, not Jeffrey. Pet'r's Post-Hrg. Supp. Br. at 4. However, Cherry stated that Jeffrey did not arrive at the same time as Jester. EH Tr. at 338. Petitioner attempts to explain why Cherry said that Jeffrey was at her home within 10-15 minutes after the shooting by arguing that Jeffrey got dropped off about 3-4 blocks from Cherry's house after the shooting. [20] *Id.* (citing Ex. 15 at 272). But this is [*44] contrary to Jeffrey's testimony that he was at the Stanford drive house all of that night.

---

[20] Petitioner notes that this is consistent with Brewer's testimony that he dropped Jeffrey off on the corner of Sage and Griffin after the shooting. *See* EH Tr. 53.

Moreover, at the evidentiary hearing Jeffrey did not clearly testify that he actually saw Oden shoot Johnson, and his memory of the shooting appeared to be unclear. Jeffrey first testified that he did not remember whether Oden or Brewer was in the passenger seat, but that the person in the passenger seat did the shooting. EH Tr. at 173. After he was shown his prior testimony in which he gave a different account, he claimed that he remembered that Oden had been in the passenger seat. *Id.* at 175. He also did not "remember" until he read his previous testimony whether Oden or Brewer had stated "let's turn around. He's talking too much shit." *Id.* at 175-76. Jeffrey testified that he did not remember which side of the back seat that he was sitting in. *Id.* at 316. He stated that he "was like laying down, looking forward, through the seats" when he heard the gun fired, and that he could see because the car had bucket seats. When he was then [*45] asked whether he laid down before or after the shots were fired, he stated that he was not sure. Then he stated that he laid down before the shots were fired because he saw Oden "bringing up the gun and . . . he was going to shoot it." *Id.* at 316-318. Jeffrey had previously testified at Brewer's trial that "when I seen Oden pick up the gun, I . . . asked him what was he doing, and he said, 'I finish shoot him because he was talking too much, he's talking too much, he deserve it.'" Henry RT 336-37. Jeffrey testified that "[a]fter the shots were fired and after I seen Andre hit the ground, I put my head down." *Id.* at 338.

Not only was Jeffrey's varying accounts wildly inconsistent, and his memory repeatedly unreliable, his demeanor at the evidentiary hearing was not at all convincing. He repeatedly stated that he did not remember various details of the shooting, only to claim that he remembered them once he had reviewed his previous testimony in which he gave varying accounts. It was apparent that what he struggled to remember was what he previously had said in prior testimony. The more probable explanation for Jeffrey's inability to recall who fired the gun is the account that he first [*46] told the police; he was not in the car at the time and did

not see who did the shooting. Also, as petitioner's brother, Jeffrey clearly has a motive for fabrication. The court finds that Jeffrey is not a credible witness.

b. Francis Brewer's testimony

Petitioner also contends that Brewer's statements to respondent's counsel in a March 10, 2009 interview and Brewer's testimony at the evidentiary hearing that Oden was the shooter support petitioner's claim of actual innocence. EH Tr. at 42. Petitioner further contends that Brewer's testimony at the evidentiary hearing that he picked up Jeffrey at Gateway Drive and Sawyer Street and that Jeffrey was in the back seat of the car at the time of Johnson's shooting bolsters Jeffrey's credibility, as Jeffrey testified that after Johnson pulled out his gun, he started to head home and asked Oden and Brewer for a ride. EH Tr. at 34, 172. However, as with Jeffrey's credibility, there are significant issues surrounding Brewer's credibility.

First, Brewer's testimony contains some internal inconsistency. In Brewer's first interview with the police in 1985, he denied any involvement, claiming that he did not know Jeffrey, but that he looked like someone [*47] who sold "fake dope," and did not leave his house on Thanksgiving day or night. EH Tr., Ex.12 at 3, 9-10. He stated that he did not know Oden well, and said that despite having Oden's number in his wallet twice, he had never called him. *Id.* at 14-16. He denied petitioner ever offered him anything to do anything, and denied owning a rifle. *Id.* at 16.

Brewer was interviewed by respondents' counsel on March 10, 2009. He said that he knew petitioner and Jeffrey; that he owned a sawed-off rifle; and that he had a car that he'd gotten from Oden. EH Tr., Ex. P at 1-3. He said that Oden woke him up between 8 and 9 p.m. on Thanksgiving evening and told him that Alex had been shot, [21] and that he

took his rifle with him and he and Oden drove to the area of Gateway and Rounds streets; there, he claimed he saw either Jeffrey or Jester and picked one of them up, but he was not sure which one. *Id.* at 3-4. He said that he stopped the car to look for Alex's body, and was halfway out of the car with his foot on the brake when Oden took the gun from under the driver's seat, stepped partially out of the car, and fired shots. [22] *Id.* at 5-6. Brewer stated he did not say anything when Oden grabbed his rifle [*48] or when Oden began firing, but afterwards asked Oden, "why did [you] shoot the person?" Brewer claimed Oden never provided an audible response, and Brewer did not pursue it further EH Tr. at 9. At the evidentiary hearing, Brewer testified that even though he had always confused Jester and Jeffrey's names, he thought long and hard about it after the interview and it was in fact Jeffrey, not Jester, who was riding with him when the shooting occurred. EH Tr. at 50-51 .

The inconsistencies between Brewer's initial interview with the police and his later testimony are relatively easy to understand. Brewer had reason to lie during his initial interview, as he was trying to avoid incriminating himself. After he had been tried and convicted for Johnson's death, there was little reason for him to continue to deny his involvement.

However, Brewer's testimony is inconsistent with petitioner's. Brewer testified that he did not know

---

[21] Jeffrey testified that he did not recall any rumors that Alex had been shot. EH Tr. at 271. Although this does not mean that Brewer is lying about the rumor-after all, Brewer may have heard a rumor that

Jeffrey did not-Jeffrey's testimony does not bolster Brewer's credibility.

[22] Petitioner says this bolsters Jeffrey's credibility because Jeffrey said that he saw Oden grab the gun and Brewer said he saw Oden with the gun when he sat back down in his car. Pet'r's Post-Hrg. Supp. Br., Dckt. No. 188 at 5. Since both witnesses testified that Oden fired the gun, this consistency does not add much credibility to their stories.

Petitioner also says Brewer's testimony that Oden was partially outside the car door when he started shooting [*49] at Johnson and that Brewer was also partially outside his own door at the time, EH Tr. at 35-38, is also bolstered by Gardner's testimony that "they were hanging out the window" and "I could see someone hanging out the window" when the car drove by, EH Tr. at 91-92. Again, this tenuous similarity in testimony does not do much to bolster Brewer's credibility.

that petitioner had been ripped off by the intended victim, and that he was not offered drugs to beat up or kill anyone. *Id.* at 13. Also, Brewer testified that he and petitioner were cellmates at Folsom prison and that petitioner had told him that he had lied to the police and told them that he hired Brewer because that was what the police wanted to hear. *Id.* at 18-19. This is [*50] contrary to petitioner's claim that he offered Brewer two rocks of cocaine to beat up Cedric Turner. Am. Pet. at 2.

There are several other major reasons why Brewer's testimony is not credible. Obviously, he has a motive to testify that Oden was the shooter, that is, to take the blame off of himself. Finally, Brewer was impeached by evidence that in addition to the indeterminate life sentence he is serving in this case, he has prior felony convictions for assault with great bodily injury, escape, and a forcible sex offense. EH Tr. at 49-50. The court finds that Brewer's testimony was not credible.

c. Charles Austin's testimony

Petitioner also contends that Austin's testimony at Brewer's trial supports his actual innocence claim. [23] At Brewer's trial, Austin testified that the passenger in the car was the shooter Brewer RT 651-52. Austin testified that he saw Brewer driving with his hands on the steering wheel *when the shots were fired,* and that Brewer was "looking funny" "like he [was] shocked." Brewer RT 652. Austin also stated there may have been three people in the car, because "I thought I seen the head pop up, but I wasn't too sure." *Id.* at 650. However, there are problems with Austin's [*51] credibility as well.

First, his testimony contains inconsistencies with that of other witnesses. For example, Jeffrey testified in the Brewer trial that Brewer's vehicle did not stop, but instead, kept moving when the fatal shots were fired. *Id.* at 299. In contrast, Austin testified at the same trial that the car came to a complete stop when the shots were fired. *Id.* at 656. In addition, Jeffrey testified he, Jester, and petitioner all were carrying sticks before the shooting, while Austin testified that the only person that he saw with a stick was petitioner. *Id.* at 645, 663, 679.

Second, and more fundamentally, Austin's story is implausible. Austin testified that the driver's side of the car was toward him and he was looking in the driver's window, but also saw the barrel of a rifle protruding out of the passenger window. Brewer RT at 649, 651. Austin further testified that he could see that Brewer's hands were on the steering wheel at the [*52] time of the shooting. *Id.* at 652. The shooting occurred at approximately 7:30 p.m. in late November (i.e. November 30). Henry RT at 124. There was testimony it was "night." EH Tr. at 108. Unless the light in the car was on, it is improbable that Austin could have seen Brewer's hands on the wheel and the expression on his face from where he stood on the sidewalk.

Third, Austin's credibility is suspect because he appears to be a friend of Brewer's. Austin met Brewer when they were in jail; they were in the same jail for two and a half months. Brewer RT at 639-40. After Austin was released from jail, he visited Brewer once and spoke with him on the phone once. Brewer RT at 642-43. While Brewer was still in custody, Brewer sent a letter to Austin's wife. *Id.* at 643. At the evidentiary hearing, petitioner argued that "[i]t's just unfortunate that all the individuals involved here have been in jail one time or another in this-how our jail was not this, that big, we're going to run into each other. And I just hope that this Court don't assume based on that that his credibility is zero." EH Tr. at 383. But Brewer and Austin's appeared to have a relationship with one another beyond simply being [*53] incarcerated in the same location; they appear to be friends. [24]

---

[23] As noted above, Austin did not testify at the evidentiary hearing because he could not be located, despite multiple unsuccessful attempts to serve him. The court admitted Austin's prior testimony at the Brewer trial by the parties' stipulation.

[24] Respondents argue that Austin's testimony is further discredited by "the fact that he claimed to have known for two years that Oden, not

2010 U.S. Dist. LEXIS 52192, *53

Given Austin's bias and the generic nature of his testimony, and the other credibility issues noted above, the court finds that Austin's testimony is not credible.

d. Other evidence

Petitioner also contends that [*54] other miscellaneous evidence supports his claim that Oden was the shooter. Each piece of evidence will be addressed in turn.

First, petitioner claims that Alex Taggart testified that Oden was the shooter. See Pet'r's Supp. Br. at 6 (citing EH Tr. at 146-47). Alex actually first testified that he did not remember seeing the passenger do the shooting. EH Tr. at 145. When shown that he had previously testified that he had seen the passenger shoot, he said that it must be true. Id. at 146. Alex later testified that he could not see where the shots came from, and that he did not see who was in the car, although he "heard and seen the direction and...seen some sparks from that area, from the car." Id. at 156. Alex's testimony is unclear and does not add much support to petitioner's version of the facts.

Second, petitioner claims that Oden's initial statements to police that Jeffrey was in the car bolster Jeffrey's credibility, and therefore add credence to Jeffrey's testimony that Oden was the shooter. Oden told the police that he and Brewer picked up Jeff Taggart and that Jeff sat in the front passenger seat. EH Tr. at 13-14. He stated that they stopped the car, then they got out and a few [*55] minutes later Brewer fired shots from the

passenger window. Id. at 15-16. He stated that he was on the opposite side of the street when this happened and that the shots were "definitely" coming from the passenger window. Id. at 16. He stated that he was sure that Brewer had fired the shots, even though Jeff was the one in the passenger seat, because Brewer was the one that had been hired to shoot. Id. at 17. He stated that Brewer dropped him off at home after the shooting. When asked how he got back in the car after the shooting he said that Brewer picked him up down the street a block away. When asked if there was a plan to be picked up, Oden stated that he had told Brewer that he would be down the street when he got out of the car. Id. at 20.

At Brewer's trial, Oden testified that Jeffrey was not in the car before the shooting. Brewer RT at 406. When confronted with his prior statements, Oden explained that he had told the detective that Jeffrey was in the car before the shooting because "I got confused." Id. at 409. When asked, "you told us this morning that Jeffrey was never in the car until after the shooting occurred; didn't you say that," Oden stated that he had "a lot going [*56] on right now . . . so I can't remember everything, details," and then admitted that he could not remember if it was true or not. Id. at 414. Later in the day Oden stated that "at one point in time [Jeffrey] was in the vehicle." Id. at 421.

An investigator interviewed Oden in 1986. EH Tr., Ex. 13. At that time Oden stated that he was in fact in the car when the shooting happened, and that Jeffrey was not, even though they had picked him up 20 minutes before. Id.

Oden's testimony is internally inconsistent, he admitted to having a poor memory of the events and he did not present as a credible witness. While Oden's original statements to the police are indeed consistent with what he might be expected to say if he was the shooter and was attempting to conform his story to that of other witnesses while not incriminating himself--that is, that Jeffrey was there, the shots came from the passenger side of the

---

Brewer, was the shooter yet, despite being prosecuted himself for robbery of a Taco Bell during that period, he never bothered to provide this information to the police . . . [and] he had not come forwards with his story during petitioner's trial because, although he had known petitioner and his family since 9th grade, he felt 'it's none of my business.'" Resp.'s Post-Evid. Hrg Br. at 19. It might reflect badly on Austin's credibility if he had actually "come forward" with his story for Brewer and not for petitioner. But Austin testified that he never actually "came forward" with his story. Austin said that when he found out what Brewer was in jail for, he told Brewer what he had seen, and Brewer "didn't say much about it" but had his attorney contact Austin. Brewer RT at 641-42.

car, and Oden himself was outside of the car and was picked up later a block away--his inconsistent and incredible testimony does not add reliable support to petitioner's version of the facts. [25]

Third, petitioner argues that Gardner's testimony at the hearing that four people were in the car at the time of the shooting supports Jeffrey's credibility. But Gardner did not actually remember how many people were in the car. She stated that "it was a lot of children in there," that "I couldn't even remember the faces who was hanging out the windows," that she could not remember whether there were more than two people in the car, that "I think there was someone in the backseat, someone in the front seat . . . I'm trying to get in my mind a picture of the car, and I cannot." EH Tr. at 91-93. Gardner did not clearly testify that there were three people in the car. Moreover, even if there were three people in the car, it would not mean that Jeffrey [*58] was the third person. More importantly, even if Jeffrey was in the car, it would not mean that Oden was the shooter. His presence in the car does little to answer for the many other conflicting accounts that were provided by Jeffrey and hardly rehabilitates his credibility and reliability as a witness. Indeed, even under Jeffrey's most recent account (the one he described at the evidentiary hearing), he was lying down in the back seat, a position that would not likely have afforded him a vantage point where he was able to observe who shot the gun.

Fourth, petitioner argues that Detective Bawart had information that Oden was the shooter, but chose to "brush it off." Pet'r's Post-Evid. Hrg Br. at 13. Bawart testified at Brewer's trial that "we had been

---

[25] The court notes that Oden was a key witness against petitioner at his trial. Thus, Oden's [*57] lack of credibility does tend to undermine some of the evidence presented against petitioner at his trial. But this is not a retrial where the prosecution has the burden of proving petitioner's guilt beyond a reasonable doubt. Rather, this proceeding is limited to the question of whether petitioner has carried his burden of affirmatively proving his actual innocence. Oden's lack of credibility does not aid petitioner in carrying this burden.

told that it was a possibility that Oden was the shooter," and that although "[t]here was nobody that could come up and tell us yes, I have that information, it was rumors that were coming from Country Club Crest, anonymous phone calls, that type of activity." Brewer RT at 612. Although Bawart's testimony that he heard rumors that Oden was the shooter does support petitioner's theory that Oden was indeed the shooter, the court does not [*59] afford much weight to this vague hearsay evidence.

Fifth, petitioner contends that Oden had a motive to shoot Johnson. Pet'r's Post-Evid. Hrg Br. at 14. He contends that there was a confrontation between Oden and Brewer and Johnson and Oden was aware that Johnson had a gun. See EH Tr. at 172, 177, 317-18 (Jeffrey's testimony that he got into Brewer's car after Johnson pulled out a firearm, that Oden said as they were driving away that they should turn around because Johnson was "talking too much shit"); Henry RT at 174 (Oden's testimony that Johnson had an argument with "a few other people" and "sounded like he was pretty upset" and yelled "Furthermore, fuck all of ya"); Henry RT at 113 (Turner's testimony that Johnson yelled, "Go ahead, I can take one" right before he was shot); EH Tr., Ex. S at 36 (Jeffrey's statement that Johnson was waving around a gun); EH Tr., Ex. P at 15 (Brewer's statement to police that he heard Johnson had a gun and "[h]e lifted his shirt up and they seen it and somebody pulled it out and held it straight in the air and that's why-- That's when he got shot and I don't know"); EH Tr., Ex. 16 (Oden's statement that Johnson kept messing with his waist, although [*60] Oden didn't see a gun); EH Tr. at 90 (Gardner's statements at hearing that an unknown man in a suit asked her if she had picked up a gun from Johnson's body after the shooting); Henry RT at 211 (Alex's testimony at Brewer's trial that Johnson had a gun at the time he was shot). But evidence that Johnson had a gun and was being confrontational towards Oden and Brewer before he was shot does not imply that Oden, rather than Brewer, shot him.

2010 U.S. Dist. LEXIS 52192, *60

Sixth, petitioner contends that the evidence shows that Johnson was the intended target of the shooter, and that Brewer did not misidentify Johnson as Turner, as the prosecution theorized at petitioner's trial. Pet'r's Post-Evid. Hrg Br. at 15. A criminologist at petitioner's trial testified that Johnson, not Turner, was clearly the intended target of the shooting. Henry RT at 431. The criminologist also testified that at least one of the shots could not have come from the window of the car. *Id.* Petitioner argues that this testimony is consistent with Brewer's testimony at the hearing that Oden had the car door open and was partially standing outside the door during the shooting. EH Tr. at 15. Petitioner argues that this is also consistent with Gardner's [*61] testimony at the hearing that someone was hanging outside the car door's window, as Gardner may have mistaken Oden standing outside the door as someone hanging outside the window. [26] This evidence does lend some support to petitioner's version of the facts. But the jury at petitioner's trial convicted him despite hearing the criminologist's testimony.

Petitioner argues that, contrary to the prosecution's theory at his trial, he was not at the Taggarts' home after the shooting to discuss payment with Brewer. Pet'r's Post-Evid. Hrg Br. at 17. He argues that because he fled after the shooting, he could not have had any discussions with Brewer or Oden at any time after the shooting, and [*62] therefore it could not be inferred that Johnson's death was a murder-for-hire gone bad. *Id.* at 18. Brewer testified at the hearing that the day after the shooting, he went to the Taggarts' home, but petitioner was not there. EH Tr. at 43-45. The only person that Brewer saw at the house was Alex, although he was not sure if there were other people

"in the bedroom, or whatever." *Id.* at 45. Petitioner's claim that he was not at the Taggarts' house on the day after Thanksgiving is corroborated by Oden in his police interview and his interview with Hicks, as well as his trial testimony in the Brewer trial. EH Tr., Ex. 16 at 18-21, Ex. 13 at 2; Brewer RT at 532 (testifying that petitioner was not at the house, and that he had previously meant to testify only that petitioner was at an earlier meeting); Alex's testimony at the evidentiary hearing, EH Tr. at 144; Cherry's testimony at the evidentiary hearing, EH Tr. at 346; and Jeffrey's testimony at the evidentiary hearing, EH Tr. at 184. However, Jeffrey stated in his initial police interview that Robert was at the house when Brewer and Oden came over. EH Tr., Ex. S at 33-34. Petitioner argues that Alex, Cherry, and Brewer were unimpeached [*63] witnesses, and therefore their testimony should be credited. Pet'r's Post-Evid. Hrg Br. at 18. But whether the post-shooting discussion between petitioner and Brewer occurred is not decisive of whether petitioner hired Brewer to harm Turner. In order for petitioner to meet his burden of proof on his free-standing innocence claim, he must establish that Brewer was not the shooter. Petitioner has not done so.

Petitioner argues that he did not have the opportunity to prepare his witnesses before the evidentiary hearing. Petitioner stated that he had not seen his family members in 15 years, and that they came to the evidentiary hearing unprepared and not having reviewed prior transcripts. EH Tr. at 412. Therefore, petitioner argues, the court should not expect them "to be a hundred percent on point"; indeed, he argues, "if they was on point on everything, I would believe that their testimony was coerced or . . . made up." *Id.* The court does not expect witnesses to have complete recall all of the details of events that happened 25 years ago. However, as described above, the witnesses' lack of credibility stems from conflicts and internal inconsistencies on the crucial details.

Finally, petitioner [*64] argues that respondents did not produce rebuttal evidence at the evidentiary

---

[26] Petitioner argues that the state's theory was that Brewer mistakenly shot Johnson thinking that he was Turner, but that Brewer testified at the hearing that he knew who Johnson was and Oden testified that Brewer knew Turner. Pet'r's Post-Evid. Hrg Br. at 16-17. Therefore, petitioner implies, even if Brewer shot Johnson, he did so for his own reasons unrelated to petitioner's quarrel with Turner, and petitioner is innocent. As discussed above, the court does not find Brewer's or Oden's testimony credible.

2010 U.S. Dist. LEXIS 52192, *64

hearing. Pet'r's Post-Evid. Hrg Br. at 19. As discussed above, petitioner has the burden of proving his actual innocence claim; accordingly, respondents are not required to introduce any evidence.

The court has also considered the testimony of Pamela Conyers at Brewer's trial. Conyers lived with her mother and Oden. According to Conyers' testimony, she had told an investigator of a statement Oden had made to her. She testified that Oden had told her that he had done the shooting because "the man had cussed at him." Brewer RT 632-38. Her testimony at the Brewer trial was that she had made up the story because she was angry at Oden for bringing other women around when he was dating her mother. *Id.* at 637. She also testified that shortly after Thanksgiving Oden asked her to store a gun in her storage, and she said no. *Id.* at 633. Although Conyers' statement to the investigator is certainly favorable to petitioner, she recanted this statement when under oath. Thus, one can argue doubt as to which version is true, the doubt as to her credibility does little to support petitioner's version of the facts and certainly [*65] does not affirmatively prove his innocence.

Taking into account all of the evidence petitioner has submitted, the court finds that petitioner has failed to meet his burden of proving that he is probably actually innocent.

## 2. Evidence to support theory that Brewer was shooter

The record contains ample evidence suggesting that, contrary to petitioner's actual innocence claims, Brewer, and not Oden, was the shooter.

### a. Oden's testimony

Oden testified at Brewer's trial that Brewer shot Johnson. Brewer RT at 384-85. Petitioner contends that Oden had a very strong motive to lie because he was the actual shooter. Pet'r's Post-Evid. Hrg Br. at 11. Petitioner also contends that Oden's testimony is not credible because he committed perjury in petitioner's trial by stating that Jeffrey

was in the backseat after the shooting and helped wipe down the car, then testified at Jester's trial that it was Jester in the backseat, then testified again in Brewer's trial that it was Jeffrey. *Id.*

Petitioner also contends Oden's guilt is shown by the fact that he left the state before Brewer's trial, apparently believing that Brewer would testify that Oden was the shooter. *Id.* at 12. T.J. Hicks testified that when [*66] he went to Oklahoma to interview Oden in the Tulsa County Jail in 1987, Oden told him that the only reason that he would go to California would be "the opportunity to escape." Doc 158, Ex. 2. Hicks testified that Oden said that the only reason that he had testified in petitioner's, Brewer's and Jester's trials was so that he wouldn't be prosecuted himself. *Id.* As the court has noted above, Oden's testimony does not appear to be credible, although it provides some support for respondent's theory that Brewer shot Johnson.

### b. Petitioner's own statements

Petitioner made several incriminating statements during and after his police interview. During his police interview, petitioner admitted that he had offered Brewer payment to harm Turner. Remarkably, the following exchange occurred between petitioner and the police:

> Detective Bawart: "OK. You told Lee about the problem you were having with Ced?"
> Petitioner: "Yep."
> Detective Bawart: "You offered Lee $ 200 to shoot Ced, right?"
> Petitioner: "No."
> Detective Bawart: "Now that's a lie, son."
> Petitioner: "I didn't offer him $ 200."
> Detective Bawart: "How much did you offer him?"
>
> Petitioner: "I offered him $ 50, well, it was really, it wasn't that, it was [*67] just cocaine and he [wasn't] gonna do it." [27]

_____

[27] The transcript of the interview reads "and he was gonna do it." Petitioner argues that the transcription is incorrect and he actually said "and he wasn't gonna do it." EH Tr. at 422. The court has

2010 U.S. Dist. LEXIS 52192, *67

Detective Bawart: "Ok. Ok. So you were going to give him cocaine if he'd shoot Ced? Ok?"

Petitioner: "Yeah."

Detective Bawart: "Did you intend for him to kill Ced?"

Petitioner: "No. I didn't even intend for him to shoot him. I just intended for him to scare him. Hold him while we can beat him. You know. We wasn't gonna, you know, shoot, not me, I know that."

EH Tr. at 20-21.

However, later in his police interview, petitioner did not renew his objections to the detective's statements that he had hired Brewer to shoot Turner: [28]

Detective Bawart: "OK. And so the next time you saw Lee, after you offered him these two rocks to shoot Ced, he was in his car with this other dude. When you first saw him, was this other dude with him?"

Petitioner: "Nnnnope."

Detective Bawart: "No? OK. How long between the time you told him you'd give him two rocks to shoot Ced and the guy came back [*68] with the car? How long was that? A matter of minutes?"

Petitioner: "About 15 minutes."

*Id.* at 29.

reviewed the recording of the interview and agrees that petitioner said "wasn't."

[28] Respondents contend that the following exchange from the transcript of the interview also constitutes an admission by petitioner that he hired Brewer to shoot Turner:

Detective Bawart: "Ok. Did you tell Brewer you wanted him to shoot Cedric when he was on foot or when he was in the car?"

Petitioner: "I told him on foot. I didn't tell him, you know, on . . .."

*Id.* at 28. Petitioner argues that the transcription is incorrect and he actually said "I didn't tell him, you know, to shoot." EH Tr. at 423. The court has reviewed the recording of the interview and agrees with petitioner. Accordingly, the exchange shows a revenge motive and some sort of solicitation of Brewer to assist in carrying out the revenge but does not constitute an actual admission that petitioner hired Brewer to shoot Turner.

Petitioner contends that his answer, "[n]ope," was only in response to the detective's last question; that is, whether Brewer was with "this other dude" when petitioner first saw him. EH Tr. at 425. Similarly, petitioner contends that his statement "[a]bout 15 minutes" meant that about 15 minutes elapsed [*69] between when he offered Brewer two rocks of cocaine and when he saw him again. *Id.*

Dectective Bawart testified that after the recording had been switched off and he asked petitioner to step into a detention cell, petitioner admitted that he had hired Brewer to kill Turner. [29] Detectives Becker and Bawart both testified that petitioner made this statement. Henry RT at 402 (Becker's testimony that "[h]e stated he couldn't understand why he was going to jail for murder, because the guy that he had hired had shot the wrong person"), 405 (Bawart's testimony that petitioner said "I hired Lee Brewer to kill Cedric Turner. He killed the wrong guy. I can't understand why I am being charged," and that this statement was "very much" his exact words, "verbatim."). Bawart's police report actually states that petitioner "made the statement which is *similar to* 'I hired Lee Brewer to kill Cedric Turner, and he killed the wrong guy. I can't understand why I am being charged.'" Am. Pet., Ex. J (emphasis added). Petitioner argues that the detectives misheard his statement, and that he actually said *"If I had* hired Francis Brewer to kill Cedric Turner, and he got the wrong guy, I don't know why I am being [*70] charged." Am. Pet., Ex. B. Petitioner notes that Bawart has a hearing problem, and that he himself is soft-spoken. Dckt. No. 157 at 12 (citing Henry RT at 512 (prosecutor's closing argument stating that "especially Detective Bawart, because he does have a hearing problem, makes a real attempt to make sure he understands and hears what, in fact, the person said")). Nevertheless, Bawart's testimony gives support to

[29] Petitioner contends that as he was not given the opportunity to cross-examine Bawart regarding this statement at his evidentiary hearing, the court should not consider his testimony. Dckt. No. 191 at 22. However, the parties stipulated to the admissibility of petitioner's trial transcripts, including Bawart's testimony.

2010 U.S. Dist. LEXIS 52192, *70

respondents' theory of the case.

Petitioner has also made some inconsistent statements. In petitioner's statement to police, he stated that before the robbery, he was selling powder cocaine near Gateway and Rounds. EH Tr., Ex. G at 4. In his deposition, petitioner said that he was selling rock cocaine, and that "[i]f I said powder before, maybe because I was under educated as to the difference at the time. I had just started selling drugs at the time I was [*71] robbed." EH Tr., Ex. N at 8. In his police statement, petitioner claimed he was robbed of $ 200 and $ 80 worth of cocaine. EH Tr., Ex. G at 9. But in his deposition, petitioner claimed it was $ 200 worth of cocaine and $ 30 or $ 50 in cash. EH Tr., Ex. N at 12. Petitioner initially told Vallejo police that he did not have any firearms at all. EH Tr., Ex. G at 14. Later in the interview, petitioner changed his story and claimed he only had an inoperable long gun. Id. at 16-17. He claimed that Jeffrey was lying about him being armed with a handgun. Id. at 18.

More significantly, petitioner stated in his amended federal habeas application that, "I offered Francis Brewer two rocks of cocaine, worth about $ 50.00, if he would help us give Cedric Turner an ass-whipping." Am. Pet. at 2. Brewer denied at the evidentiary hearing that petitioner offered him money to hurt Turner. EH Tr. at 31, 57. Petitioner then testified that "I would have to say that I didn't offer him" coke to help assault Turner, "because the whole thing was tooken out of context." Id. at 235-36. Petitioner explained in his post-hearing brief that he did offer Brewer "two rocks of cocain[e] [*72] to 'help' [him] whip Turner's ass," but that the offer was just something he threw up "in the air, as part of a general discussion." Pet'r's Post Hrg. Brief at 5. Petitioner contends that he was not serious, that Brewer did not use drugs back then, and that Brewer did not agree or accept such an offer. Id. Petitioner explains the inconsistency between his testimony and Brewer's by arguing that he only asked Brewer to "help" beat up Turner, and that he never asked Brewer to personally beat up or

kill Turner. Id. at 20-21. While some of these inconsistencies are relatively minor, compared with the inconsistencies of most of the other witnesses in the case, they do undercut the credibility of his testimony, particularly as he attempted to explain away the highly incriminating statements he initially made to the police that he hired Brewer, for two rocks of cocaine, "to kill Cedric Turner, and he got the wrong guy, I don't know why I am being charged."

c. Additional evidence of petitioner's guilt

Turner testified at petitioner's trial that the first time he saw petitioner, who was with Jester, in the early evening of Thanksgiving Day, he told petitioner that he wanted to talk with him. Petitioner [*73] and Jester repeatedly told Turner "you're gonna die." Henry RT at 41, 45. Turner further testified that several minutes before the shooting, Jester told the crowd that had gathered outside Johnson's house to move because "Somebody's going to get shot." Id. at 48-49. Immediately before the shooting, Turner heard someone yell, "Watch out, he's gonna shoot." Turner testified that he did not see who said that but "it sounded like Jester' voice." Id. at 59. Turner later testified that Jester had actually yelled, "get back, get back," and had not said that there would be a shooting. Id. at 95. [30]

Another piece of evidence of petitioner's guilt is that petitioner had his brother drive him to Richmond and stayed at a hotel on the night of the shooting. If petitioner was not involved in the shooting, he would not have felt the need to flee. The fact that he did manifests consciousness of guilt. Petitioner explains his behavior by stating that he thought that he might have been the intended victim of the shooting, since he and his family were feuding with another family in the neighborhood. [*74] Am. Pet. at 4. Petitioner further explains that he called his sister Debrah from the hotel, and she told him that the police were looking for him in connection with the

---

[30] Turner later agreed with counsel's statement that Jester had said "watch out, watch out." Henry RT at 101.

shooting. *Id.* Petitioner states that he went to the police station the next day because he "didn't do anything" and wanted "to straighten it out." *Id.* Nonetheless, his flight on the night of the shooting and before he spoke with his sister lends support to respondent's theory.

In light of the evidence of his guilt that resulted in his conviction, and the lack of credibility of the witnesses he now relies to attempt to try to show Brewer was not the shooter, petitioner has not met his burden of proving that he is actually innocent on the theory that Oden was the shooter, and not the man petitioner had hired, Brewer. Under *Carriger,* petitioner has fallen far short of his burden of affirmatively proving his actual innocence. [31]

B. Petitioner's theory that he is innocent because he did not hire Brewer to kill Turner

Petitioner also argued at the evidentiary hearing that he is innocent because he did not hire Brewer to kill Turner, only to beat him up. This claim is similar to his defense at trial, to his claim before Judge Singleton, and to his third claim on appeal to the Ninth Circuit regarding insufficiency of the evidence. Petitioner wrote in his opening brief to the Ninth Circuit:

At Mr. Henry's trial, the only percipient witness who testified regarding the conversation that occurred between Robert and Francis Brewer prior to the shooting, Bernard Oden, indicated that Mr. Henry offered Francis Brewer two rocks of cocaine to give Cedric Turner a

---

[31] In *Carriger,* the Ninth Circuit found that Carriger had not proven that he was actually innocent where the prosecution's star witness confessed in open court, without being granted immunity, that he, and not Carriger, had committed the crime, and there was little other evidence of the petitioner's [*75] guilt. *132 F.3d at 477.* The Ninth Circuit stated that the witness' confession to the crime only "served to undercut the evidence presented at trial" and that because the witness later recanted his story, his confession only constituted "some evidence" in Carriger's favor. *Id.* The Ninth Circuit implied that Carriger had not met his burden of affirmatively proving his actual innocence because he had not provided evidence as convincing as alibi or DNA evidence. *Id.*

beating. [*76] RT 160. No one testified that Robert Henry offered Francis Brewer two rocks of cocaine to kill Cedric Turner. Thus, even without the evidence that later emerged -- that Bernard Oden and not Francis Brewer was the shooter -- there was insufficient evidence to prove that Robert intended for Brewer (or anyone else) to kill Turner (or anyone else). Moreover, assuming for the sake of argument the truth of Oden's impeached testimony and Jeff's impeached statement that Robert was present the following date and engaged in a conversation with Brewer to the effect that Brewer "killed the wrong man," such an after-the-fact statement cannot prove that Robert intended for Francis Brewer to kill Cedric Turner at the time Andre Johnson was shot.

There was ample evidence from the only percipient witness who testified, Bernard Oden, that Brewer had an independent reason to shoot Johnson. Oden testified that Robert approached him and Brewer out on Gateway when Cedric Turner was already in Johnson's car, and pointed out Cedric to Brewer in unequivocal terms as being the intended recipient of the "ass-whipping." RT 146-47; 167-72. Oden also testified that Johnson was upset and belligerent, making general [*77] insulting remarks. RT 174; 186-88. Oden further testified that he and Brewer drove away, returned, slowed nearly to a stop, and Brewer took out his gun and began firing directly at Andre Johnson. RT 194-95. There was no indication based on this testimony that Brewer was attempting to shoot Cedric Turner, and missed and hit Andre Johnson instead, or that Brewer mistook Andre Johnson for the intended recipient of the "ass-whipping."

In sum, based on the evidence actually presented at Mr. Henry's trial, there was simply no proof that, before the shooting, Robert Henry hired Francis Brewer intending to use Brewer as his agent to shoot Cedric Turner, nor was there any proof that the person seated in

Johnson's car, and not Johnson, was the person Robert wanted "whipped." In other words, there was no evidence that Robert intended to have Turner killed by Brewer or that, in killing Johnson, Brewer was under the misapprehension that Johnson was Turner. There was neither evidence of intent or of transferred intent. Accordingly, no rational factfinder could have found based on the evidence presented, even when construed in the light most favorable to the prosecution, each essential element of [*78] the crime beyond a reasonable doubt. *Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)*.

Appellant's Opening Br., 2005 WL 4838037. Judge Singleton denied this claim, writing, "Henry argues that while there was substantial evidence that he hired Brewer to assault Turner, there was no evidence that he paid Brewer to kill Turner. The evidence of Henry's contract with Brewer must be considered in context with Henry's admissions to the police. These admissions provide substantial evidence from which a reasonable jury could find guilt beyond a reasonable doubt." [32] Dckt. No. 102 at 12. Judge Singleton had declined to issue a certificate of appealability on this claim. *Id.* at 13. The Ninth Circuit also declined to grant a certificate of appealability on this claim. Dckt. No. 114 at 3. The Ninth Circuit then remanded the case solely for the purpose of conducting an evidentiary hearing on the specified ground that the testimony of Jeffrey and Austin, if truthful, would qualify petitioner to have made out a valid freestanding claim of innocence. *Id.* at 4. The Ninth Circuit's remand order does not allow this court to revisit petitioner's claim that he is innocent even if Brewer killed Johnson. Accordingly, [*79] this court does not address this claim.

III. Actual Innocence -- *Schlup v. Delo*

Petitioner also argues that the prosecutor committed misconduct during closing argument by speculating about facts not in evidence. Dckt. No. 151 at 23. A claim of actual innocence that is accompanied "with substantial claims of constitutional violations at trial," may bring a habeas petitioner within the "narrow class of cases . . . implicating a fundamental miscarriage of justice." *Schlup v. Delo, 513 U.S. 298, 315, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)*. Unlike a *Herrera* claim, the "miscarriage of justice" exception is not an independent avenue to relief. Rather, if established, it functions as a "gateway," permitting a habeas petitioner to have considered on the merits claims of constitutional error that would otherwise be procedurally barred. *See Schlup, 513 U.S. at 315-16; Herrera, 506 U.S. at 404*. A *Schlup* claim of [*80] innocence has a much lower threshold than a *Herrera* freestanding actual innocence claim. *Schlup, 513 U.S. at 316*. Although petitioner argues he has a *Schlup* claim of innocence, per the remand order, the issue before this court is *petitioner's freestanding* actual innocence claim.

Nonetheless, even if the issue were before this court, petitioner would not be able to make out a *Schlup* actual innocence claim because his claims were not procedurally defaulted. All of petitioner's claims were decided on the merits by Judge Singleton. Further, the only relief that petitioner would be entitled to if he prevailed on a *Schlup* claim would be to have his procedurally defaulted claims considered on the merits, which Judge Singleton has already done.

Petitioner also asks the court to revisit his third and fourth claims-that there was insufficient evidence at trial to prove that he hired Brewer to kill Turner, rather than just assault him, and that the prosecutor misstated the evidence at his trial--under *Schlup*. Pet'r's Post-Evid. Hrg Br. at 26. Petitioner notes that his fourth claim was not raised in his appeal to the Ninth Circuit. Dckt. No. 191 at 5. Again, neither of these claims were procedurally [*81] defaulted. Judge Singleton considered them and rejected them on the merits.

---

[32] This court notes that several words in the transcripts of petitioner's interview with the police were incorrectly transcribed, and that at least one statement that respondents contend is an admission that petitioner hired Brewer to shoot Turner is actually a denial. However, ample evidence of petitioner's guilt remains.

2010 U.S. Dist. LEXIS 52192, *81

CONCLUSION

As petitioner's witnesses at his evidentiary hearing were not credible, petitioner has not met his burden of affirmatively proving that he is probably innocent. Therefore, petitioner cannot make out a valid freestanding claim of actual innocence.

Accordingly, it is hereby RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus be denied;

2. Petitioner's October 22, 2009 motion for bail be denied; and

3. The Clerk be directed to enter final judgment in this matter.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of *28 U.S.C. § 636(b)(1)*. Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998)*; *Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991)*.

Dated:  [*82] May 27, 2010.

/s/ Edmund F. Brennan

EDMUND F. BRENNAN

UNITED STATES MAGISTRATE JUDGE

End of Document

# APPENDIX B1

## FEDERAL DISTRICT COURT DOCKET SHEET

## ROBERT HENRY V. CHARLES MARSHALL

### 2009-2012

Case: 24-2415, 04/17/2024, DktEntry: 2.1, Page 101 of 209

LIVE 6.1.3 CM/ECF - U.S. District Court for Eastern California  Case 2:22-cv-00902-KJM-DB  Document 1  Filed 04/06/22  Page 101 of 209  Page 1 of 22

HABEAS,CLOSED

## U.S. District Court
## Eastern District of California - Live System (Sacramento)
## CIVIL DOCKET FOR CASE #: 2:94-cv-00916-JKS-EFB

(HC) Henry v. Marshall
Assigned to: Senior Judge James K. Singleton
Referred to: Magistrate Judge Edmund F. Brennan
Demand: $0
Case in other court: Ninth Circuit, 05-16947
          USCA, 10-17206
Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 06/09/1994
Date Terminated: 09/13/2010
Jury Demand: None
Nature of Suit: 530 Habeas Corpus
(General)
Jurisdiction: Federal Question

**Petitioner**

**Robert Henry**

represented by **Robert Henry**
D-32467
CALIFORNIA STATE PRISON,
CORCORAN (3466)
P.O. BOX 3466
CORCORAN, CA 93212-3466
PRO SE

**FD**
Federal Defender's Office
801 I Street
Third Floor
Sacramento, CA 95814
916-498-6666
Fax: 498-6656
*TERMINATED: 08/03/1995*

**Connie Marie Alvarez**
Office of the Federal Defender
801 I Street, 3d. Floor
Sacramento. CA 95616
(916) 498-6666
Fax: (916) 498-6656
Email: connie_alvarez@fd.org
*TERMINATED: 07/29/1998*

**David M. Porter , FD**
Office of the Federal Defender
801 I Street
3rd Floor
Sacramento, CA 95814
916-498-5700 x241

Document received by the CA 1st District Court of Appeal.

6

Case: 24-2415, 04/17/2024, DktEntry: 2.1, Page 102 of 209

LIVE 6.3.3 CM/ECF - U.S. District Court for Eastern California                    Page 2 of 22
Case 2:22-cv-00609-KJM-DB    Document 1    Filed 04/06/22    Page 102 of 209

Fax: 916-498-5710
Email: david_porter@fd.org
*TERMINATED: 11/18/2008*

**Tivon Schardl**
Federal Defenders Office
Capital Habeas Unit
801 I Street, 3rd Floor
Sacramento, CA 95814
916-498-6666
Fax: 916-498-6656
Email: Tim_Schardl@fd.org
*TERMINATED: 11/18/2008*

V.

**Respondent**

**Charles D Marshall**                    represented by **Peggy S. Ruffra**
Attorney Generals Office
455 Golden Gate Avenue
San Francisco, CA 94102
415-510-3855
Fax: 415-703-1234
Email: peggy.ruffra@doj.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Herbert F Wilkinson**
Attorney General's Office of the State
of California
110 West A Steet
Suite 1100
San Diego, CA 92101-3702
619-645-2617
Fax: 14157031234
*TERMINATED: 10/11/2007*

**Michael D. O'Reilley**
Department of Justice. Office of the
Attorney General
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
415-703-5965
Fax: 415-703-1234
Email: michael.oreilley@doj.ca.gov
*TERMINATED: 07/06/2010*

Document received by the CA 1st District Court of Appeal.

7

Case: 24-2415, 04/17/2024, DktEntry: 2.1, Page 103 of 209

LIVE 6.3.3 CM/ECF - U.S. District Court for Eastern California                    Page 18 of 22
Case 2:22-cv-00609-KJM-DB   Document 1   Filed 04/06/22   Page 103 of 209

| 03/31/2009 | | SERVICE BY MAIL: 160 Order, served on Robert Henry. (Plummer, M) (Entered: 03/31/2009) |
|---|---|---|
| 04/03/2009 | 162 | SUBPOENA RETURNED EXECUTED as to Mary Gardner on 4/1/2009. (Gaydosh, J) (Entered: 04/06/2009) |
| 04/03/2009 | 163 | SUBPOENA RETURNED EXECUTED as to Superior Court Judge Harry Kinnicutt on 4/1/2009. (Gaydosh, J) (Entered: 04/06/2009) |
| 04/03/2009 | 164 | SUBPOENA RETURNED UNEXECUTED as to Alex Taggart. (Gaydosh, J) (Entered: 04/06/2009) |
| 04/06/2009 | 165 | LETTER claiming hardship and request for dismissal regarding subpoena from Mary Gardner. (Gaydosh, J) (Entered: 04/07/2009) |
| 04/10/2009 | 166 | DEPOSITION TRANSCRIPT of Robert Henry taken on March 12, 2009. (Attachments: # 1 Interview of Francis Lee Brewer taken at Susanville State Prison March 10, 2009 by Deputy Attorney General Michael D. O'Reilley, # 2 Declaration of Service by Mail)(O'Reilley, Michael) (Entered: 04/10/2009) |
| 04/15/2009 | 167 | ORDER signed by Magistrate Judge Edmund F. Brennan on 4/15/09 ORDERING Mary Gardner's 165 motion to quash the subpoena is DENIED; the clerk to fwd a copy of this order on the USM; and no later than 4/17/09, the USM to serve a copy of this order on Mary Gardner at the Gateway Drive address. (cc: USM) (Yin, K) (Entered: 04/15/2009) |
| 04/15/2009 | | SERVICE BY MAIL: 167 Order served on Robert Henry. USM served w/ 2 copies of 167 order. (Yin, K) (Entered: 04/15/2009) |
| 04/15/2009 | 168 | REQUEST to include exhibits by Robert Henry. (Gaydosh, J) (Entered: 04/16/2009) |
| 04/17/2009 | 169 | SUBPOENA RETURNED EXECUTED as to Jeffrey Taggart on 4/15/09. (Gaydosh, J) (Entered: 04/20/2009) |
| 04/17/2009 | 170 | SUBPOENA RETURNED EXECUTED as to T.J. Hicks on 4/15/09. (Gaydosh, J) (Entered: 04/20/2009) |
| 04/20/2009 | 171 | MINUTES for EVIDENTIARY HEARING held on 4/20/2009 before Magistrate Judge Edmund F. Brennan: Evidentiary Hearing (Day 2) set for 4/21/2009 at 09:45 AM in Courtroom 25 (EFB) before Magistrate Judge Edmund F. Brennan. Plaintiffs Counsel in pro per present. Defendants Counsel Michael O'Reilley, DAG present. Court Reporter/CD Number: Tiffany Brown, ECRO. (Cannarozzi, N) (Entered: 04/20/2009) |
| 04/21/2009 | 172 | MINUTES for EVIDENTIARY HEARING (Day 2) held on 4/21/2009 before Magistrate Judge Edmund F. Brennan: Evidentiary Hearing (Day 3) set for 4/23/2009 at 09:30 AM in Courtroom 25 (EFB) before Magistrate Judge Edmund F. Brennan. Plaintiffs Counsel in pro per present. Defendants Counsel Michael O'Reilley, DAG present. Court Reporter/CD Number: Jonathan Anderson, ECRO. (Cannarozzi, N) (Entered: 04/22/2009) |
| 04/21/2009 | 173 | SUBPOENA for Alex Taggart returned unexecuted. (Carlos, K) Modified on 4/22/2009 (Carlos, K). (Entered: 04/22/2009) |

Document received by the CA 1st District Court of Appeal.

23

Case: 24-2415, 04/17/2024, DktEntry: 2.1, Page 104 of 209

LIVE 6.3.2 CM/ECF - U.S. District Court for Eastern California    Page 10 of 22
Case 2:22-cv-09003-TJM-DB   Document 1   Filed 04/06/22   Page 104 of 209

| Date | No. | Entry |
|------|-----|-------|
| 04/21/2009 | 174 | SUBPOENA for Cherry Taggart returned unexecuted. (Carlos, K) Modified on 4/22/2009 (Carlos, K). (Entered: 04/22/2009) |
| 04/21/2009 | 175 | SUBPOENA for Charles Austin aka Charles Eichler returned unexecuted. (Carlos, K) (Entered: 04/22/2009) |
| 04/21/2009 | 176 | SUBPOENA for C. Kramer returned executed. (Carlos, K) (Entered: 04/22/2009) |
| 04/22/2009 | 177 | ORDER RETURNED UNEXECUTED 167 by USM. (Carlos, K) Modified on 4/24/2009 (Plummer, M). (Entered: 04/23/2009) |
| 04/23/2009 | 178 | MINUTES for EVIDENTIARY HEARING held on 4/23/2009 before Magistrate Judge Edmund F. Brennan: Plaintiffs Counsel in pro per present. Defendants Counsel Michael O'Reilley, DAG present. Court Reporter/CD Number: Johnathan Anderson, ECRO. (Cannarozzi, N) (Entered: 04/24/2009) |
| 04/24/2009 | 179 | ORDER signed by Magistrate Judge Edmund F. Brennan on 4/24/09 ORDERING Petitioner to file a brief in this action on or before 5/21/09; Respondent shall file a responsive brief on or before 6/4/09; Petitioner shall file a response, if any, to respondents brief on or before 6/18/09; and in light of those deadlines, between now and 6/18/09, petitioner shall be given preferred legal user status and access to the law library at CSP-Sacramento, CSP-Corcoran, or any other institution at which he is housed. (Carlos, K) (Entered: 04/24/2009) |
| 04/24/2009 | | SERVICE BY MAIL: 179 Order served on Robert Henry (Carlos, K) (Entered: 04/24/2009) |
| 04/24/2009 | 180 | SUBPEONA RETURNED UNEXECUTED as to Charles Austin, aka Charles Eichler on 4/21/09. (Gaydosh, J) (Entered: 04/27/2009) |
| 04/29/2009 | 181 | REQUEST for two copies of the 4/20/09 court hearing transcript, by Robert Henry. (Kastilahn, A)(Response sent: "Please contact Jonathan Anderson at 916-930-4072 to obtain copies of hearing transcripts.") Modified on 5/4/2009 (Plummer, M). (Entered: 05/01/2009) |
| 05/19/2009 | 182 | TRANSCRIPT of Evidentiary Hearing - Day 1 Proceedings held on 4/20/09, before Magistrate Judge Edmund F. Brennan. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction must be filed within 5 court days. Redaction Request due 6/9/2009. Redacted Transcript Deadline set for 6/19/2009. Release of Transcript Restriction set for 8/17/2009 filed by ECRO Jonathan Anderson, Phone number 916-930-4072 E-mail janderson@caed.uscourts.gov. (Anderson, J) (Entered: 05/19/2009) |
| 05/19/2009 | 183 | TRANSCRIPT of Evidentiary Hearing - Day 2 Proceedings held on 4/21/09, before Magistrate Judge Edmund F. Brennan. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction must be filed within 5 court days. Redaction Request due 6/9/2009. Redacted |

Document received by the CA 1st District Court of Appeal.

APPENDIX C

SUPREME COURT
# FILED

MAR 2 3 2022

Jorge Navarrete Clerk

_____

Deputy

**S271618**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re ROBERT HENRY on Habeas Corpus.

---

The petition for writ of habeas corpus is denied.

**CANTIL-SAKAUYE**

*Chief Justice*

EXHIBIT 1.

TRANSCRIPT OF AUDIO RECORDING

OF JEFFREY TAGGART'S

POLICE INTERROGATION

NOVEMBER 30, 1985

85-15913
Pc 1 THRU 48

## TAPE RECORDED INTERVIEW W/JEFFERY TAGGART

### 113085

GB  OK, you're JEFFERY TAGGART?  Yeah, I'm DET BAWART and this is DET BECKER.  We're investigating the shooting incident that took place in Country Club Crest.  Ok?

JT  Mmhmm.

GB  Now, our investigation has revealed that you fellows were at least out there when this occurred.  Ok.  And we want to talk to you about what you saw when this happened.  Ok?  A lot of people, you know, when these things happen, a lot of people shine things onto other people and tell us stories that sometimes are true and sometimes aren't true.  So, now's your turn to talk to us and tell us what you saw and what you know about this particular incident.  Do you understand that?  Ok, before we talk to you, because some people have sort of pointed the finger at you guys' direction, I'm going to advise you of your rights.  Have you ever had that done before?

JT  Mmhmm.

GB  Ok, so you know what I'm going to tell you, then.  Ok.  You have the right to remain silent.  You understand that?  Anything you say can and will be used against you in a court of law.  Do you understand that?  Ok.  You have the right to talk to a lawyer and have him present while you're being questioned.  Do you understand that?  If you cannot afford to hire a lawyer, one will be appointed to represent you before any questions if you wish one.  Do you understand that?

JT  Yeah.

GB  Ok.  If you desire a lawyer any time during my questioning, inform me of this and further questions will not be asked until your lawyer is present.  Do you understand that?  Ok.  Having these, do you understand each of these rights?

JT  Mmhmm.

GB  Ok, having those rights in mind, do you wish to talk to us now?

JT  Tell you what I have to say about it.

GB  Ok.  Ok.  Why don't you just, why don't we just make it easy.  Just tell me what you know what happened?

JT  All right.  About that time, I came home from my house.  I was by myself.

GB  Where's your house at?

- 1 -

SIDE 2 OF TAPE

**RB**  JESTER more or less referred him to ROBERT, because he's the one that set it up, is that right?  And ROBERT told him he hit the wrong guy?  What did LEE have to say about that?

**JT**  Hmm?

**RB**  What did LEE say when he was told he hit the wrong guy?

**JT**  He said, "Oh, well, he was talkin', he was talkin' a mile a minute", before...guns.  That's what he said.

**GB**  So, did ROBERT tell him he wasn't going to pay him because he shot the wrong guy?

**JT**  I don't know.  ROBERT didn't say that, I don't think.

**GB**  Didn't BREWER get upset, he wasn't goin', you know, he was, $200 to shoot somebody.

**JT**  No, he didn't get upset.

**GB**  Didn't he say, "Hey, man, you gonna pay me part of the money", or...

**JT**  He said "Yeah, I'm...

**GB**  Huh?

**JT**  He say, "Yeah, I'm gonna straighten it out".

**GB**  Who said that, ROBERT?

**JT**  Yeah.

**GB**  How much money did he say he'd give him?

**JT**  I suppose $200.

**GB**  The $200?

**JT**  Yeah.  Oh, how much do you just halfway pay?

**GB**  Yeah.

**JT**  $100?

**GB**  Did he say he was gonna halfway pay him for...?

**JT**  He say he gonna straighten him out.

**GB**  Straighten him out.

**JT**  Yeah.

**GB**  Ok.  What, what do, when you say straighten him out, what, what do you think it means?

- 34 -

037

JT   Take care of him.

GB   Take care of him. Ok.

RB   Did he say when?

JT   No, he didn't.

GB   Did ROBERT have any money then?

JT   ROBERT?  I don't think so.

GB   Ok.  That's when he was trying to get ahold of ANTHONY JOHN-SON for the money for the hit, huh?  Remember that?

JT   He suppose, he probably did.  I don't know.

GB   Ok.

JT   He's the one stickin' the, you have to...all day and every day.

RB   LEE say where he's gonna be staying?

JT   Who?

RB   LEE?  Where'd he say he was gonna be stayin' at?

JT   He ain't stayin' with that EMMA?

GB   On, on Stella?

JT   Yeah.

RB   He didn't say he was gonna be staying anywhere else for awhile?

JT   I didn't hear him say that.  But that's where he stays at.

GB   Let me ask you a question now.  You know, why did you guys hire BREWER to do, in essence, your dirty work, rather than doing it your own damn selves?  You had guns and everything.

JT   I don't know why.  Really, I don't.

GB   Can I suggest something to you?  Maybe, maybe you guys didn't have the balls to do it.  Or maybe you just ain't killers.  Let somebody else do your dirty work.  You know?

JT   Mmhmm.  I don't know why they did it.

RB   Tell me about this gun that you keep saying OZZIE had.  We didn't see nothin'.

- 35 -

EXHIBIT 2.

TRANSCRIPT OF AUDIO RECORDING

OF ROBERT HENRY'S

POLICE INTERROGATION

NOVEMBER 30, 1985

85-15913

PG-1 THRU 32

TAPE RECORDED INTERVIEW W/ROBERT HENRY

11/30/85

GB  ROBERT, have a seat in that little brown chair there. Uh, I'm DET BAWART, this is DET BECKER. This is Saturday 113085, it's approximately 22 minutes to one in the afternoon. Ok? You were brought down here by one of your relatives, Mr. LEONARD COX. You came down with your brother JEFFERY.

RH  Yeah.

GB  And your cousin, I guess, JESTER TAGGART.

RH  Yeah.

GB  How old are you?

RH  19.

GB  19?  And your name is, ROBERT'S your first name?

RH  ROBERT HENRY.

GB  What's your middle name.

RH  None.

GB  No middle name?  And your last name's HENRY.

RH  Yeah.

GB  And you stay at 832 Stanford St?

RH  Yeah.

GB  Ok, ROBERT, what we're investigating is the death of Mr. AN-DRE JOHNSON, they call him OZ. And I understand that he's a friend of the family and you folks know him..

RH  Yeah.

GB  And so forth. And, your name has come up during the inves-tigation as well as a bunch of other names. Ok?

RH  Yeah.

GB  And that's what we're here to talk to you about. Before we talk to you, we're gonna advise you of your rights. Ok. you've had this done before, I see that you've been down here before. Ok, so, I'll get my card out here. Listen to these, Ok? You have the right to remain silent. Do you understand that? Any-thing you say can and will be used against you in a court of law. Do you understand that?

- 1 -

85- 15913

RH  She must have messed it up.

GB  You just had that this morning, huh?

RH  Yeah.  I can't keep them cigarettes with me?

GB  No, you can't.

RB  Is that a gray jacket you got there, ROBERT?

RH  Gray and black.

GB  15913, huh?  Here's a sheet for your property.  You go ahead and put your jackets on, you know, any order you like, there.

RB  You got no money?

GB  (mumble mumble)

RB  You're not going to school, are you?

RH  No, Ok, I was enrolled in...

GB  All set?

RB  Yeah.

GB  Ok, Mr. HENRY, anything else you want to add?

RH  No.

GB  Ok.  Pardon me?

RH  Not that I know of.

GB  Ok.  We got a warrant for your arrest charging you with murder.

RH  Murder?

GB  Yeah.  Signed by Judge DACEY of the Vallejo Municipal Court yesterday.  You'll be booked into jail, there is no bail on it. You're not eligible for bail.

RH  Mmhmm.

GB  Do you have any questions?

RH  Yeah.  Uh, uh, this murder, how, what, you know, who I kill?

0 5 8                    0 0 2 9 9

GB  You were instrumental in the killing of Mr. JOHNSON.

RH  How was I...

GB  You know, I can't, I, you know, if I go out and tell DET BE-CKER there, hey, I'll give you two rocks of cocaine if you'll

- 31 -

shoot ROBERT HENRY for me, 'cause I don't like that dude, and he
shoots you, and, well, I got mine, just blow his toe off or hit
him in the leg or something, you shoot him, he shoots you right
between the eyes and you die, I'm guilty of murder even though
he's the one that pulled the trigger.

RB  It's also true if I miss and I shoot your brother and kill
your brother, he's guilty and I'm going to jail.

RH  Well, what I'm sayin'...

(Phone conversation going on at the same time as the explanation
and Mr. HENRY'S conversation with DET BECKER)

RB  Made yourself pretty clear ...

RH  Thing about it, when he, he's arguin' with him anyway.  He
arguin' with the dude that shot him, in the car, anyway.

GB  Who was?

RH  The dude that got shot.

GB  He shouldn't have been arguin', huh?

RH  With them, that's, he not arguin' with me...

GB  But he didn't, you know, you know, arguin's one thing, but he
didn't pull out no guns and shoot at anybody or nothin', he was
just standin' out there fat, dumb and happy.

RH  Whoever shot him you should tell that to, 'cause I didn't...

GB  Well, you didn't see Mr. JOHNSON take out any Uzis or sawed-
off rifles or anything like that, did you?

RH  Naw, I didn't have nothin' myself.

GB  Ok.  Mr. JOHNSON didn't have any kind of weapon except his
bare hands, right?

RH  That's what it lookin' like.

GB  Yeah.  Ok.

RH  And they shoulda seen that, too, but they didn't ... whoever
did it.  I didn't do it.

GB  Mr. JOHNSON made the mistake of goin' up there and arguin'
with people who were armed and he was just there with his bare
hands.

RH  He probably didn't even know they was armed.

GB  Ok.  Anything else?  Ok.  It's 1:45 in the afternoon on the
30th of November.  Shut this off!

- 32 -

# EXCERPTS OF TRANSCRIPTS

## PEOPLE V. ROBERT HENRY, CASE NO. VC19726

1    A.          Right.

2    Q           Okay.  Do you recall telling him that Mr. Johnson

3    went over to a blue car to talk with four black male juveniles?

4    A.          No, I don't.

5    Q           Let me see if I can refresh your memory.

6                MR. O'HANLON:  That's Cosgrove, counsel.

7                THE WITNESS:  All right.

8    BY MR. O'HANLON:

9    Q           Have you had plenty of time?

10   A.          Yeah.

11   Q           Now, he indicates that you went over to the blue

12   car -- Mr. Johnson -- excuse me -- went over to the blue car to

13   talk to four black male juveniles, they argued, and someone in

14   the car started shooting, they shot Johnson and fled.  Turner

15   thinks the four were from Richmond.

16               Is that what you told Officer Cosgrove?

17   A.          No.

18   Q           You did not tell him that?

19   A.          No, I didn't.

20   Q           He either made a mistake or wrote down a lie?

21   A.          He made a mistake.

22   Q           Now, immediately preceding the shooting, did, in

23   fact, the car, the little blue car, slow down and Mr. Johnson

24   go over to the car?

25   A.          No, he didn't go over to the car.

26   Q           He didn't go over to the car, all right.  Let me try

27   to refresh your memory again.  Would you look here on page 36

28   of the Bawart report, and it's about the middle of the page, a

1    little bit towards the bottom.  See where I have marked some

2    yellow marks in there?

3             Okay.  Now, you talked to Detective Bawart, sitting

4    here, the night of the incident?

5    A        Right.

6    Q        Doesn't it say there that you said that Johnson

7    approached the small blue vehicle and said to the driver, "Go

8    ahead, I'll take one"?

9    A        No.

10   Q        Didn't say that there?

11   A        There, maybe I said it, but --

12   Q        You didn't say that?

13   A        That's not correct.

14   Q        So, he has a mistake, then, down here?

15   A        Right.

16   Q        All right.  Then he said -- then it says, when he

17   turned back and started walking toward the vehicle, you saw the

18   shot fired?

19   A        He was standing by the door when the shots was fired.

20   Q        You're saying he didn't approach the little blue

21   vehicle?

22   A        He didn't.

23   Q        All right.  So, both these officers are wrong when

24   they have in there that you said that he approached the little

25   blue vehicle?

26   A        Right.

27   Q        All right.  Now, you also had Mr. Taggart yelling out

28   this morning, you said something that he yelled out something,

1   A        Somewhere between 9:00 and 10:00 o'clock in the

2   evening.

3   Q        And did Mr. Turner tell you that Mr. Johnson went

4   over to a little blue car?

5   A        Yes.

6   Q        Did he tell you that he talked with four black male

7   juveniles in that car and argued?

8   A        I believe so.

9   Q        And then somebody started -- somebody in the car

10  started shooting?

11  A        Yes.

12  Q        And they shot Johnson and then fled?

13  A        Yes.

14  Q        And he thought these four black male juveniles were

15  from Richmond?

16  A        Yes.

17  Q        Did he indicate anything to you about who they were

18  other than this Richmond thing?

19  A        He did not indicate to me.  I don't believe he was

20  sure.

21  Q        He didn't know any names, in other words?

22  A        No.

23  Q        He didn't say Lee Francis Brewer or something like

24  that?

25  A        No.

26  Q        Now, you were the one talking to him.  Did you get

27  the impression that, immediately preceding the shooting, that

28  Mr. Johnson walked over to this blue car and had this

1   conversation and boom, boom, boom; is that the way it sounded

2   to you as he explained himself to you?

3   A.         Yes.

4   Q.         So, more or less just sort of a chain of events that

5   followed just one after another; he goes to the car, talks to

6   him a few seconds, turns around and boom, boom, boom, he's

7   shot?

8   A.         Well, there was some -- there was some events that

9   had preceded the evening --

10   Q.         Yeah, he told you about the robbery of Robert Henry

11   and all this stuff?

12   A.         Right.

13   Q.         I'm talking about the time of the shooting itself.

14   That's what he said, that Mr. Johnson walked over to the blue

15   car, talked to four black male juveniles, they argued, and

16   someone in the car just started shooting?

17   A.         Yes.

18           MR. O'HANLON:  Then they just fled.  Thank you **very**

19   much.

REDIRECT EXAMINATION

21   BY MR. KINNICUTT:

22   Q.         Officer, do you have a copy of your report with you?

23   A.         No, I do not.

24   Q.         Do you remember exactly what's in your report,

25   Officer?

26   A.         Not word for word.

27   Q.         Do you think if you reviewed your report it might

28   help you refresh your memory as to what Mr. Turner told you?

1    across -- by Simonton Street.

2    Q.        And what happened when you drove to this location?

3    A.        Well, he parked across the street trying to see what

4    was going on.

5    Q.        Did you both stay in the car?

6    A.        At that time, yeah.

7    Q.        What did you observe?

8    A.        Uh, a lot of people standing on the street, a lot of

9    commotion going on, a lot of noise.  This was three or four

10   girls and the rest all guys, I guess about -- total of about

11   12, maybe 13 people.

12   Q.        And did you recognize anybody?  Was Mr. Robert Henry

13   out on the scene?

14   A.        At that time, yeah, I think he was.

15   Q.        Did you ever -- well, you tell me what happened next

16   then.

17   A.        Somebody trying to open up the back door of a car,

18   someone setting in the back seat, and eventually couldn't get

19   the door open.  So, finally, left it alone --

20   Q.        Who was --

21   A.        Hollering, hollering, "That's the guy."

22   Q.        Who was saying that?

23   A.        Robert Henry, I think.

24   Q.        Who was he saying that to?

25   A.        Referring to the guy in the back seat, but he was

26   saying that to Lee Francis.

27   Q.        How close to Lee Francis was Mr. Henry when this

28   was being told to Mr. Lee Francis Brewer?

```
 1   A.        Oh, just a few feet away.

 2   Q.        You were both still in the car?

 3   A.        We were standing outside of the car.

 4   Q.        So, gotten out of the car?

 5   A.        Yes.

 6   Q.        And Mr. Henry was pointing out to you and Mr. Brewer

 7   the individual he had discussed earlier?

 8   A.        Yeah.

 9   Q.        About the ass whipping?

10   A.        Yeah.

11   Q.        Was there an argument occurring that you could see?

12   A.        Yeah.

13   Q.        Who was involved?

14   A.        A guy, Andre Johnson, that was his name.  I didn't

15   know his name at the time, but that's who was arguing.

16   Q.        You since then determined what his name was?

17   A.        Yes, that's correct.

18   Q.        Showing you a photograph marked previously as

19   People's No. 9, do you recognize the individual depicted in

20   that photograph?

21   A.        Yes, I do.

22   Q.        Who is that?

23   A.        Andre Johnson.

24   Q.        He was out in the street?

25   A.        Yes.

26   Q.        And he was arguing with people?

27   A.        Yeah, he was a little bit in front of his car and --

28   uh, I don't know what all had happened to lead up to the
```

167

1 car?

2 Q       Yeah.

3 A       No.

4 Q       Did Mr. Brewer ever come over here and stand?

5 A       No.

6 Q       Did he ever move anyplace over on this side of the

7 street?

8 A       Uh, no, I don't think so.

9 Q       You don't recall him ever going over there?

10 A       No.

11 Q       You said that you two guys were out of the car, and

12 on your direct examination from Mr. Kinnicutt, you said that

13 you and Lee Francis were out of the car, and Mr. Henry came up

14 and pointed out Cedric?

15 A       That's correct.

16 Q       Where were you outside of the car when that happened?

17 A       I was right there where I just told you I was at.

18 Q       You were here.  And Mr. Brewer was clear over here?

19 A       He was still on the opposite side of the street.

20 Q       How far away were you fellas?

21 A       What, me and Lee?

22 Q       Yeah.

23 A       I don't know.  I guess about eight, ten yards, maybe.

24 Q       Eight, ten yards.  Did Mr. Brewer say anything when

25 Mr. Henry said, "That's the guy in the car"?

26 A       No.

27 Q       He was pointing out the fellow sitting in the

28 passenger seat of this car?

1   A        No, he was pointing out the fella sitting in the

2   back seat.

3   Q        Oh, the back seat of the car?

4   A        Uh-huh.

5   Q        The back seat of this car here.  And there was only

6   one person in the car, right?

7   A        That's correct.

8   Q        There weren't more than one person in there?

9   A        Huh-uh.

10  Q        Now, Mr. Brewer acknowledged, didn't he, he knew who

11  was going to get the ass whippping?  I mean, didn't he indicate

12  who -- yeah -- he knew who it was supposed to be?

13  A        That's the impression I was supposed to get.

14           MR. KINNICUTT:  What was the last X?

15           MR. O'HANLON:  X-3 was where Brewer was standing.

16           MR. KINNICUTT:  You mean O-3?

17           MR. O'HANLON:  Yeah, Oden-3.  That's where he says

18  Brewer was standing.

19           Okay.  Mr. Kinnicutt, Oden's statement, January 21st,

20  page nine.

21           Mr. Oden, I'll just go ahead and read you a few lines.

22  This is a tape recorded statement you made to --

23           MR. KINNICUTT:  Hold it --

24           MR. O'HANLON:  -- to Detective Bawart on January 21st.

25           MR. KINNICUTT:  Perhaps have it read to him and see

26  if it refreshes his recollection.

27           MR. O'HANLON:  I'll read this to you and see if it

28  refreshes your recollection.

```
 1              "George Bawart:  Yeah, well, didn't he --
 2              didn't he stop, and Henry come up and had
 3              a second conversation with him in the street?
 4              "Bernard Oden:  Yeah, as a matter of fact,
 5              he did, yeah.
 6              "George Bawart:  Okay.  What was that conver-
 7              sation?
 8              "Bernard Oden:  Oh, uh, he told -- he said,
 9              'There he is in the back seat of the car,
10              there he is.'
11              "George Bawart:  Okay.  So, Henry pointed
12              him out?
13              "Bernard Oden:  Yeah.
14              "George Bawart:  Did Jester or Jeffery or
15              anybody else point out, too?
16              "Bernard Oden:  No, I don't think so."
17   BY MR. O'HANLON:
18   Q         Okay.  Did he point him out like that?
19   A         Yeah.
20   Q         Okay.  Now, directing your attention to the
21   preliminary hearing transcript, page 18, lines 25 to 28, on
22   page 19, lines 1 through 6, I'll read you the testimony you
23   gave down there in the courtroom.
24              "Question:  What was said by who?
25              "Answer:  Henry told me that the guy was
26              sitting in the back seat of the car down the
27              street.
28              "Question:  Okay.  And which -- in which car
```

170

1          was that?

2          "Answer:  Andre Johnson's car.

3          "Question:  And who was in the back seat of

4          the passenger seat?

5          "Answer:  Cedric.

6          "Question:  Mr. Turner?

7          "Answer:  Yeah.

8          "Question:  And what did Mr. Brewer say?

9          "Answer:  He said, 'Okay.'"

10         Is that correct about what Mr. Brewer said?

11    A    I'm not sure.  I don't remember him saying anything.

12    Q    You don't now remember him saying anything?

13    A    No, I don't.

14    Q    But you do -- do you have any doubt that you testified

15    before that Mr. Brewer indicated that he -- okay -- when

16    Mr. Henry pointed him out --

17    A    I'm not saying he didn't or did.  I'm just saying I

18    don't remember.

19    Q    Do you remember testifying that he did?

20    A    Yeah, now that you mention it, yeah.

21    Q    And did you go in there and tell a lie about

22    Mr. Brewer saying that?

23    A    If I did, it wasn't intentionally.

24    Q    You're saying maybe you made a mistake because you

25    don't know if he said anything or not now?

26    A    (No response.)

27    Q    All right.

28         THE COURT REPORTER:  I'm sorry, I didn't get an

1    answer.

2              THE WITNESS:  Yeah.

3    BY MR. O'HANLON:

4    Q.        All right.  Directing your attention to page 23:

5              "Question:  All right.  And this is while

6              you were sitting in the car you saw this --

7              "Answer:  No, I was out of the car then.

8              "Question:  All right.  Was Mr. Brewer out

9              of the car then?

10             "Answer:  Yes.

11             "Question:  And the car was parked at the

12             scene?

13             "Answer:  Down the street, yeah.

14             "Question:  This is before the shooting?

15             "Answer:  Yeah, before the shooting.

16             "Question:  Did Mr. Henry have a conversation

17             with Mr. Brewer at this point in time?

18             "Answer:  No, except he said, 'That's him in

19             the back seat.'  Other than that, no.

20             "Question:  Pointing at who?

21             "Answer:  Cedric."

22             Do you have any doubt whatsoever that this conversa-

23   tion took place?

24   A.        No, that's what happened.

25   Q.        Okay.  Now, let me ask you this question.  Maybe I

26   won't have to go to the next part here.

27             The lighting conditions were good enough for you to

28   see all right that evening?

1   A.         Yeah, I guess so.

2   Q.         Well, did you have any difficulty seeing Cedric

3   sitting in the back seat of the car?

4   A.         No.  Um, I could tell he was dark.

5   Q.         Did you have any difficulty knowing who -- that there

6   was a person sitting in the car?

7   A.         Oh, no, it was definitely somebody sitting in the

8   car.

9   Q.         Did you have any difficulty knowing that Mr. Johnson

10  was outside the car?

11  A.         No, no.

12  Q.         Did you have any difficulty seeing anybody at anytime

13  out there?

14  A.         No, I didn't.

15  Q.         All right.  In other words, the lighting conditions

16  were good enough for you to see; is that correct?

17  A.         Yeah.

18  Q.         Was there any doubt in your mind who the person was

19  that was to get the ass whipping?

20  A.         Well, like I say, at the time, I didn't know his

21  name.  I still don't really know him.  But, uh, I knew it was

22  supposed to be the one sitting in the back seat of the car.

23  I know that much.

24  Q.         Was there any reason why Mr. Brewer wouldn't know

25  exactly what you knew?

26  A.         No, I don't think so.

27  Q.         All right.  Is Mr. Brewer deaf?

28  A.         Of course not.

1    Q        Does he have any vision problems or does he see all

2    right?

3    A        I would imagine so.  He never complained to me about

4    having a problem seeing.

5    Q        All right.  And so, as far as you know, he knew

6    exactly what you knew?

7    A        Yeah.

8    Q        And let me ask you this:  Was there any obstruction

9    between you and the automobile in which Cedric was sitting?

10   A        Any obstruction?  You mean like somebody who might

11   have been in the way?

12   Q        Prevent you from seeing.

13   A        No, there wasn't.

14   Q        Was  there anybody who would prevent Mr. Brewer from

15   seeing?

16   A        I don't think so, no.

17   Q        Now, when Mr. Henry was doing this pointing out as

18   to who was seated in the back, the person to get the ass

19   whipping seated in the back of the car, was he talking to you

20   or was he talking to Mr. Brewer?

21   A        Talking to Mr. Brewer.

22   Q        Was he closer to you or was he closer to Mr. Brewer

23   when he said these things?

24   A        Uh, well, we both was pretty close together, so --

25   at that time.

26   Q        So, it could have been that it was said to either you

27   or to Mr. Brewer?

28   A        No, no, he was referring to Francis Lee.

1   Q.      There's no doubt in your mind that he was talking to

2   Mr. Lee Francis?

3   A.      Whatsoever.

4   Q.      Now, you indicated that there was some kind of

5   argument before the shooting; is that correct?

6   A.      Yeah.

7   Q.      And the argument was between whom?

8   A.      Andre Johnson and, uh, I would imagine a few other

9   people.  'Cause that's the impression I got.  He wasn't just

10   talking to no one specific person.  So, what transpired --

11   what it started behind, I don't know.  Sounded like he was

12   pretty upset.

13   Q.      What made you feel Mr. Johnson was upset?

14   A.      Well, because of the tone of his voice, his actions,

15   the words he used.  You know, you know, when somebody upset,

16   you don't take no G's if somebody angry.

17   Q.      What did he say that made you feel he was angry?

18   A.      I caught the last part of it.  Besides all the

19   hollering and the people talking back and forth, 'cause I

20   really couldn't understand, you know, what all they was saying,

21   but, you know, the last part of his converation was, "Further-

22   more, fuck all of ya," and that's when he proceeded to walk

23   away.

24   Q.      Was he saying this in a quiet tone of voice or was

25   he yelling?

26   A.      No, he looked like he yelling.  He looked like he

27   might have been ready to punch somebody in a second.

28   Q.      Would you describe what he looked like as far as his

1    to the Food and Liquor Store?

2           MR. KINNICUTT:  Objection.  Grounds of relevancy

3    at this point.

4           MR. O'HANLON:  We'll have to argue it outside the

5    presence, Judge.

6           THE COURT:  Approach the bench.

7           (Off-the-record discussion at the bench.)

8           THE COURT:  It's getting late enough in the day, and

9    this is something we have to do outside your presence.  So, I

10   think what we'll do is stop now, at least as far as the jury is

11   concerned.

12          If you would leave your notebooks here, please.

13   Remember the admonitions I've given you.  I would expect you

14   all back at 10:00 o'clock tomorrow, and we'll try to start

15   with testimony at that time.

16          I would like the Defendant and counsel to remain a

17   few minutes and we'll make a record.

18          (The following proceedings were had outside

19          the presence of the jury.)

20          THE COURT:  Mr. Oden, please wait outside.  I don't

21   know if we'll need your testimony more today or not, but please

22   wait outside.

23          THE WITNESS:  Sure.

24          THE COURT:  Okay.  The record will reflect that the

25   jury -- we're meeting outside the presence of the jury to hear

26   an offer of proof on behalf of the Defendant by Mr. O'Hanlon

27   on the relevance of this prior incident, November 5th incident.

28          MR. O'HANLON:  Your Honor, Mr. Oden would testify, at

1   least insofar as the police reports I have seen and the previous

2   testimony he's given, that on November 5th, which is approxi-

3   mately 23 days prior to this incident, Mr. Brewer went over to

4   the Food and Liquor Store across the street from Mr. Oden's

5   house, and Mr. Oden was in a position to observe the proceedings

6   over there.

7            Mr. Oden indicates that he watched Mr. Brewer, in

8   general terms, try to rob a man.  The man resisted the robbery,

9   swore at Mr. Oden -- swore at Mr. Brewer, rather, took a swing

10  at Mr. Brewer -- this was a 66-year old man -- and missed; and

11  then proceeded to turn his back and walk away, at which time

12  Mr. Brewer shot him in the back of the head.

13           Fortunately, the man turned his head slightly and

14  the bullet went in and came out the side.

15           I think it would be relevant under the Evidence

16  Code -- I believe it's 1101 -- becuse it shows intent, it

17  shows the possible motive, it even might resolve Mr. Kinnicutt's

18  identity problem; because under the circumstances here,

19  there's nothing to preclude me from arguing that Mr. Oden is

20  the killer who's merely covering up or making a deal with --

21  in other words, shoving the blame off onto Mr. Brewer.

22           I want to provide this testimony because it gives

23  Mr. Henry an alternative explanation for the aberrant behavior

24  of Mr. Brewer.

25           MR. KINNICUTT:  It's our position, your Honor, all

26  the earlier incident is is a robbery attempt that went bad and

27  he shot the guy.  The fellow, after attempting to hit him,

28  turned around and ran away, was shot as he was running into

,181

1    the store.

2           Under 1101, I don't see any similarity at all to the

3    crime we're discussing today.  I don't see any similarity.

4           MR. O'HANLON:  I would like to point them out, your

5    Honor.  The following similarities are there, in that in both

6    cases, there was swearing, which could be perceived as directed

7    at Mr. Brewer --

8           MR. KINNICUTT:  Okay --

9           MR. O'HANLON:  In both cases, there was a challenge

10   made by the victim to Mr. Brewer.  In both cases, the victim

11   turned his back, at which time, Mr. Brewer then proceeded to

12   shoot that particular person.

13          While it's not a situation where anybody is saying

14   "hiring" or anything like that, it's obvious I'm putting it on

15   for different reasons, because I want to show that Mr. Brewer

16   doesn't like being challenged, for some reason, has this

17   tendency to shoot people who challenge him, and that he was,

18   in fact, challenged here, and for that reason, lost his temper

19   at the swearing and what have you and shot Mr. Johnson.

20          THE COURT:  All right.

21          MR. O'HANLON:  Provides me with an alternative motive.

22          THE COURT:  When you try to use a prior time to show

23   identity -- apparently, we're not trying to do that in this

24   case.  It's not for the purpose of showing identity --

25          MR. O'HANLON:  It is, in a sense.

26          THE COURT:  If it is, there are no distinctive

27   features, I don't believe.

28          MR. KINNICUTT:  Under 1101, the crimes are so

182

1   dissimilar that --

2           THE COURT:  As I say, that's to prove --

3           MR. KINNICUTT:  But anytime the crime --

4           THE COURT:  The question here is:  Is this admissible

5   to show motive?

6           MR. KINNICUTT:  How does it show motive?  I don't

7   see it.  I frankly can't see how the earlier crime, which was

8   a robbery attempt, and this crime are similar in any fashion.

9           MR. O'HANLON:  Well, I'm saying that they are, and

10  it shows Mr. Brewer's response to a challenge.

11          THE COURT:  I'm going to admit it on the grounds of

12  proving his conduct on that specific occasion, his intention

13  for doing so.  It's not being offered for -- if it were solely

14  for the purpose of identity, I wouldn't permit it.

15          MR. KINNICUTT:  Well, I just -- I'm sorry.  I don't

16  follow your reasoning.  It will be in to show what?  It seems

17  to me the offer of proof is to show one of the things 1101

18  describes.

19          THE COURT:  Yes.

20          MR. KINNICUTT:  Okay.  How --

21          THE COURT:  Such as motive, opportunity, intent --

22          MR. KINNICUTT:  Okay.  How does that prior attempted

23  robbery -- what does that show?  Shows that he committed a

24  robbery and it didn't work and he shot somebody.  How does that

25  help us in this case?  I fail to -- I just fail to see the

26  reason.

27          THE COURT:  It could show that he intended to kill

28  the victim, Mr. Johnson, instead of the hired victim -- or

183

1   rather, the hired person, Mr. Turner, or the person he was

2   allegedly hired to kill, Mr. Turner, because he jumped, he

3   snapped at being called a name.

4        MR. KINNICUTT:   There's no evidence that this

5   Mr. Brewer was called a name by anyone at all before this

6   Court.   There's no testimony of that at all.   There's no

7   testimony that Mr. Brewer  was ever challenged at all by

8   anybody.

9        MR. O'HANLON:   Your Honor --

10        MR. KINNICUTT:   The only testimony that you've heard

11   is tht Mr. Cedric Turner said he was standing at the scene

12   observing.   The only other testimony is from Mr. Oden, that

13   there was a discussion, and he was talking to this crowd, but

14   it was never directed towards Mr. Brewer.

15        MR. O'HANLON:   Your Honor, I would disagree with that.

16   We also have the additional fact that Mr. Johnson was hollering

17   out, "That's okay.   I can take one," or something to that

18   effect, immediately preceding --

19        MR. KINNICUTT:   Not directed towards anybody.

20        MR. O'HANLON:   -- preceding the shooting.   If you're

21   going to follow your theory, Mr. Kinnicutt, you're saying this

22   man drove around the block there, and Jester Taggart yelled,

23   "Watch out, watch out," because he's foreseeing the shooting.

24   And then you have this man, in addition to calling them

25   "fucking punks" before, saying, "Yeah, I can take one."

26        MR. KINNICUTT:   If, in fact, those remarks were

27   directed towards Mr. Brewer, but they're not.

28        THE COURT:   Is there any evidence they're

184

1   not directed to Mr. Brewer?

2           MR. KINNICUTT:  Yes.  The testimony is he's in the

3   middle of the street and having a discussion with Jester Taggart,

4   within five minutes of the shooting having a discussion with

5   Jester after he already had the discussion with -- the argument

6   with Robert Henry.

7           The only testimony we have is that Mr. Brewer is

8   either standing across the street down to the right there by

9   Simonton or standing up in front of the vehicle, but he's

10  standing on the sidewalk observing.  The testimony is that

11  he's talking to the people in the street who are talking to

12  him.  There's an argument.  He says, you know, says whatever

13  he says, and then "Fuck all of you," whatever it is.  But

14  there's no evidence that Mr. Brewer is being confronted or

15  called any names by Mr. Johnson before he's killed.

16          MR. O'HANLON:  Your Honor, I must disagree with that.

17  His witness he put on this morning, Mr. Turner, is emphatic

18  that, immediately preceding the shooting, Mr. Johnson hollered

19  out this challenging remark about, "Okay, I can take one --

20          MR. KINNICUTT:  Okay, that's not swearing --

21          THE COURT:  But it isn't directed -- I didn't get

22  any direction there.

23          MR. O'HANLON:  Well, I don't know who it could be

24  directed towards other than somebody in the car.  If you -- if

25  you follow this theory that somehow there will be some kind of

26  shooting here, under the circumstances, it seems to me that it's

27  just one more episode in which Mr. Brewer appears to be

28  challenged, at least one of the reasonable conclusions that

185

1   could be arrived at here, that he was challenged and responded

2   to the challenge, the whole situation he feels threatened by

3   or challenged.  Therefore, he responds.  He's -- if you cut

4   him off on the freeway, you might get it.

5          MR. KINNICUTT:  Well, my position is, your Honor,

6   there simply isn't evidence of that.  There isn't sufficient

7   evidence given the dissimilarity of the two events that that

8   will help provide some idea of the intention of this killing.

9          THE COURT:  I'm going to give you more opportunity

10   tomorrow, Mr. O'Hanlon, to see if you can get anything more

11   out of this witness to indicate that, but it might be

12   directed --

13          MR. O'HANLON:  Well, this witness claims that he

14   didn't hear that remark.

15          THE COURT:  But he testified about some other

16   challenging remark --

17          MR. O'HANLON:  Oh, yes.

18          THE COURT:  If you can get some evidence on -- I'm

19   surprised the District Attorney even cares.  Seems to me --

20          MR. KINNICUTT:  We can probably work out some

21   stipulations, but I don't think the defense would be agreeable.

22          MR. O'HANLON:  What do you want to stipulate to?

23          THE COURT:  We're now off the record.

24          (Proceedings outside the presence of the

25          jury concluded.)

26          (Evening adjournment.)

27                    --oOo--

28

199

1         "Question:  Well, you just said you were in

2         the car at the time Mr. Henry pointed out

3         Mr. Turner.  Were you outside the car?

4         "Answer:  No.  I think we was  in the car.

5         "Question:  You were in the car at the time

6         you think Mr. Henry said, 'That's the fella

7         sitting in the back seat'?

8         "Answer:  Yes.

9         "Question:  Then did you get out of the car

10        after that before you left, or did you leave

11        without getting out of the car?

12        "Answer:  I got out of the car for a few

13        minutes.

14        "Question:  You got out of the car for a few

15        minutes.  What about Mr. Brewer?

16        "Answer:  He stayed in the car."

17  Q      Is that correct?

18  A      Huh-uh.

19  Q      Did you testify to that in court in Vallejo?

20  A      I think so, yeah.

21  Q      You haven't got a reason to believe the court

22 reporter made a mistake, do you?

23  A      No.

24  Q      Well, Mr. Oden, whether you were in the car or out

25 of the car or Mr. Brewer was in or out of the car, there's no

26 doubt in your mind, is there, that Mr. Turner was, Cedric, the

27 intended person for the ass whipping, was sitting in the car

28 that belongs to Mr. Johnson?

238

1   A.      Yes.

2   Q.      He came back out?

3   A.      Yes.

4   Q.      Who did he come out with?

5   A.      Mr. Johnson.

6   Q.      And then another argument started?

7   A.      With Mr. Johnson and my brother.

8   Q.      The Defendant seated here?

9   A.      They wasn't arguing; they was talking at the moment,

10  but Mr. Johnson came out raising a lot of commotions and

11  everything.

12  Q.      Who did he direct this anger towards?

13  A.      He was, uh, just -- when he came out the house, he

14  was just talking, you know, and then he walked up to my brother,

15  and then they was talking and --

16  Q.      Okay.  Where did this conversation take place?

17  A.      In front of Mr. Johnson's car.

18  Q.      Okay.  And that was down the street from the Morgan

19  residence?

20  A.      Yes.

21  Q.      About three houses down?

22  A.      Uh, one, two, three -- yes, three houses down.

23  Q.      So, at some point, you saw your brother move from

24  in front of the Morgan's house down to Mr. Johnson's car?

25  A.      Yes.

26  Q.      What was he doing when he was walking from in front

27  of the Morgan's house down to Mr. Johnson's car?

28  A.      He was talking to Mr. Johnson.  He was -- they was

253

1      THE COURT: Okay. Now, Mr. O'Hanlon?

2      MR. O'HANLON: Yes, your Honor. We have that

3  other matter, and I wanted to clarify the record as to offering

4  to have Mr. Oden testify about what he observed on November 5th

5  1985, at 501 Fairgrounds Road on that date.

6      Mr. Oden would indicate that he saw Lee Brewer go

7  across the street to the Food and Liquor store where there is

8  also a gasoline station. He observed Mr. Brewer climb into a

9  person's car over there, subsequently get out of the car and

10  point a gun at that individual. The individual called,

11  according to the reports I have, called Mr. Brewer a mother

12  fucker and took a swing at him and missed. That individual

13  then turned and ran towards the gas station attendant's

14  office; at which time Mr. Brewer fired and hit him in the back

15  of the head causing a grazing wound. Fortunately, it did not

16  penetrate.

17      The victim of that particular offense would come in

18  here and testify that he was filling -- his name is

19  Mr. Stancliff, S-t-a-n-c-l-i-f-f -- would come in and testify

20  that he's a 66-year old man, he was in that station filling up

21  his automobile with gasoline when this individual came over

22  and demanded his wallet and, I believe, the keys to his car.

23  He refused to give those to him. He did take a swing at him,

24  missed, turned and ran; at which time, he was shot in the back

25  of the head.

26      He believes the reason it didn't penetrate is that

27  he must have turned his head and it caused this grazing wound.

28  The bullet then hit the plate glass window in the front of the

254

1    station there, and apparently broke the window.

2           I would be offering this testimony from Mr. Stancliff

3    and Mr. Oden to call an alternative reason for the commission

4    of the offense; the alternative reason being that Mr. Brewer

5    responds to challenge by acts of violence, and did so in the

6    past, and he would do so here based upon a challenge he

7    received at the time of listening to Mr. Johnson, even though

8    those remarks were not directed directly towards Mr. Brewer,

9    he would be aware of those remarks, the similarities involved,

10   swearing, some kind of challenge, the turning of the back

11   trying to get away, at which time, both instances, Mr. Brewer

12   fired and hit the party.

13          I think the Rule in 1101, although it does use the

14   word "persons" is principally there for the purpose of

15   preventing prosecutors from bringing in evidence as to

16   defendants on trial with extraordinarily prejudice type of

17   material, as far as the Defendant, without possibly more points

18   of similarity than we have here.  I don't see that that

19   particular rule would be applicable here.

20          Although I have cited no case authority for it, I

21   found no case directly that says that, but nevertheless, I

22   believe that would be the reasoning behind it.

23          This is relevant evidence as to the position of

24   Mr. Henry, that whatever shooting went on out there didn't

25   have anything to do with any solicitation of an ass whipping

26   or killing or anything else.  It transpired because Mr. Brewer

27   decided to do this.

28          THE COURT:  All right.  I have indicated my ruling in

255

1   the past, and that is why you did not question that witness

2   on that subject.

3           As far as I can determine from the evidence, and you

4   did  go over it again, the swearing was directed at people in

5   general.  Mr. Oden put Mr. Brewer as one of the more distant

6   individuals in this crowd of some 50 around Mr. Johnson and

7   the scene.  That is far, far different from the situation where

8   there's a one-on-one, an attempted assault, very much directed

9   swearing and flight.  It is so far distant that, certainly

10  under 352 of the Evidence Code, I feel that its relevance,

11  if any, is far outweighed by the prejudice that it would

12  engender by introducing that evidence.

13          MR. KINNICUTT:  Thank you, your Honor.

14          THE COURT:  Thank you.

15          MR. KINNICUTT:  One thirty?

16          THE COURT:  Yes, 1:30.

17          (Proceedings outside the presence of the

18          jury concluded.)

19          (Noon recess.)

20                          --oOo--

21

22

23

24

25

26

27

23

258

1   Q       People out here watching.

2   A       Over a hundred, about a hundred and fifty.

3   Q       A lot of people?

4   A       A lot of people.

5   Q       You indicated you were standing over here someplace

6   at the time the shots were fired; is that correct?

7   A       Uh-huh.

8   Q       All right.  Now, if I'm -- I marked over there when --

9   when you said -- let's see if we can find any of these that

10  have any ink left.

11          I'll put that as G-1 for the place where Gary Henry

12  indicates he was standing.  Is that about right where I made

13  that X?

14  A       Yes.

15  Q       Okay.  Now, how long -- did you go there directly

16  when these people -- when Mr. Turner got in the car, say?

17  A       No.

18  Q       Were you milling around out there?

19  A       Yes.

20  Q       So, that's just where you were when the shots were

21  fired?

22  A       Yes.

23  Q       You said when you came out of there Robert started

24  talking with Mr. Johnson at some point?

25  A       Yes.

26  Q       But before that, Mr. Johnson came out of there and

27  was raising hell?

28  A       Right.

259

Q       And what was Mr. Johnson doing when he was raising
hell?

A       He was yelling that he was -- him and his brother
was gonna come down here and tear the whole place up, shoot
the whole place up, and everything; and then he seen my
brother and, you know, he calmed down and started talking
to my brother.

Q       Who was he yelling this at when he came out of there?

A       No one. He just come out of the house yelling to
everybody, I guess.

Q       Is that the only thing he said?

A       Yes, that's all I heard him say.

Q       All right.  And you heard him say that, and then he,
Mr. Turner, ran over here to the car, and Mr. Johnson came down
here somewhere?

A       Yes.  He started walking up towards the car.

Q       And then he started talking to Robert?

A       Yes.

Q       Where did he do this talking to Robert?

A       Well, they met, uh, about right where -- there where
that middle X is in front of the car, and then walked to the
side of the car on the driver's side.

Q       Out here somewhere?

A       No, to the side of the driver's car.

Q       Okay.  Here somewhere?

A       No, the driver's side.

Q       Right out here in the street?

A       Yes.

318

1   for the preliminary hearing in another matter last Friday.

2   However, under 1324 of the Penal Code, I'm asking at this

3   time to grant Mr. Jeffery Taggart the immunity pursuant to

4   1324.

5          THE COURT:  Which is transactional immunity?

6          MR. KINNICUTT:  That's correct, your Honor.

7          THE COURT:  Do you understand what that means,

8   Mr. Taggart?

9          THE WITNESS:  No.

10         THE COURT:  That means, if you testify in this matter,

11  you cannot be prosecuted for anything about which you're

12  questioned.

13         THE WITNESS:  Okay.

14         THE COURT:  Okay.  Do you understand that?

15         THE WITNESS:  Uh-huh.

16         THE COURT:  Okay.  I'll grant that immunity to you,

17  so you're in a position to go ahead and testify on the subject

18  that he asks you about.

19                    DIRECT EXAMINATION

20  BY MR. KINNICUTT:

21  Q        Mr. Taggart, please tell us where you live, sir.

22  A        832 Stanford Drive.

23  Q        At one time, were you charged in Juvenile Court in

24  this particular matter you're here on today, correct?

25  A        Yeah.

26  Q        And that case has been dismissed against you by

27  myself; is that correct?

28  A        Yeah.

355

1    Q.        And the next day did some people come over to your

2    house?

3    A.        The next day?

4    Q.        Yes.

5    A.        Not my house.

6    Q.        The house that you were staying at that time?

7    A.        Yeah.

8    Q.        And that was Mr. Brewer and Mr. Oden?

9    A.        Yes.

10   Q.        And why was Mr. Brewer there?

11             MR. O'HANLON:  Excuse me, your Honor.  I would like

12   to interpose an objection here.

13             THE COURT:  Yes.

14             MR. O'HANLON:  I don't want to do it in the presence

15   of the jury, your Honor.  May we --

16             THE COURT:  You may come forward.

17             (Off-the-record discussion at the bench.)

18   BY MR. KINNICUTT:

19   Q.        Now, Mr. Taggart, when you were -- when you saw all

20   these people come over to where you were staying the next day,

21   who was there?

22   A.        Me and Alex.

23   Q.        Was anybody else there?

24   A.        No.

25   Q.        Well, didn't you tell this police officer that Jester

26   was there?

27   A.        Oh, yeah, Jester was there.  He was in the back

28   asleep.

356

1   Q.      You didn't tell him that the Defendant was there,

2   Robert Henry?

3   A.      Robert?  I mistook him of Alex, but he wasn't there.

4   Q.      But you did tell him that; is that correct?

5   A.      Yes, I did.

6   Q.      And this was the day after Thanksgiving, correct?

7   A.      Uh-huh.

8   Q.      And Mr. Brewer and Mr. Oden were there and the

9   Defendant was there, right?

10  A.      No, he wasn't.

11  Q.      All right.  You did tell the officer that, though?

12  A.      Yes, I did.

13  Q.      Okay.  And that was when they discussed --

14          MR. O'HANLON:  Your Honor, again, I want the matter,

15  please, clarified before we go forward with this kind of --

16          MR. KINNICUTT:  Fine.

17  Q.      What did the Defendant tell Mr. Brewer?

18  A.      What did the Defendant --

19          MR. O'HANLON:  Your Honor --

20          THE WITNESS:  -- tell Mr. Brewer?

21          MR. KINNICUTT:  Right.

22          MR. O'HANLON:  Your Honor, may I interpose my

23  objection?  The witness has testified that Mr. Henry,

24  Mr. Robert Henry, was not present.  Under those circumstances,

25  I think that until --

26          MR. KINNICUTT:  Well, he's also testified -- you

27  know, he also told this officer two days after the event that

28  the Defendant was there.

357

1      MR. O'HANLON:  That may be, but there's still other

2   matters --

3      THE COURT:  I think the question as presented can be

4   answered without --

5      MR. O'HANLON:  No.  I would like to -- I don't like

6   to argue this kind of thing in the presence of the jury.  It

7   gets highly technical, and it's the kind of thing that

8   shouldn't be discussed that way.

9      THE COURT:  Would you come up here again, please?

10      (Off-the-record discussion at the bench.)

11      MR. KINNICUTT:  Thank you.

12   Q.      Now, Mr. Taggart, did you tell this police officer

13   that the Defendant told Mr. Brewer that Mr. Brewer killed the

14   wrong man?

15   A      Um, when did I tell him this?

16   Q.      This police officer --

17   A      No.  When did I tell -- when did he tell --

18   Q.      No --

19   A      -- Brewer?

20   Q.      Okay.  This was not at your house, but the house

21   you were staying at when Jester was there.  You were there,

22   Mr. Robert Henry was there, some other people were there.

23   A      He wasn't there.

24   Q.      Well, you told this police officer he was.

25   A      What?

26   Q.      So, you're saying -- did you tell the police officer

27   that the Defendant told Mr. Brewer that he killed the wrong

28   man?

358

1   A       . No, because -- what I told him -- he wasn't there.

2   I mistook him, like I said, from someone else.

3   Q       Well, who is this someone else you mistook him for?

4   A       Huh?

5   Q       Who did you mistake -- this is your brother, correct?

6   A       I know it.  I thought he was in there, though, but he

7   wasn't.

8   Q       And do you remember telling this officer in the

9   presence of Mr. Brewer -- in response -- or in the presence of

10  the Defendant, in response to him telling Mr. Brewer he killed

11  the wrong man, that Mr. Brewer said, "Oh, well, he was talking

12  a mile a minute;" did you tell the policeman that?

13  A       That he was what?

14  Q       Talking a mile a minute.

15  A       Wait a minute.  I ain't -- I ain't catching you on

16  that.

17  Q       All right.  When you were at that house with -- at

18  this meeting, and Bernard Oden and Francis Lee Brewer were

19  there, did you tell the policeman that Mr. Brewer said, "Oh,

20  well, he was talking a mile a minute"?

21          THE COURT:  Wait a minute.  In response to --

22  BY MR. KINNICUTT:

23  Q       In response to being told he killed the wrong man.

24  A       Oh, yeah.

25  Q       You told the police officer that?

26  A       Yes.

27  Q       And the response to that -- in response to that,

28  Mr. Robert Henry said that he would straighten it out?

359

1    A          (No response.)

2    Q          That he would pay him $100 of the $200?

3    (3) means no., Huh-uh.

4    Q          Did you tell the policeman that?

5    A          Huh-uh.

6          THE COURT:   That's no?

7          THE WITNESS:   Yeah, no.

8          MR. KINNICUTT:   No further questions at this time.

9          THE COURT:   Mr. O'Hanlon, go ahead.

10          MR. O'HANLON:   Yes, just a few questions.

11                    CROSS-EXAMINATION

12    BY MR. O'HANLON:

13    Q          Mr. Taggart, how old are you?

14    A          Seventeen.

15    Q          How old is your cousin, Jester?

16    A          He's 18.

17    Q          Robert Henry is 19?

18    A          Yeah.

19    Q          All right.  Now, you indicated that you had some

20    kind of meeting where you went over to the house after Robert

21    was robbed by Mr. Turner; is that correct?

22    A          Yes.

23    Q          I mean, all of you went over to some house?

24    A          Uh-huh.

25    Q          Which house was that?

26    A          Jester Taggart's house.

27    Q          And so, that is 315 Sawyer Street?

28    A          Uh-huh.

377

1   A.        Um, as he ran into the house, somebody threw a

2   bottle from across the street.

3   Q.        A big bottle?

4   A.        Yeah, about a 40 ounce, I think it was.

5   Q.        You didn't see who threw it?

6   A.        No, I did not.

7   Q.        Now, when Mr. Turner came out of that house, did

8   anybody come with him?

9   A.        Yes.

10  Q.        Who was that?

11  A.        Andre Johnson.

12  Q.        Did you know Mr. Johnson before this?

13  A.        No, I did not.

14  Q.        When they first came out of the Morgan house, what

15  happened?

16  A.        Andre Johnson came out like he wanted to fight or

17  something.

18  Q.        Where did Mr. Johnson go then?

19  A.        He -- he was walking with Cedric Turner.

20  Q.        Okay.  Which direction?

21  A.        Up Gateway.

22  Q.        Towards his car?

23  A.        Yeah.

24  Q.        And he was talking to some people?

25  A.        He was talking to some people?

26  Q.        Was he?

27  A.        Yeah.  He was arguing with Mr. Henry.

28  Q.        And what were they arguing about?

378

1    A       Over Cedric.

2    Q       And were they getting progressively more upset with

3    each other?

4    A       Yes.  He pushed Mr. Henry.

5    Q       Okay.  And so, if someone else testified that

6    Mr. Henry calmed Mr. Johnson down, that wouldn't be the truth?

7    A       Excuse me?

8    Q       Well, you're saying that they're getting,

9    Mr. Henry and Mr. Johnson, getting more and more angry with

10   each other as they're talking walking down towards Mr. Johnson's

11   car; is that right?

12   A       Yeah, that's right.

13   Q       And at what point did this shove occur in this walk

14   to the car?

15   A       When Mr. Henry tried to approach Mr. Turner.

16   Q       Where was Mr. Turner?

17   A       In the back of Mr. Johnson.

18   Q       Where were they in relationship to Mr. Johnson's car?

19   A       Going towards the car.  Didn't make it there yet.

20   Q       How close were they?

21   A       Um, about ten feet away, something like that.

22   Q       And did Mr. Turner after that get into the car?

23   A       Yes, he got into the car.

24   Q       Where was he seated?

25   A       In the passenger seat.

26   Q       And did Mr. Johnson get in his car?

27   A       I didn't see him get in his car.

28   Q       Well, he never made it into his car, did he?

390

1  said to Mr. Brewer?

2  A        That's correct.

3  Q        Did he tell you what Mr. Brewer said?

4  A        I believe he did.  I don't recall specifically what

5  the wording was.

6  Q        Would you take a look at page 31?  Would that

7  refresh your memory?

8  A        Yes.

9  Q        Middle of the page.

10  A        Pardon me?

11  Q        About the middle of the page.

12  A        (No response.)

13  Q        I've got you confused now.

14  A        Yes.  He indicated that Mr. Brewer said that it was

15  all right, and that he would return, or something to that

16  effect.

17  Q        I would direct your attention to page 34.  I sent you

18  to the wrong page.  I'm sorry.

19          Basically, the whole page, just read it to yourself

20  and see if that refreshes your memory.

21  A        Pardon me?

22  Q        Just read the whole page to yourself and see if it

23  refreshes your memory.

24  A        (Refers.)  Yes.  He indicated that Robert Henry had

25  indicated he shot the wrong man and that he was talking a mile

26  a minute.

27  Q        Who said that?

28  A        Robert Henry -- or Jester -- Jeffery Taggart said

391

1    that of Robert Henry.

2    Q        No.   Officer, take a look at line three.

3    A        Yes.  (Refers.)   Oh, he said that Lee Brewer was

4    talking a mile a minute.

5    Q        Lee said that?

6    A        Yes.

7    Q        Mr. Brewer?

8    A        Yes.

9    Q        And did they discuss the payment?

10   A        Yes.   They indicated that, because he had hit --

11   shot the wrong man, that he was only going to pay half of

12   the moneys; instead of paying $200, he was going to be paid

13   only 100.

14            MR. KINNICUTT:  Thank you.  I have no further

15   questions at this time, your Honor.

16            THE COURT:  All right.  Cross-examination,

17   Mr. O'Hanlon?

18            MR. O'HANLON:  Yes.

19                     CROSS-EXAMINATION

20   BY MR. O'HANLON:

21   Q        He also told you, did he not, that Cedric had a gun?

22   A        I don't recall specifically he did.

23   Q        You don't recall him telling you that Cedric had a

24   gun in the course of this conversation?

25   A        I don't recall if it was specifically Jeffery Taggart

26   or not who told me that.  Are you referring to a specific page?

27   Q        It's in there, but I don't have the specific page

28   written down.  You have a hearing problem, don't you?

392

1    A       Yes, I do.

2    Q       All right.  And so, you are relying on this transcript

3    as far as what was said?

4    A       Uh, as far as my hearing problem; is that what

5    you're referring to?

6    Q       Yeah.

7    A       I was sitting across from him, and I could hear the

8    conversation, and I'm relying on this transcript to refresh

9    my memory of what was said some six or so months ago.

10   Q       And you don't recall him telling you that Cedric had

11   a gun; is that correct?

12   A       I don't recall if it was him specifically that told

13   me that, or if it was one of the other brothers related to

14   the Defendant.

15   Q       All right.  And how long did you speak with him?

16   A       About an hour, an hour and a half.

17   Q       And how many pages of transcript have you got there?

18   A       Total of 48.

19   Q       Okay.  And this conversation took place down in the

20   police department?

21   A       That's correct.

22   Q       And where in the police department?

23   A       In my office.

24   Q       Who was present?

25   A       Myself and Detective Becker and Jeffery Taggart.

26   Q       Nobody else was present?

27   A       No.

28   Q       No relative of Jeffery's?

394

1    conspiracy so that -- it's going to have to be ironed out at

2    some other time.

3         The rule is that a statement made in furtherance of --

4    by a co-conspirator introduced in evidence against the

5    Defendant should only be received if there's a foundation

6    showing that the statement was made by the declarant while the

7    declarant was participating in the conspiracy, the statement

8    was made in furtherance of the objectives of that conspiracy,

9    and the statement was made by the declarant either prior to or

10   during the time that the party was participating in that

11   conspiracy.

12        Jefferson in the section on this subject, which is

13   3.5, et sec, indicates that it's a reasonable inference to

14   draw that, if there is a mistake made and the wrong man is

15   killed, it's a reasonable inference to be found that the

16   conspiracy had terminated at that moment and, therefore, going

17   on for the payment does not show a continuing conspiracy.

18        In other words, the contract has essentially been

19   breached and, under those circumstances, the party would not

20   be -- certainly would tend to absolve himself of any further

21   responsibility.

22        I have taken the position, at least as far as some

23   of these witnesses, it was indicated that Robert Henry was not

24   present during the course of these things, that it was not an

25   admission and, therefore, could only come in as a statement

26   made in furtherance of a conspiracy and shouldn't come in at

27   all.

28        I admit, in the last one that testified, Alex, I

395

1    never made the objection because he had it out before I could

2    get it out of my mouth.  Nevertheless, I would like the record

3    to reflect -- and they can do whatever they want with it, it's

4    in now.

5         THE COURT:  Yes, I understand.  I'm letting it in

6    because it comes in really as -- I realize he denied it on

7    the stand, said it before, but then it comes in impeaching

8    what he said, and it would come in, then, as an admission.

9         MR. KINNICUTT:  That's correct.

10         MR. O'HANLON:  Only -- only -- all right. But only

11   if Mr. Henry was, in fact, present.

12         THE COURT:  Yes, which I guess becomes a factual

13   question for the jury to decide.

14         MR. KINNICUTT:  Yes.

15         THE COURT:  All right.  Now, did you have something,

16   Mr. Kinnicutt, that you wanted to put on?

17         MR. KINNICUTT:  Yeah.  If I can get her here, I'm

18   going to try to have you at least speak with her.

19         Your Honor, I would ask that Patrice Johnson be sworn.

20         THE COURT:  Ms. Johnson, would you come forward.  I

21   won't swear Ms. Johnson, but I understand that you might have

22   some information that might be valuable to the District

23   Attorney.  In the interest of justice, you should present him

24   with that information.

25         MS. JOHNSON:  Okay.  I explained to him -- well, I

26   don't want to go into this.  I want to talk to you, and I

27   would like to talk to you -- or you can have these -- but I

28   don't want Mr. Henry to know I'm -- him to know about this and

428

Q.        If the Conquest was approximately, say, five feet away from Mr. Johnson's automobile, where would that be on the diagram?

A.        Well, I have a dotted line that's vertical, and that's just to the left of the victim's torso on the ground. The dotted line would represent the right-hand side of the Conquest being approximately five feet from the left side of the Oldsmobile.

Q.        And so, if we moved over to the dotted line, then you're saying, whoever would fire the shots would have to fire the shots in such a way as to hit the torso on the ground; is that correct?

A.        That's correct.

Q.        Or in the location you have it?

A.        Yes.

Q.        Why do you pick a location essentially on the ground?

A.        Well, because the projectories into the torso itself indicate quite clearly that the victim could not have been standing when he was shot in the torso, all three shots.

Q.        All right.  And I see some dotted lines over into a person sitting in the Johnson car; is that correct?

A.        That's correct, yes.

Q.        And what do these depict?

A.        Now, that depicts the projectory of the bullets that would be fired from the Conquest toward the passenger sitting in the front passenger seat.

Q.        In other words, pretty much a straight shot across; is that correct?

429

1  A.        It would be pretty much a straight across shot,

2  depending on how high above the bottom of the window the weapon

3  is aimed.

4  Q.        All right.  And, of course, the shots were not fired

5  in that direction, were they?

6  A.        No.  All the shots were fired at a level below that,

7  yes.

8  Q.        Now, did you make some photos that kind of show this

9  kind of thing as far as manipulating that doll?

10  A.        Yes, I did.

11  Q.        Do you feel that those photos would assist the jurors

12  in understanding how the body was probably located at the time

13  the bullets were received?

14  A.        Yes, they would.

15            MR. O'HANLON:  Your Honor, if we could just set up a

16  slide machine, and it will only take a few minutes.

17            THE COURT:  I'm concerned about counsel not having a

18  chance to see them first.

19            MR. O'HANLON:  Your Honor, I'll do that immediately.

20  It will only take him a second.

21            There appears to be no objection, your Honor.

22            MR. KINNICUTT:  That's fine, your Honor.

23            MR. O'HANLON:  May I have them marked next in order?

24            THE COURT:  You may.

25            THE CLERK:  Marked as a group.

26            MR. O'HANLON:  Any way you want.

27            THE CLERK:  Defendant's D marked for identification.

28            (Defendant's Exhibit D, a group of slides,

430

1          was marked for identification.)

2    BY MR. O'HANLON:

3    Q       I hand you Defendant's D for identification.  Maybe

4    you'd want to come down here and pick out which one you want to

5    show first?

6    A       Okay.  Could I have the lights again for a minute?

7            Okay.  You can turn off the lights, please.  All

8    right.

9    Q       As far as the first one showing the doll standing

10   up --

11           THE COURT:  First of all, can all the jurors see

12   that?

13           (Affirmative responses.)

14   BY MR. O'HANLON:

15   Q       What is the significance of that particular shot to

16   you?

17   A       Well, this shot shows the mannequin standing up

18   straight, and it shows all three of the shots into the torso

19   that are coming at an angle from well above the body.

20   Q       And you say you entered into that picture about car

21   door height of that Conquest, and where would that come on the

22   body?

23   A       Well, the 36 inches -- this scale model is approxi-

24   mately twice the size to the scale on the drawing.  So, the 36

25   inches would be probably, um, just about in the middle of

26   the --

27   Q       In the buttocks area?

28   A       Just about in the buttocks area, I would say.

431

Q.        If a person were going to fire shots while the man was standing, from where would they have to be fired?

A         They would have to be fired from well above the body.

Q         All right.  Is there any other significance to you in that particular photo?

A         Well, the significance is that, in this position, the individual, the decedent, could not be shot from the window of the Conquest.

Q         All right.  Would you go to the next photo, then, please?

A         Okay.  I have the next photo on.

Q         What is the significance of this photo?

A         This photo shows the torso of the victim being on the right side, in other words, lying down on the right side, and then showing the projectory in the shoulder and the back wound being at an angle almost horizontal to the surface of the road. It has an upward angle, looks like between five and fifteen degrees towards the two wounds, and that would be consistent with the bullets coming from the level of the Conquest window.

Q         So, you're saying that, as far as those two wounds, the one in the back and the one in the shoulder, it's probable that the victim was in a position somewhat similar to this?

A         It would be similar to it.  He would be on his right side, perhaps, or just a little bit more toward being on the stomach.  Basically, he would be on his right side in order to line those up with the shots coming from a vehicle the size of the Conquest.

Q         And it's probable that he was on the ground in that

432

1    same way, is it not, or falling towards the ground?

2    A        That's correct, either on the ground or very close to

3    it.

4    Q        And could you show us, then, the next photo?

5    A        I have it in the slide.

6    Q        And this is the third one, then.  What does that

7    depict?

8    A        This one depicts the victim on his stomach, and it

9    shows the angle of the hip wound, which is the far left probe

10   in the mannequin.  That is a little bit higher than the angle

11   that you expect to come from the Conquest, so that would

12   indicate that he would be rolled a little more over to his

13   right side at the time that shot was fired.

14   Q        All right.  So, you're saying, though, that he had to

15   be, of course, in a position that he could receive the bullet

16   wound in the direction that is shown by the doctor's

17   observations?

18   A        That's correct, yes.

19   Q        So, he had to be in a position somewhat similar to

20   this?

21   A        Yes.

22   Q        And basically on the ground?

23   A        Yes, he would be on the ground or very near it.

24   Q        Fine.  Thank you.  Any other comments you want to

25   make about this particular one?

26   A        That's all I have for that one.

27   Q        Thank you very much.  Now, you also were aware, were

23   you not, that there was a bullet hole in the side of the door

436

Q.      From the various things you have here, the informa-
tion from Dr. Brazil, your own experimenting out there by
firing into the car door, your angles, all these things, do you
have any opinion as to who the target of the shooting was?

A.      Yes.

        MR. KINNICUTT:  At this point, your Honor, I'll have
to object.  I fail to see how he's competent to testify to this
kind of questioning.

        THE COURT:  I'll overrule that.

        MR. KINNICUTT:  Thank you.

        THE WITNESS:  Yes, I do.

BY MR. O'HANLON:

Q.      And what do you think was the target of the shooting?

A.      Well, the angles and projectories of the projectiles
clearly indicate that the victim on the ground was the intended
target of the shooting, and they're clearly inconsistent with
the individual sitting inside the car being the intended target
of the shooting.

Q.      Is there any way for you to determine from these
angles and that material there whether it was the driver of the
Conquest or the passenger in the Conquest who fired the shots?

A.      No, I wouldn't be able to determine that accurately,
no.

Q.      And you've indicated, then, you have some idea of the
position he was in at the time the bullets actually hit him,
and that is, the hip one, sort of on the stomach, the other two
on the side.  Can you tell in any way what the order was of
these bullets?

1   this intention by your actions.  Then you see what the actions
2   are, and you draw the reasonable conclusion from those actions.

3        Circumstantial evidence, in other words.  The Court
4   will give you the instruction on circumstantial evidence.

5        Now, malice can also be implied when the killing
6   results from an intentional act involving a high degree of
7   probability that will result in death.  If the idea -- if what
8   you find the facts to be is that it was only going to be a
9   shooting, again, what's the reasonable or probable consequence
10  of that act or probability of that act?

11       The natural consequence of the act is dangerous to
12  life, and the act was deliberate.

13       Aforethought, all that means is that the required
14  mental state must precede the act rather than follow it.  You
15  have to think about it beforehand.

16       Now, there's -- the Court, again, is going to give
17  you a number of instructions on the law; first degree murder,
18  second degree murder and manslaughter.  If it's intentional,
19  deliberate and premeditated killing with express malice
20  aforethought, then it's first degree murder.

21       The Court will also give instructions on;
22  if you don't find those various items, what it becomes in the
23  eyes of the law, and of course, again, this all determines --
24  it will all be determined by what you find the facts to be.

25       Now, I also told you at the time of the voir dire.
26  and it is the law, that when one attempts to kill a certain
27  person, but by mistake or inadvertence kills another person,
28  the crime so committed is the same as though the person

476

1    intended to be killed had been killed.

2          So, what that means is, whatever crime it was, as

3    long as one of the people was killed, you didn't kill the

4    guy he wanted to kill or expected to kill, but somebody else

5    was killed, whatever crime it is, it's the same had he killed

6    the person he wanted to kill.

7          The thing about arming -- you will get to that if

8    you make a guilty finding of any of these charges -- if you

9    feel that Mr. Brewer, in fact, used that weaopn, well, that's

10   sufficient to make all the principals armed.

11         It's a different concept -- sometimes you hear the

12   word "use of a weapon."  In this case, the only people

13   responsible for the actual use to have this enhancement, a use

14   enhancement, is the person who pulls the trigger.  All other

15   principals in the same crime are considered armed if one

16   person is either armed or uses the weapon.

17         Now, ladies and gentlemen, rather than, you know --

18   I want to bring this up, might as well bring it up now.  When

19   I picked the jury, I made comments that the People don't get

20   to pick who we'll have come in here and be a witness.  I

21   indicated to you there would be people with felony records, and

22   I came through; there were a number of people with felony

23   records, and there were a number of very reluctant witnesses.

24         What you have to do as triers of the fact, ladies

25   and gentlemen, is look at the various witnesses and make a

26   decision as to who was telling you the truth, who was telling

27   you all the truth, who was telling you none of the truth,

28   whatever you feel it was, and I will not stand here and tell

478

1  Jester and Gary were out there, they all confronted

2  Mr. Cedric Turner, and he didn't turn and run until sometime

3  later, but he was not afraid of them, he was ready to fight,

4  and they simply didn't have the guts to fight him.

5          One reason, take a look at the sizes of these

6  individuals. You saw Cedric Turner, a pretty good sized man.

7  You saw the Defendant and Mr. Brewer and some of these other

8  people who testified. Perhaps they didn't have what it takes

9  to beat him up. Certainly they didn't. They allowed him to

10 go inside Mr. Morgan's house.

11         Then what happens? Mr. Henry, at some point after,

12 either before they allow Mr. Turner to go into the Morgan

13 house, shortly after he comes out, the Defendant goes and talks

14 to Mr. Brewer. Apparently, this is when, I submit to you, the

15 contract was made, because originally, if you recall, Mr. Oden's

16 testimony was that they were at one of the locations and

17 sticking to the Defendant, and there was going to be a good

18 ass whipping, and I believe the price then was $50.

19         I submit to you, at the time out at the scene, the

20 Defendant told you about in that tape when he talked to

21 Mr. Brewer, and you know that he denied initially to the officer

22 he had ever talked to Mr. Brewer at the scene, but later on

23 he changed his story, and Mr. Brewer's sitting there in his

24 car being talked to by this Defendant, this Defendant pointed

25 out Mr. Cedric Turner, and apparently Mr. Brewer did not know

26 who Cedric Turner was, and this is where the mistake is made,

27 ladies and gentlemen, as to the inadvertent killing of

28 Mr. Johnson.

479

1    What are the circumstances?  Mr. Brewer is there at
2    the scene watching the confrontation between Cedric Turner
3    and Robert Henry, or does he watch the confrontation between
4    Mr. Johnson?  Because as soon as they come out of the house,
5    all the testimony seems to be that Mr. Turner went straight
6    and got into Mr. Johnson's car.

7        The only other evidence we have is Mr. Henry and the
8    victim, Mr. Johnson, they were out in front of Mr. Johnson's
9    car.  There's a heated argument going on, various time estimates
10   of how long it occurred.  Who does Mr. Brewer see pushing the
11   person who just hired him?  Who does he see him having a
12   problem with?  Does he see him having a problem with
13   Cedric Turner?  No, he doesn't.  He sees him having a problem
14   with Mr. Johnson.

15       So, in his mind, without knowing exactly who
16   Cedric Turner was, he figures Mr. Johnson is the man that
17   Mr. Robert Henry wants to be hit.

18       So, what does he do?  He drives down the street,
19   flips a U -- one witness says he goes down Simonton, one says
20   down Gateway, but you can safely say they drive around, make
21   the U-turn, and Mr. Brewer shoots down in cold blood
22   Mr. Andre Johnson.

23       He's trying to walk and get into his car and he's
24   killed.

25       Now, I think the other pieces of evidence that point
26   out that my theory is correct, ladies and gentlemen, is the
27   fact that, later on, either that night, some of the testimony is
28   that same night, Bernard Oden and Mr. Brewer go to collect --

480

1    or the next day.  But up until that time, Mr. Brewer thought

2    he had, in fact, done the right deed, shot the right man.  But

3    this Defendant said, "No, you shot the wrong guy."

4              Notice at this point now they're no longer talking

5    about a couple hubbas but talking about he wanted $200,

6    Mr. Brewer wanted $200.

7              What does the Defendant tell him?  "Look, you shot

8    the wrong guy.  Well, you know, he was talking a mile a minute.

9    I'll take care of you.  I'll give you a hundred bucks."

10             Ladies and gentlemen, what I want you to do when you

11   go back in the jury room is to take a look at the totality of

12   the evidence, disregard the parts that you find not to be true.

13   When you put it altogether, I submit this Defendant was

14   instrumental in the killing of Andre Johnson.

15             Thank you very much.

16             THE COURT:  Thank you, Mr. Kinnicutt.

17             Mr. O'Hanlon, are you ready to proceed?

18             MR. O'HANLON:  Yes, your Honor.

19             CLOSING ARGUMENT ON BEHALF OF THE DEFENDAN

20   BY MR. O'HANLON:

21             Ladies and gentlemen, the first thing I want to

22   state, in light of the fact that I heard that the newspaper

23   reporters, who have been in here, thought this gun that was

24   introduced in here was the murder weapon, it is not.  That's

25   just in case somebody got confused about that.  That's the

26   gun allegedly used by Mr. Shellmon to rob Mr. Henry in this

27   case.

28             I only get an opportunity to speak to you one time.

481

1   It is the intent of the law that I answer whatever it is he

2   says, then give you my position on the case, Mr. Henry's

3   position on the case, and then he answers whatever it is I

4   say when he gets his closing argument.  I don't get a chance

5   to answer the argument made by him.

6         So, I suggest to you, since I don't get that

7   opportunity, that you think of what I might have said were I

8   to have that opportunity to those things he has not said here,

9   his argument.

10         His closing argument is supposed to be rebuttal to

11   my argument and not contain new matters; but if it does contain

12   new matters, I don't get the chance to respond to it.

13         We've only been here five days, and I won't reiterate

14   each bit of evidence here.  I may make a short comment about

15   most of them, but it will be very short, because I feel that

16   there's no question in the world but that you will remember

17   what the witnesses said, and between the 12 of you, you will

18   remember what the witnesses testified to in here.  So, I will

19   have to take an approach in here where I simply will not

20   discuss everything in the case.

21         The general defense position, however, will be that

22   there was no transferred intent in this case.  If there is no

23   transferred intent, there is no homicide, whether it be murder

24   or manslaughter, committed by Mr. Henry.  That will be the

25   basic position of the defense.

26         Now, in order to present that defense to you, I'll

27   have to take the position of the worse case type of scenario

28   in terms of your thinking; that is, that you think that

482

1    Mr. Brewer was solicited to go out and kill Mr. Turner.  I have
2    to do that in order to discuss it.
3           That doesn't mean that I concede that when I discuss
4    it.  It's the only vehicle I have to discuss this no transferred
5    intent situation, which I will be maintaining here.  I don't
6    see that with the type of testimony we had in this case, find
7    that you believe practically none of these witnesses, go back
8    there and say, "I've got a blank page," and you're more or
9    less in the same position we were when we started this case,
10   because I don't think there's anybody in this room who thinks --
11   who doesn't think there were a lot of lies in here, and you
12   may say, "I don't believe what they had to say and I have a
13   blank page," and it's like the first day when we came in here,
14   and you will vote not guilty because you don't know what to
15   believe.
16          If you don't know what to believe, you have a
17   reasonable doubt, do you not?  If you know what to believe and
18   it leads to innocence, then you take that; and if you know what
19   to believe and it leads to guilty, you take that.  If you can't
20   decide what to believe because of the quality of the witnesses,
21   of course, you would have a reasonable doubt.
22          Now, so, I just want to reiterate that.  Just because
23   I discuss the case as if there was some kind of solicitation,
24   that doesn't mean I concede that there was.  I'm sort of like
25   a defense attorney in a suit for money damages.  There are two
26   main issues in one of those civil suits.  The first is
27   liability and the second, if the jury finds liability, is how
28   much money.

483

1        Well, the defense counsel may be so cocky and

2   confident that he says, "Well, the jurors aren't going to

3   find liability, therefore, I don't need to discuss damages,"

4   so he just leaves that part of his discussion out.  Then the

5   jurors do find that there's liability, and the only discussion

6   they have had about damages came from the injured party's

7   attorney, and that's what will stick in their mind.

8        So, the defense attorney always has to discuss

9   damages so that, if the jurors do find any liability, they

10  have something, they've heard a defense side of the liability

11  issue, and I'm put in that kind of a position in this

12  particular case.  I have to discuss things as if something

13  happened without conceding that it did.

14       The next thing I would like to mention is that the

15  Defendant has not testified in this case.  Now, the Judge will

16  instruct you that you are not to hold that against this man.

17  That's difficult for some people to do.  Some of the jurors

18  in the process of selection found it almost impossible.  It

19  really isn't.

20       If you go in there and you feel that you're getting

21  some kind of response because of that fact, if you've got to

22  blame somebody, blame me, but don't blame this gentleman

23  sitting over here.  If you want to blame somebody, blame me,

24  don't take that fact out on Mr. Henry.

25       As far as some of the quality of some of the people

26  who testified in here, I think it would be reasonable for you

27  to find that some of the people in here were, quote, "bad

28  people," unquote, undesirable type of people.  I hope you don't

484

1   say, because these people were bad people, we're going to hold

2   that against the Defendant and have that all rub off on the

3   Defendant.  I would like you to not have these types of

4   emotional responses, if it's possible.

5          Everybody has them to some degree, and that's why

6   I bring it up.  I would like you to not have these emotional

7   responses insofar as it's humanly possible, and to reason

8   with this case and reason with this evidence.

9          Regarding the homicide count in here, then, the

10  main issue is, the main principal issue that you have to face

11  is whether or not there was any transferred intent; in other

12  words, whether or not the killing of Mr. Johnson was an

13  intended killing of Mr. Cedric Turner.

14         It is the defense position it is not and, therefore,

15  Mr. Henry is not liable at all for the killing of Mr. Johnson.

16         Now, you're going to have an opportunity to consider

17  several verdicts.  You're going to have an opportunity to

18  consider murder in the first degree, murder in the second

19  degree and voluntary manslaughter and solicitation of an

20  assault with force likely to cause great bodily injury.

21         You get to consider each and every one of those

22  possible verdicts.

23         Murder in the first degree is an unlawful killing

24  with malice aforethought, as mentioned by Mr. Kinnicutt.  In

25  addition, it has to be a willful, premeditated and deliberate

26  murder.  Plain murder does not have those last things to it.

27  It doesn't have the willful, premeditated and deliberate aspect

28  of it.

494

1  was the shooter, because I told you I would have to accept the

2  worst scenario here to make the argument in the case.

3       Now, the next possibility the District Attorney

4  didn't bother to mention, but at least at various times must

5  have been in his mind, was that if, in fact, I shoot at A and

6  by mistake I hit B because B gets in the way, I'm liable for

7  the shooting of B, even though I intended to shoot A.  This

8  is the doctrine of intent that he just referred to.

9       But if you look at the bullet patterns here and

10  remember the discussion of Mr. Ogle, I think you'll reject

11  that particular conclusion that Mr. Johnson walked into the

12  line of fire and got hit.  The reason you will reject that is

13  that it's irrational and not a reasonable conclusion.

14       The question becomes, is it a rational or reasonable

15  conclusion?  The answer is, no, because the line of fire is

16  so far off that you have to say that it's not reasonable or

17  rational to conclude that the shooter was firing at

18  Cedric Turner seated in the automobile because of the projectory

19  of the bullets.

20       So, you do conclude that the shooter was trying to

21  hit Mr. Johnson.  Then does this mistaken identification

22  interpretation which the District Attorney insists is the

23  correct interpretation necessarily hold water?

24       Now, remember, we've got to believe Mr. Oden to

25  accept his argument, do we not?  I mean, he's not saying he's

26  totally truthful, but we've got to believe Mr. Oden to accept

27  his argument.

28       Mr. Oden says, number one, there was a solicitation

495

1   for an ass whipping.  He's not always consistent about every-

2   thing he says, but he says it was solicitation for an ass

3   whipping.

4         He says that Mr. Henry came over to Mr. Oden and

5   pointed out the person to receive the ass whipping as the

6   person in the car.  He has him in the back seat.  Mr. Turner

7   says he was in the front seat, but it doesn't make any

8   difference.  He points him out.  So, he knows, under those

9   circumstances, who the intended victim of the killing is

10   supposed to be, does he not?  How else could you conclude

11   anything else if somebody comes over and says, "He's the guy

12   in the back seat, he's the one in the back seat"?

13         I must have gone over this with Mr. Oden I don't know

14   how many times, and he was a little bit confusing, because

15   sometimes he said that Mr. Henry did this while they were

16   sitting in the little blue car, while he and Mr. Brewer were

17   sitting in the little blue car, and other times he says no,

18   he did it when they were out on the street where I marked the

19   little X's up there, but he had no doubt whatsoever in his

20   mind that Mr. Henry came over there and said to him, "It's the

21   guy in the car."

22         And there was no doubt in Oden's mind, it was said,

23   "There was no doubt in my mind who the intended victim was,"

24   and there was no doubt in his mind that that information was

25   not being imparted to himself, because I specifically asked

26   him that, if that information was being imparted to Mr. Brewer,

27   and he had no reason to believe that Mr. Brewer didn't hear it,

28   that he was blind or deaf.

496



1        All right.  Then you have Mr. Turner talking about

2   Mr. Brewer standing out here on the street and other people

3   talking about Mr. Brewer standing out here on the street.  He

4   was forever and a day out there to make a determination of

5   who the intended victim was.  He has every opportunity in the

6   world to see who the intended victim was.

7        Therefore, under those circumstances, it's unreason-

8   able and irrational to believe that there was a mistake in

9   identification.

10       Now, the District Attorney says that, "Oh, no,

11  because he wouldn't have gone over and asked for his money."

12  Number one, there's some confusion about whether or not that

13  took place.

14       Mr. Oden was very inconsistent about that in his

15  first statement.  He denied it within the space of -- three

16  times within the space of two or three pages, three pages, as

17  I recall, that Mr. Henry was present at any such thing.

18       In here, of course, he testified differently, he

19  testified differently in here.

20       Now -- but in any event, he says he wouldn't have

21  gone over there.  How would you like to be in Mr. Henry's

22  position, to believe that he wouldn't go over there and

23  misrepresent to Mr. Henry, or what have you?  You have to, in

24  some sense, believe that Lee Francis Brewer, an upstanding

25  person who wouldn't cheat, misrepresent or anything like that

26  to Mr. Henry.

27       Now, that is an unreasonable thing to believe.  So,

28  it is utterly unreasonable to believe, in light of all the

497

1    information to Lee Francis Brewer, that he didn't know who

2    the intended victim was in this particular case.

3          If there's even a reasonable doubt about it, if you

4    have even a reasonable doubt about it, what do you have to vote?

5    You vote not guilty under those facts.

6          Certainly, don't hold my client liable on the theory

7    that somehow Lee Francis Brewer, an upstanding person that

8    wouldn't take advantage of a person, because that is not a

9    reasonable conclusion to come to about that particular person.

10         Now, you get to the point where you say, "Why in the

11   world, then, did this person shoot down a man in front of 30

12   people out there?"  That's what you can say.  One person said

13   50, and I think somebody else said 150.  We had a rather wide

14   range of differences here.

15         Well, I don't think that jerk needs reason.  He's

16   the kind of person, if you called him a name and took a swing

17   at him and turned around and ran off, he would shoot you in

18   the back; or if you cut through close to him on the freeway,

19   I think he might get you there, too, for that, and I can't

20   explain that.  But the Defendant doesn't have any burden of

21   proof in here.

22         I'm suggesting to you, in light of the evidence

23   presented by the prosecution in here, that Lee Francis Brewer

24   knew who Mr. Turner was, he didn't know -- he didn't know his

25   name, but he knew he was the man sitting in the car, and he

26   shot down Mr. Johnson for his own reasons.  Maybe he has a

27   hair trigger.

28         You have Mr. Johnson out there calling people fucking

498

1    punks and things of that nature.  He may be sufficiently

2    paranoid to get out of shape about that and take it all

3    personally.

4           You have Mr. Johnson apparently making a rather wise

5    remark as the car comes back around, "Hey, man, I could take

6    one," something like this.  All of this may have triggered

7    this warped mind into the process of firing these shots.

8           I'm saying that we don't have to prove anything.

9    We're just making suggestions here.  It's the District

10   Attorney's job to prove something.

11          How in the world this man didn't know who

12   Cedric Turner was after all the information imparted to him

13   is something that escapes me.  He had to know, whatever else

14   he may claim he did or did not do, or the witnesses claim he

15   did or did not do later on.

16          Now, when you analyze this case, I would hope that

17   you do keep in mind something I mentioned earlier, and that

18   is, there are two people involved in this case as far as you're

19   concerned, that is, Lee Francis Brewer, his acts and his state

20   of mind, and Robert Henry, his acts and his state of mind,

21   and they may be very, very separate.

22          They are two different individuals.  They may have

23   different states of mind at different times.  Do not confuse

24   themand say, well, because Lee Brewer was thinking this,

25   Robert Henry does, and make him accept the same range of legal

26   liability you might impose upon Mr. Brewer if Mr. Brewer were

27   here before you today.

28          He's getting his comeuppance.  It's coming along.

499

1    I think under the circumstances, I made myself
2    clear about that, but I do hope -- I'll even go a little
3    further.

4         All crimes are basically divided into two general
5    parts; that is, acts and state of mind.  Well, in this
6    particular case, you have got two individuals, so you've got
7    different acts and certainly very potentially different
8    states of mind.

9         Please keep these individuals separately.

10        I won't make comments about some of the witnesses,
11   the ID tech and Dr. Brazil.  No purpose in saying anything
12   there.  Mrs. Johnson, no purpose in saying anything there.

13        Cedric Turner, I would like to comment about him.
14   Of course, he lied about being one of the robbers.  Certainly
15   he was, no doubt in the world.  Certainly that would make
16   Mr. Henry have a motive to get revenge on him, no doubt about
17   that whatsoever.  Any reasonable, normal human being would
18   feel like they would want some -- want to get some revenge on
19   this robber.

20        The man had a motive to lie for the prosecution, too.
21   He wants to get himself his little revenge now.  Thinking about
22   that, you see him there putting Mr. Brewer in a position where
23   Mr. Brewer had all the opportunity in the world to know who
24   the intended victim was of any supposed or alleged solicitation.

25        This is a witness who has a motive to lie for the
26   prosecution.

27        The same is true of Mr. Oden.  Mr. Oden has the
28   powerful motive to lie, not even for himself as far as liability

500

1  in this case, but for his other charges that are now pending.

2  He stated to you, no ifs, ands and buts, he hopes his 666

3  charge is reduced to a misdemeanor so that the maximum

4  punishment is a term in the county jail, maximum of one year

5  rather than state prison, the other penalty, potential penalty

6  in the other thing.  That's a powerful motive to try to

7  please the prosecution.

8          Yet, Mr. Oden has been consistent about something.

9  He's terribly inconsistent about some things and consistent

10 about some things.  He's consistent that there was a solicita-

11 tion for an ass whipping.  He is consistent that Robert Henry

12 came over and pointed out the intended victim as the man

13 sitting in the car.  There was only one person sitting in the

14 car, Cedric Turner, and he's consistent that he was totally

15 surprised when, in fact, there was a shooting.

16         Now, he's been consistent about it.  He's not

17 consistent about what transpired after the shooting, but those

18 things he has been consistent about.

19         Now, considering that he has a motive to lie in

20 favor of the prosecution, it is reasonable to believe that

21 Lee Francis Brewer knew exactly who the intended victim was

22 in this particular case.

23         Alex Taggart and Jeff Taggart.  I don't think we

24 need to get into those.

25         Officer Cosgrove, we did have a little business

26 there.  Turner told a vastly different story to him than he's

27 now telling in court.  He told him about how Mr. Johnson went

28 over to the little blue car and talked to the four black male

501

1    juveniles in there and then turned around, somebody started
2    shooting, boom, boom, boom, just like that.  That's what he
3    told him the first time down at the station.

4         I sort of got confused.  It was apparently down at
5    the station, as Officer Cosgrove testified.  So, that's quite
6    a bit different.

7         Then we had George Bawart.  I promoted him to
8    sergeant yesterday, but he's a detective down there.  He
9    testified about some inconsistencies and some statements for
10   both sides.  He testified about some of Turner's inconsistencies
11   about what he did, and he also testified about the alleged
12   statement of Robert Henry at the time he was put into the
13   holding cell.

14        He testified that he felt that the verbatim statement
15   was, "I hired the guy to kill Cedric Turner, and he killed the
16   wrong man.  I don't know why I'm being charged."

17        On the very face of his report it says that he made
18   a statement similar to, and he admitted that what he -- that's
19   what his report said back there in November, and apparently his
20   memory improves with age, and now six, eight months later,
21   whatever it is, he thinks that he now remembers more clearly
22   than he did at the time he selected the language he put in
23   his report, "similar to."

24        Then we had Officer Ron Becker in here testifying
25   that there was a similar remark.  He said -- what was it?  I
26   think he said, "I don't know why I'm being charged.  I hired
27   the guy and he killed the wrong man."

28        Well, he killed the wrong man if you -- if you -- if

502

1    he hired somebody, whatever it might be for,  to do something

2    to Cedric Turner.

3        Okay.  Let's assume for purposes of discussion that

4    happened.  It's a statement of fact, isn't it, to say he killed

5    the wrong man?  That's just a statement of fact, and we don't

6    know at all from that statement, there's no way to tell from

7    that statement, whether the hiring was for a beating, whether

8    the hiring was for a shooting, or whether the hiring was for a

9    killing.

10       It seems to me that, in light of the matters that

11   surround the gathering of this evidence and the manner in which

12   it was presented, it is more reasonable to say that Ron Becker

13   is more accurate about this, particularly in light of Officer

14   Bawart's selection of language written in his report.

15       If it's verbatim, you would write in your report,

16   "verbatim statement, this is a direct quote," something like

17   that.  You wouldn't write down in your report, "similar to,"

18   and then come into the courtroom and say that it's verbatim.

19       Okay.  Of course, we had Lee Francis Brewer displayed

20   in here.  The District Attorney takes the position that

21   Lee Francis Brewer probably couldn't beat up old Cedric Turner.

22   Well, I guess we've all seen him, you can come to your own

23   conclusions about that.

24       The fact Mr. Brewer weighs a little bit less, I don't

25   think that would make much of a difference in that particular

26   case, but that's something for you to decide, the import of

27   that kind of a thing.

28       Of course, let's assume for purposes of discussion,

503

1   probably fallaciously, that Lee Brewer couldn't take care of

2   him. Why, he always has his old buddy Bernard around. So,

3   that kind of thing just doesn't hold much water.

4           THE COURT: Mr. O'Hanlon, is this a good time to

5   take a short recess?

6           MR. O'HANLON: Sure.

7           THE COURT: All right. Let's take about a ten

8   minute recess now, ladies and gentlemen, and then we'll

9   continue with his presentation.

10          (Short recess.)

11          THE COURT: All right. Mr. O'Hanlon, ready to

12   continue?

13          MR. O'HANLON: Yes, your Honor.

14          THE COURT: Please do.

15          MR. O'HANLON: Ladies and gentlemen, I just have

16   about a minute or two to go, anyway. I just couldn't tell

17   that when the Judge asked to take a break or I would have

18   completed this.

19           I might tell you that we might explain the difference

20   between George's version of what my client said and Ron Becker's

21   version by the fact that George has some kind of hearing

22   problem which may have made it more difficult, under the

23   circumstances, for him to hear, as opposed to Ron Becker.

24           Now, we had Richard Long in here to explain something

25   about the mental functioning of my client. I think that's

26   there to help you understand what the process would be down

27   there in the police station making a statement to the police.

28           My client goes down there and turns himself in, and

504

1    they go through this.

2           Now, George wasn't beating him with a rubber hose

3    or anything like that.  That's quote obvious when you listen

4    to the tape.

5           Let me tell you something, and I think you'll all

6    believe it.  To be down at the police station is an intimidating

7    experience.  You're down there with an investigation of a

8    homicide going on, somebody can read you that little Miranda

9    card from now until doomsday and you will feel intimidated.

10   I don't care how calm you may sound or otherwise.  You are,

11   in fact, going to be intimidated.  It's the nature of the

12   situation.

13          You have a man with a 75 IQ that obviously is not

14   careful in the selection of his language, which is evidenced

15   in listening to that tape.

16          I want to reiterate, when I said I would argue this

17   case and present you the defense side of this case from a

18   worst case scenario, I'm making this argument based upon the

19   idea that you're going to believe he did hire him to kill

20   Cedric Turner, and he's still not liable.

21          He's still not liable, because there's no transferred

22   intent.  There is no transferred intent because Lee Francis Brewer

23   knew exactly who the intended victim was, because the intended

24   victim was pointed out to him.

25          For his own reasons, he shot down Mr. Johnson.  It

26   has nothing to do with whether my client solicited him to kill

27   Cedric Turner or not.

28          The evidence in this case presented by the prosecutor

512

1   A general gesturing of where the argument was taking place in

2   front of Mr. Johnson's car.

3          All right.  Again, another area where Mr. O'Hanlon

4   attempted to testify for you about Mr. Brewer.  He said he

5   would shoot you in the back, and he said he would shoot you

6   on the freeway, and that he has a hair trigger.  Is there any

7   evidence of that, ladies and gentlemen?  Did he present any

8   evidence at all?  No, he didn't.

9          You notice, though, that Mr. O'Hanlon doesn't want

10  you to believe Mr. Oden when he tells us that, either that

11  evening right after the shooting or the next day, they went

12  to the Defendant's house and attempted to collect.  He wants

13  you to ignore that part of it.

14         You know, I thought that was sort of a cheap shot

15  to pick on the detective's hearing.  Ladies and gentlemen,

16  when you hear that tape -- you can take it back in the jury

17  room with you, and I'll bring up the big radio, various terms

18  for it -- but you will be able to hear it again, and I think

19  it's pretty important to notice that the policeman, especially

20  Detective Bawart, because he does have a hearing problem, makes

21  a real attempt to make sure he understands and hears what, in

22  fact, the person said.

23         I submit to you, ladies and gentlemen, there's

24  absolutely no evidence that these police officers came in here

25  and lied to you.  In fact, I'm a little bit offended he would

26  even attempt to bring that up.

27         I'll tell you why he does it, because that's the

28  most damaging part of the whole People's case.

1   got their own behinds in hot water, so they've all got motives
2   here.  It's your job to decide who is telling the truth.
3   That's your job.

4          One thing before I end here.  We should take a look
5   at Jeff's testimony.  Even though he didn't want to be
6   straight with us on the witness stand, one day or two days
7   after the homicide took place, he gave a statement to the
8   detectives.  Told them that the Defendant had a .25 automatic,
9   had a rifle, had himself, Gary Henry and Jester.

10         You notice they didn't attack him.  Why?  Because
11  they were afraid of Cedric Turner.  He was not backing down.

12         He says they took the guns away, and that's an
13  interesting point, and I'll talk about that a little more when
14  I get to the defense testimony.  He said Jeffery Taggart, the
15  Defendant's brother, that he saw this rifle in Mr. Brewer's
16  car when Mr. Henry was talking to him.

17         The most important part of Jeffery's testimony is
18  when he said to the officer -- I submit to you the testimony,
19  when he made his statement to the police officer, was certainly
20  more credible than "I don't remember" answers he gave you in
21  here earlier this week.

22         He says, after the shooting, Mr. Brewer and Mr. Oden
23  came over to collect.  Well, what did this Defendant tell
24  Mr. Brewer?  "You killed the wrong man."  What does the
25  Defendant do then?  "Oh, I'll straighten it out.  It was
26  supposed to be 200 bucks, we'll make it a hundred dollars."
27  And Jeffery Taggart says, at the present time, and that was on
28  November 30th, the payment hadn't been made, but what did he

EXCERPTS OF TRANSCRIPTS

PEOPLE V. FRANCIS LEE BREWER, CASE NO. VC20218

723

1   something.

2           MR. FOOR:  Well, I want to understand a couple of

3   things.  Is the subject of these transcripts going to the jury

4   still going to be considered by the Court, or is the Court

5   indicating at this time they won't be allowed to because,

6   because --

7           THE COURT:  The transcripts?

8           MR. FOOR:  Yes, the transcript itself.

9           THE COURT:  Well, at this point --

10          MR. KINNICUTT:  I'm not asking that it be submitted.

11          THE COURT:  They're not being offered, and I am not

12  going to send in those transcriptions.

13          MR. FOOR:  Then I don't have any further comment

14  about that.

15          THE COURT:  Okay.

16          MR. FOOR:  I think I've made all my comments.

17          THE COURT:  I think so.  All right.  Officer Bawart,

18  you can sit right there.  You can ask him the questions for

19  the foundation.  You are still under oath from yesterday or

20  the day before.

21                          GEORGE BAWART

22  A witness called by the People, being previously sworn,

23  testified as follows:

24                       DIRECT EXAMINATION

25  BY MR. KINNICUTT:

26  Q       Detective Bawart, was a tape recording made of the

27  conversation that you had with the witness Jeffrey Taggart?

28  A       Yes, there was.

724

1    Q       Oh, all right.  And have you reviewed the original

2    tape that was made for that event -- of that event?

3    A       I have.

4    Q       All right.  And have you reviewed the copy of that

5    tape that I made this morning?

6    A       Yes, I have.

7    Q       All right.  And other than the deletions that the

8    Court asked me to make, is that a true and correct copy of the

9    actual tape?

10    A       It is.

11    Q       All right.  And you've seen the transcription that

12    you had prepared at the police department of the tape?

13    A       That's correct.

14    Q       All right.  And I've shown you today a copy of

15    the -- of that particular document?

16    A       That's correct, right.

17    Q       And does that accurately -- and we can discuss how

18    accurate -- but does that accurately reflect what the tape has

19    on it?

20    A       It does.

21    Q       All right.  And there are some -- there are some

22    places where it's difficult to understand?

23    A       That's correct.

24    Q       And there are some places that may not be 100

25    percent accurate?

26    A       That's correct.

27    Q       And other than what's on that tape, did you

28    interview the witness Jeffrey Taggart other than what's on the

Case 2:22-cv-00609-KJM-DB    Document 1    Filed 04/06/22    Page 189 of 209

725

1    tape?

2    A        No.

3    Q        Okay.  And other than the part where the tape was

4    turned from the front to the back, was everything you spoke to

5    him about on the tape?

6    A        That's correct.

7             THE COURT:  A question:  Officer, when you say there

8    are certain inaccuracies, does that mean that you can't

9    understand something from the tape, it's inaudible, or there's

10   interruptions, things like that?

11            THE WITNESS:  Yes, Your Honor.  There are portions

12   where the voice is either so low you can't hear it, or my

13   chair would squeal, or the door would open and would

14   obliterate what the person, Mr. Taggart, was saying, or

15   sometimes what I was saying.  And sometimes, words are

16   mistyped.

17            It doesn't change the meaning of the sentence in any

18   way, shape, or form, but the English is reversed around a

19   little bit sometimes.  But the gist of the conversation and

20   what's being said is basically correct in each instance.

21            THE COURT:  All right.  Do you have questions?

22            MR. FOOR:  Sure I do, yes.  Thank you.

23            THE COURT:  Okay.

24                        **CROSS-EXAMINATION**

25   BY MR. FOOR:

26   Q        What you're saying is that the typist who typed this

27   out has kind of put her own words in some of these exchanges;

28   isn't that so?

726

1    A        No, I'm not saying that.  I'm saying that the typist
2    is putting into her own -- the best of her ability.  That's
3    what they're supposed to do, what they hear on the tape.
4    Q        I know.  But isn't it true that much of what's in
5    here isn't verbatim; it's not every single word?
6    A        Well, I would say the majority of it is verbatim.
7    There are small portions that are not.
8    Q        How many small portions?
9    A        Well, the document is some 48 pages long.  I
10   couldn't say how many particular areas there are.  There are a
11   number of areas where what I hear on the tape is not exactly
12   what is on the transcription.
13            MR. FOOR:  Well, okay.  I've made my objection.
14   I'll --
15            THE COURT:  All right, thank you.  Have the jury
16   come in, please?
17            **(Proceedings outside the presence of the jury**
18            **concluded.)**
19            THE COURT:  All right.  The record will reflect that
20   the jury has now returned and are seated and in their
21   appropriate places.
22            Ladies and gentlemen, what we propose to do at this
23   time -- you will recall the issue -- there was an issue as to
24   the interview between Officer Bawart and, I think, also
25   Officer Becker was present and the witness Jeffrey Taggart who
26   testified here in court.  And it is now proposed and will be
27   offered to you that that tape recording will be played.
28            I want to say a few things to you, though, about it.

1    friend, if you were going to lie, would you finger your friend

2    as a murderer or finger the maniac who's in the passenger seat

3    who you don't even know?  That's what you would do if you were

4    going to lie on November 30, 1985.

5            Jeffrey Taggart, when he was talking to the police,

6    that's when he gave the most truthful statements of what

7    occurred because he was trying to save himself.  Now that his

8    brother's gone, his cousin's gone, he wants to get the man who

9    helped send them away, Bernard Oden.

10           You know, other thing that the Court's going to tell

11   you when you consider the believability of witnesses and

12   whatnot is that innocent misrecollection is common.  And on

13   some of the minor details, a lot of these witnesses were

14   confused or gave different stories.  And again, that's your

15   decision to make whether that's honest misrecollection or an

16   intentional falsehood.

17           You know, the defense attorney in some respects

18   wants his cake and he wants to eat it, too.  The reason I say

19   that is, you know, he tells you that basically to disregard

20   everything Bernard Oden said.  And he tells you that these

21   other witnesses have changed their stories, and basically

22   implies that every person I brought to the witness stand, you

23   know, is completely to be disbelieved.

24           And yet, he wants you to believe two real important

25   people because they're important to his case.  Charles Austin

26   he wants you to believe, and he wants you to believe Pamela --

27   I can't remember her last name right now.

28           Now, if you accept Charles Austin's testimony, that

# EXCERPTS OF FEDERAL EVIDENTIARY HEARING TRANSCRIPTS (FEDERAL COURT)

## HENRY V. MARSHALL, CASE NO. CIV. S-94-0916 JKS EFB P

### TESTIMONY OF

### FRANCIS LEE BREWER

Brewer - Direct                                    40

1   face and just know them by that alone.

2   A.   Yes.

3   Q.   Where would you categorize you and Johnson -- Andre

4   Johnson's relationship in that area?  Which way?

5   A.   I knew him by face.

6   Q.   You knew him by face?

7   A.   I knew who he was, yeah.

8   Q.   Okay.

9   A.   But we had met there only one time, but I knew him.

10  Q.   Okay.  What about Cedric Turner?

11  A.   Him, I do not remember meeting, but I seen him before, I

12  just never met him personally.

13  Q.   Okay.  So you didn't know neither one of them, you just

14  seen their faces?

15  A.   Yes.  But I mean, I met Andre Johnson, so --

16  Q.   Oh.

17  A.   -- the one time I met him, if I would see him again in

18  passing I would speak, you know, but that's just, you know,

19  because I met him once.  That's all.

20  Q.   Can you tell the Court -- I read your interview that you

21  did with Mr. O'Reilley here.  Do you recall making that

22  interview?

23  A.   Yes, sir.

24  Q.   Can you explain to the Court as well as Mr. O'Reilley

25  that -- why you didn't say you knew Andre Johnson, or -- well,

Brewer - Direct                                          41

1   seeing him before, or Cedric Turner in that respect, or as have

2   any -- he actually questioned whether you knew either one of

3   them, and you said you didn't know them.  Is that in the sense

4   that you didn't know them personally or in just you didn't know

5   them unless you seen them?

6   A.   I didn't know Cedric, but I knew who he was, I mean, if

7   somebody -- you know, Cedric, I'm okay.  I mean I know him like

8   that, I mean, but other than that, I didn't never meet him.

9   Q.   Okay.  So if the District Attorney -- let me just ask you

10   this, in both our trials, if he was to say that you had did

11   this shooting, right?  And this is a hypothetical situation.

12   A.   Actually he did say that, didn't he?

13   Q.   Yeah, he did, but I was just asking.

14   A.   Oh.

15   Q.   But let's just say he did say this; right?

16   A.   Yes.

17   Q.   Out at the scene of the crime, you seen Andre Johnson;

18   right?

19   A.   Yes.

20   Q.   You would know that that's not Cedric Turner; wouldn't

21   you?

22   A.   Well, I would know it was Andre Johnson.

23   Q.   You would know that it wasn't Cedric Turner, though;

24   right?

25   A.   Yes.

Brewer - Direct                                              42

Q.   And if you seen Cedric Turner standing outside the car of
Andre -- by Andre Johnson's car, you would know that that's not
Andre Johnson, you would know that that's Cedric Turner, am I
right?

A.   Yes.

Q.   Okay.  Thank you.  After the shooting occurred -- first of
all, let me ask you this, did Oden do the shooting?

A.   Yes.

Q.   That shot Andre Johnson?

A.   Yes, sir.

Q.   Okay.  After the shooting, what happened?  Can you tell
the Court?

A.   After the shooting, when he finished shooting the gun, I
looked to see what -- where he was shooting at, and I seen one
person rolling on the ground, he wasn't -- you know, he was
laying on the ground, but he was like rolling, he was still
moving, so it looked like maybe he was trying to reach and
maybe a bullet went into the back or something, you know,
and -- the lower back, and I seen other people running away and
ducking in behind cars.  But I reached over after that and
snatched the gun out of his hand, Bernard's hand, and I stuck
it back under my seat, and I threw the car in gear, and he
jumped back in the car, and I hit -- I floored it and went down
the street, the second to the last street, and I think -- I
don't know if it Rounds or Simonton, one of them.

Brewer - Redirect                                    70

1    witness, so it would be redirect, but you're free to ask more

2    questions.

3              MR. HENRY:  All right.

4                        REDIRECT EXAMINATION

5    BY MR. HENRY:

6    Q.   Mr. Brewer, in reading your interview by Mr. O'Reilley,

7    you said something to the effect that someone said Mr. Johnson

8    had a firearm on him, or something like that.  Do you recall

9    who made that statement, or who told you that, or how you come

10   up with that information?

11   A.   Well, actually I heard two different ways it happened, and

12   two different ways he showed up with the same firearm.  So you

13   know, I mean, it was just rumors out there, you know.

14   Q.   Okay.  You don't know who that came from though?

15   A.   No, sir.

16   Q.   All right.  Let me ask you this.  Have you ever testified

17   in any trial regarding your involvement in the murder of Andre

18   Johnson?

19   A.   No, sir.

20   Q.   This is your first time giving testimony under oath?

21   A.   Yes, sir.

22   Q.   All right.

23   A.   In that case, yes.

24   Q.   Yeah, in this case?

25   A.   Yes.

E

# EXCERPTS OF EVIDENTIARY HEARING TRANSCRIPTS (STATE COURT)

## In re ROBERT HENRY, CASE NO. FCR333123

### DECEMBER 2019

```
 1  December 2, 2019                        Fairfield, California
 2                          ---oOo---
 3       The above-entitled matter came on this day for further
 4  proceedings before the Honorable ROBERT C. FRACCHIA, Judge of
 5  the Superior Court.
 6       The People were represented by JULIE UNDERWOOD, Deputy
 7  District Attorney of Solano County.
 8       The Defendant, ROBERT HENRY, was present and was
 9  represented by LESLIE PRINCE, Attorney at Law.
10                          ---oOo---
11       THE COURT:  All right.  We are calling the matter of
12  Robert Henry.  Mr. Henry is here with Ms. Prince.  Ms. Underwood
13  is here for the People.  This matter is on today for a hearing
14  related to Mr. Henry's writ of habeas corpus.
15       Are both counsel ready to proceed?
16       MS. PRINCE:  Yes.
17       MS. UNDERWOOD:  Yes.
18       THE COURT:  I was alerted by my clerk that, Ms. Prince,
19  one of your witnesses has counsel here and that witness
20  apparently is going to assert his Fifth Amendment right to
21  remain silent.  We can do that in open court or counsel can make
22  its representation and if it's agreed that that's the status
23  then, obviously, that sounds like that witness would not be
24  available.
25       MS. PRINCE:  Correct.
26       THE COURT:  So it's up to you, Ms. Prince.  I mean I am
27  happy to have that witness called first.  Have Mr. Byers --
28  Mr. Byers, it's my understanding you represent Mr. Brewer in
```

PEOPLE vs HENRY, ROBERT 120219                                    Non-Confidential
FCR333123                          Vol 1 December 02, 2019

1 these proceedings.

2       MR. BYERS:  That's correct, your Honor.

3       THE COURT:  And you alerted my clerk in advance of this

4 matter that Mr. Brewer intended to assert his Fifth Amendment

5 rights to remain silent, is that correct?

6       MS. BYERS:  Yes, he does, your Honor.  I have confirmed

7 that this morning.

8       THE COURT:  You told both counsel that?  All right.  So

9 Ms. Prince, do you want to accept that to be true or do you want

10 to have Mr. Brewer called and assert that right?

11      MS. PRINCE:  I am willing to accept that as true.

12      THE COURT:  All right.  Ms. Underwood, is this agreeable?

13      MS. UNDERWOOD:  That's fine.

14      THE COURT:  Then we do not need Mr. Brewer any longer

15 today.  He will be released subject to the removal order since

16 his matter is concluded.  We will accept counsels' agreement

17 that he has asserted his Fifth Amendment rights and therefore he

18 is not available as a witness.

19      All right.  Thank you, Mr. Byers.

20      MR. BYERS:  Thank you.  Then my presence is no longer

21 needed.

22      THE COURT:  Your presence is no longer needed.

23      MR. BYERS:  Thank you, your Honor.

24      THE COURT:  All right.

25      So Ms. Prince, this is your hearing.  And do you wish to

26 call witnesses?

27      MS. PRINCE:  I wish to make a brief opening statement,

28 your Honor.  And I also have a hearing brief I would like to

PEOPLE vs HENRY, ROBERT 120219                                              Non-Confidential
FCR333123                        Vol 1 December 02, 2019

1   A   Yes.

2   Q   Did you tell the police -- let me ask you this.  Were you

3   completely truthful with the police?

4   A   No.

5   Q   Why not?

6   A   Because I was scared.

7   Q   Did you tell the police that Andre Johnson had pulled out

8   a gun that night?

9   A   Yes.

10  Q   And did you tell the police that Mr. Brewer had been

11  confronted with having shot the wrong man and that he said,

12  referring to Mr. Johnson, "He pulled out a gun"?

13  A   I'm sorry, can you rephrase that?

14  Q   Did you relate to the police this conversation that you

15  had with Mr. Brewer about whether the wrong man had been shot?

16  A   No, I don't...

17      MS. PRINCE:  Your Honor, I would like to play a portion --

18  just a very small portion of Jeffery Taggart's police interview.

19      THE COURT:  All right.  Is that for purposes of refreshing

20  his recollection, not for introduction or a substantive purpose?

21      MS. PRINCE:  To Refresh his recollection.

22      MS. UNDERWOOD:  If this is the enhanced version I would

23  object.  If it is the original I would not object.

24      THE COURT:  All right.  So what are we playing, Ms.

25  Prince?

26      MS. PRINCE:  Well, so I mentioned in my hearing brief

27  there was -- which was the original tape, and I think in the

28  original tape it is hard to hear a certain portion.  And then

PEOPLE vs HENRY, ROBERT 120219                                    Non-Confidential
FCR333123                          Vol 1 December 02, 2019

1 there were transcripts that were made and in the transcripts,
2 there is a very significant portion about Mr. Johnson pulling
3 out a gun was omitted.

4      And we had the tape enhanced by a Greg Stutchman.  I have
5 him lined up as a potential witness if necessary to authenticate
6 the tape although I am hoping Ms. Underwood will stipulate
7 because he is very sick.  But it is relevant --

8      THE COURT:  No, we're not talking about admission of the
9 tape at this time.  We talking about whether he can have his
10 memory refreshed from anything.  As they say, the smell of the
11 cologne, the sight of a feather, it is used to refresh his
12 recollection, not for the substantive purpose of it.

13      So it is only being used for that purpose at this point,
14 Ms. Underwood?

15      MS. UNDERWOOD:  At this point I haven't heard him say that
16 he doesn't remember.

17      THE COURT:  I thought he just testified that he did not
18 recall telling the police.

19      MS. UNDERWOOD:  About the gun.

20      THE COURT:  Ask your question again.  And we will clarify
21 that.

22  Q   BY MS. PRINCE:  Do you recall having a conversation with
23 the police about what Mr. Brewer said when he was confronted
24 with having shot the wrong person?

25  A   I don't remember.

26      THE COURT:  That is my recollection of his testimony.  And
27 you are offering this to refresh his recollection?

28      MS. PRINCE:  Correct.

PEOPLE vs HENRY, ROBERT 120219                                    Non-Confidential
FCR333123                        Vol 1 December 02, 2019

```
 1       THE COURT:  It's not substantively coming in as evidence.
 2 It's something that may or may not refresh his recollection.
 3       With that understanding I'll allow it.  It is simply for
 4 that purpose.
 5       MS. PRINCE:  I would like you to listen to this and see if
 6 this refreshes your recollection about what you told the police
 7 that night.
 8       Could the Court hear that?
 9       THE COURT:  It is not me who needs to hear it.
10       THE WITNESS:  I didn't hear it.
11       THE COURT:  I am not asking my court reporter to take this
12 down.  It is not substantive.
13       You might want to bring it closer to the witness so he has
14 a better opportunity to hear it as well.
15   Q   BY MS. PRINCE:  Does that refresh your recollection as to
16 what you told the police?
17   A   Yes.
18   Q   Is that what you did in fact tell the police that Brewer
19 said after being confronted with having shot the wrong man?
20   A   I'm sorry?
21   A   Did you tell the police at that time that Brewer said "He
22 was talking a mile a minute and he pulled out a gun," referring
23 to Andre Johnson?
24   A   Yes.
25   Q   And is that your recollection of what Mr. Brewer said at
26 that time?
27   A   Yes.
28   Q   Is that also your recollection of what happened at the
```

PEOPLE vs HENRY, ROBERT 120219                                    Non-Confidential
FCR333123                      Vol 1 December 02, 2019

```
 1  scene?

 2   A   Yes.

 3   Q   So I want to play you another portion of the tape to see

 4  if it refreshes your recollection as to whether or not you were

 5  read your rights when the police were interrogating you that

 6  day.

 7       That's good.  Thank you.

 8       Does that refresh your recollection as to whether or not

 9  you were read your rights when you were being interrogated by

10  the police that night back from 1985?

11   A   Yes.

12   Q   And were you fact fat read your rights?

13   A   Yes.

14   Q   Were you scared?

15   A   Yes.

16       MS. PRINCE:  Thank you.  I have no further questions.

17       THE COURT:  All right.  Ms. Underwood.

18                    CROSS-EXAMINATION

19   Q   BY MS. UNDERWOOD:  Thank you.  Good morning.

20   A   Good morning.

21   Q   So on Thanksgiving you would have been just a few months

22  shy of turning 17 then if your birthday is in January, is that

23  right?

24   A   Yes.

25   Q   Now, I just want to ask you a little bit about your

26  criminal history.  Were you convicted in 1989 of providing false

27  information to a police officer in Solano County?

28   A   I don't remember.
```

1       THE COURT:  All right.  Two issues, one nonissue.

2       All right.  C, the reference was -- that's Mr. Brewer.

3       MS. UNDERWOOD:  And I would indicate with respect to
4  Mr. Brewer --

5       THE COURT:  And that was Brewer at the Federal level.

6       MS. PRINCE:  Yes.

7       MS. UNDERWOOD:  Correct.

8       And so I believe Mr. Brewer based on his taking of the
9  Fifth, that is he legally unavailable.  I wouldn't object to his
10 testimony from the Federal hearing coming in because I believe
11 that he is unavailable and that was a hearing where there was
12 similar interest and motive to cross-examine the declarant.  And
13 I would just ask that if -- that all of his testimony come in.

14      THE COURT:  Well, if part of it is offered and the balance
15 of it needs to be put into context, it is up to the proponent in
16 which to put it into context and make it available to me.

17      If you have it and you want to make it available to me to
18 put it in context I think you are entitled to.  But clearly the
19 Court's ruling today that he is unavailable because he has
20 asserted his Fifth Amendment rights makes him unavailable for
21 this purpose.  So I think it would be admissible.

22      And then the question is just the balance and context.  If
23 you are going to offer up the rest, make sure it comes to me.
24 Because I don't have access to the same records you all
25 collectively do.

26      So that  is C.

27      D is --

28      MS. PRINCE:  D goes to this whole issue about this false

1    Q    Were there any phone calls between you?

2    A    No.

3    Q    The next morning when Mr. Brewer came over, was Mr. Oden

4   with him?

5    A    I don't remember.

6    Q    And it's your testimony that you didn't tell the police

7   and you didn't mention at your brother's trial that you were

8   actually inside the car because you were scared.

9    A    Yes.

10   Q    Okay.  In spite of the fact that at the time of your

11  brother's trial your case had already been dismissed and you had

12  been given immunity --

13       MS. PRINCE:  Objection, argumentative.

14       THE COURT:  Sustained.

15   Q    BY MS. UNDERWOOD:  Okay.  At the time of your brother's

16  trial had your case already been dismissed and you had already

17  been told that nothing would happen from your testimony in that

18  case, is that fair to say?

19       MS. PRINCE:  Objection, compound and asked and answered.

20       THE COURT:  The sequence is clear in the Court's mind.

21  You don't need to ask the question.  And he didn't testify at

22  trial, didn't testify, gave a statement to the police and he was

23  granted immunity.  I know all those things to be true.

24       MS. UNDERWOOD:  Okay.  I think that is all I have.

25       THE COURT:  All right.  Thank you.

26       Ms. Prince, any follow-up?

27                      REDIRECT EXAMINATION

28   Q    BY MS. PRINCE:  Thank you.

PEOPLE vs HENRY, ROBERT 120219                          Non-Confidential
FCR333123                  Vol 3 December 05, 2019

1        MS. UNDERWOOD:  I do think he agreed to that.

2   Q   BY MS. UNDERWOOD:  But at no time -- what you are saying

3  is at no time during this history of yours did you have any

4  questioning by the police prior to this instant case, is that

5  what you are saying?

6        MS. PRINCE:  Objection, vague.

7        THE COURT:  Overruled.

8        THE WITNESS:  Yes.

9        THE COURT:  The answer will stand.

10  Q   BY MS. UNDERWOOD:  Now, now, let me ask you this.  In 2009

11 at the -- at that District Court hearing in 2009, right, you

12 called Mr. Brewer as a witness, right?

13  A   Yes, I did.

14  Q   Okay.  And I am assuming if he would not have taken the

15 Fifth in this particular hearing you would have called him as a

16 witness, is that fair to say?

17  A   Yes.

18  Q   And I am assuming that you believed him to give truthful

19 testimony at the hearing in 2009.

20        MS. PRINCE:  Objection, relevance.

21        THE COURT:  Sustained, whether he believes it or not is

22 not relevant.

23  Q   BY MS. UNDERWOOD:  Umkay.  Now, I believe you made a

24 statement that Mr. Oden and Mr. Brewer had some other personal

25 issue with Mr. Johnson.  I believe that was the words that you

26 used yesterday, that they had some other personal issue.

27        Did you ever tell the police that you believed that

28 Mr. Brewer and Mr. Oden had some other personal issue with

PEOPLE vs HENRY, ROBERT 120219                          Non-Confidential
FCR333123                    Vol 3 December 05, 2019

1  Mr. Johnson?

2   A   No, I just told them that they were arguing.

3   Q   So it is your testimony that you told the police that they
4  were arguing?

5   A   Yes.

6   Q   In your testimony in 2009 did you ever bring up that you
7  thought that Mr. Oden and Mr. Brewer had some other personal
8  issue with Mr. Johnson?

9   A   I sought to show that Oden had a personal issue with Mr.
10  Johnson because I was trying to show Oden was the shooter.

11   Q   Did you ever say that in your testimony, that you believed
12  that Mr. Brewer had had some other personal issue?

13        MS. PRINCE:  Objection, it's vague.  I mean it requires
14  him to know everything that he said in the context of his
15  testimony.

16        THE COURT:  If there is something specific you want to ask
17  him about, Ms. Underwood, that would be helpful.  Again, this is
18  something that is now ten-years old.  I am not sure he would
19  necessarily recall everything that he testified to.

20        But I also understand that there is going to be an offer
21  of proof of that entire transcript for the Court's
22  consideration, correct?

23        MS. UNDERWOOD:  Yes.

24        THE COURT:  All right.  Then the transcript will speak for
25  itself.

26        MS. UNDERWOOD:  Okay.

27   Q   BY MS. UNDERWOOD:  Now, I do want to ask you just a few
28  more questions about -- because yesterday you were indicating

# PROOF OF SERVICE BY MAIL
## [CCP §§ 1013(a), 2015.5]

STATE OF CALIFORNIA, COUNTY OF ___San Juaquin___

I am a citizen of the County of ___Solano County___, State of California. I am a citizen of the United States of America. I am over the age of eighteen (18) and not a party to this action. I am a resident of the County of San Joaquin, CDCR#__D32467__.

My address is:

California Health Care Facility
P.O. Box 213040

Stockton, CA 95213

On ___APRIL 4___, 2022, I served via United States Mail a copy of the following document(s): Petition for writ of Habeas Corpus 2254

The above-noted legal document(s) was placed in a sealed envelope, with postage thereon fully prepaid, addressed to the person at the address indicated below pursuant to California Code of Civil Procedure Section 1013. I placed the envelope or package in a mailbox or other like facility addressed to:

USDC EASTERN DISTRICT OF CALIFORNIA
501 I STREET, #4-200
SACRAMENTO, CA. 95814

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. This document was executed on ___APRIL 4___, 2022 in San Joaquin County, California.

___ROBERT HENRY___
Type or Print Name

___R. Henry___
Signature

ROBERT HENRY D32467
CALIFORNIA HEALTH CARE FACILITY
E3B-127
P.O. BOX 213040
STOCKTON, CA-95213